# EXHIBIT D

1         UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5   TAMIKA MILLER and JULIANNE
    CHUANROONG, on behalf of
6   themselves, the general
    public, and those similarly
7   situated,

8            Plaintiffs,

9   v.                    No. 3:21-cv-09751-TLT

10

11  TRAVEL GUARD GROUP, INC.,
    AIG TRAVEL, INC., and
    NATIONAL UNION FIRE
12  INSURANCE COMPANY OF
    PITTSBURGH, PA.,

13

           Defendants.
14  _____/

15  Remote Expert Deposition of

16     LORIN M. HITT, Ph.D.

17   Tuesday, August 8, 2023

18

19       **CERTIFIED COPY**

20  REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23        NOGARA REPORTING SERVICE
            150 Sutter Street
              P.O. Box 538
24     San Francisco, California 94105
              (415) 398-1889

25

```
1                         I N D E X

2                                        Page Number

3    EXAMINATION BY MR. RAAB                    4

4    EXAMINATION BY MR. RAAB (Resumed)         93

5                       ---o0o---

6                    E X H I B I T S

7    Plaintiffs'

8    Exhibit 94      Expert Report of Lorin        9
                     M. Hitt, Ph.D. dated
9                    July 26, 2023 (Filed
                     Under Seal)
10                     ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:21-cv-08751-TLT   Document 187-5   Filed 11/21/23   Page 4 of 45

1         BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition and on Tuesday, the 8th day of

3    August, 2023, commencing at the hour of 9:30

4    o'clock a.m. (PDT), via Zoom remote

5    videoconference, before me, CINDY TUGAW, a

6    Certified Shorthand Reporter in the State of

7    California, personally appeared,

8                   LORIN M. HITT, PH.D.,

9    called as a witness by the Plaintiffs, having been

10   by me first duly sworn, was examined and testified

11   as hereinafter set forth.

12                   ---o0o---

13                APPEARANCES OF COUNSEL

14   For the Plaintiffs

15        GUTRIDE SAFIER, LLP
          305 Broadway, 7th Floor
16        New York, New York 10007
          BY:  STEPHEN M. RAAB, Attorney at Law
17        (415) 639-9090 x109
          stephen@gutridesafier.com
18

19

20   For the Defendants
          O'MELVENY & MYERS, LLP
          Two Embarcadero Center, 28th Floor
21        San Francisco, California 94111
          BY:  ERIC ORMSBY, Attorney at Law
22        (415) 984-8700
          eormsby@omm.com
23

24   Also Present:  David Ho, Zoom Host

25

1                    EXAMINATION BY MR. RAAB

2          MR. RAAB:  Q.  Hello.  My name is Stephen

3    Raab.  I represent the plaintiffs, Tamika Miller

4    and Julianne Chuanroong, in the putative class in

5    this class action litigation.

6               Would you please state and spell your name

7    for the record.

8          A.  Lorin Moultrie Hitt.  First name

9    L-o-r-i-n, middle name Moultrie, M-o-u-l-t-r-i-e,

10   last name Hitt, H-i-t-t.

11         Q.  Thank you.  I'll just cover some ground

12   rules for the deposition.  The court reporter just

13   swore you in, and you are testifying under oath

14   just as if you were testifying at trial.

15              Do you understand?

16         A.  Yes.

17         Q.  And do you understand that my questions

18   and your answers will be recorded in the transcript

19   by the court reporter and may be used as evidence

20   in this case?

21         A.  Yes.

22         Q.  Because we need a transcript of your

23   answers, please do not respond to questions by

24   moving your head or using sounds such as "Um-hmm."

25   Please try to answer verbally so the court reporter

1    of 1996, and I've been there ever since.

2         Q.   Do you have any expertise as an actuary?

3         A.   No.

4         Q.   Are you an expert on insurance?

5         A.   So I am aware of the economics of

6    insurance because one of the areas in which I do my

7    research and had my training in was something

8    called information economics, which motivates, you

9    know, a lot of the modeling in the insurance

10   industry.

11        And I've done research in the insurance

12   industry.  But I would not say I'm, in the

13   abstract, an insurance expert, but I do know and

14   have expertise in various economic issues like the

15   ones I'm talking about in this report as well as,

16   more broadly, on the economics that might be

17   relevant to insurance.

18        Q.   Prior to this engagement, what research

19   did you do in the economics of insurance?

20        A.   So -- well -- so I've done -- I've gone

21   through economics training course.  I think it's

22   either literally called information economics or

23   information and uncertainty, which is the basis for

24   a lot of type of economic modeling in insurance.

25        I did -- I wrote a number of papers on --

Case 3:21-cv-08751-FLT   Document 137-5   Filed 11/21/23   Page 7 of 45

1    are models like the hedonic model that try to use

2    prices and characteristics to try to make

3    inferences about consumer purchases for better or

4    worse.

5            And then there's a variety of techniques,

6    yeah, so they're mostly data-focused that use that

7    first insight, that if you bought, that's -- that

8    gives you something -- some insight into your

9    utility applied, for example, a difference -- a

10   difference framework or some other kind of natural

11   experiment of the world, where you try to make it,

12   for instance, about value by looking at how people

13   behave when something has changed.

14       Q.  What role does the amount a consumer is

15   willing to pay for a service play in your

16   understanding of the value that that consumer has

17   for that service?

18       A.  So willingness to pay, when you're talking

19   -- you know, value has many, many different

20   meanings.  When you're talking about value in the

21   consumer context, you typically -- we are thinking

22   about willingness to pay.  That is the closest

23   meaning of value in consumer theory, is willingness

24   to pay.

25       Q.  Is that generally how you're using value

1          CERTIFICATE OF WITNESS

2                  ---o0o---

3

4          I, LORIN M. HITT, Ph.D., hereby declare

5    under penalty of perjury that I have read the

6    foregoing deposition testimony; and that the same

7    is a true and correct transcription of my said

8    testimony except as corrected pursuant to my rights

9    under Section 2025.520(b)-(d) of the

10   California Code of Civil Procedure.

11

12          _____
                      Signature
13

14          _____
                        Date
15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SAN FRANCISCO )

 3        I, CINDY TUGAW, a Certified Shorthand

 4   Reporter of the State of California, duly

 5   authorized to administer oaths pursuant to Section

 6   8211 of the California Code of Civil Procedure, do

 7   hereby certify that

 8             LORIN M. HITT, Ph.D.,

 9   the witness in the foregoing deposition, was by me

10   duly sworn to testify the truth, the whole truth

11   and nothing but the truth in the within-entitled

12   cause; that said testimony of said witness was

13   reported by me, a disinterested person, and was

14   thereafter transcribed under my direction into

15   typewriting and is a true and correct transcription

16   of said proceedings.

17        I further certify that I am not of counsel

18   or attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22        Dated the 10th day of August, 2023.

23

24   CINDY TUGAW
     CSR No. 4805 (California)

25
```

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   TAMIKA MILLER and JULIANNE
    CHUANROONG, on behalf of
6   themselves, the general
    public, and those similarly
7   situated,

8              Plaintiffs,

9   v.                              No. 3:21-cv-09751-TLT

10

11  TRAVEL GUARD GROUP, INC.,       **CERTIFIED COPY**
    AIG TRAVEL, INC., and
    NATIONAL UNION FIRE
12  INSURANCE COMPANY OF
    PITTSBURGH, PA.,

13             Defendants.

14  _____/

15  Remote Expert Deposition of
       LORIN M. HITT, Ph.D.
16    Volume 2, Pages 142-248
     Friday, November 3, 2023

17

18  (TRANSCRIPT PROVISIONALLY DESIGNATED AS
    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER)

19

20

21  Reported by: THOMAS J. LANGE, CSR No. 4689

22

23           NOGARA REPORTING SERVICE
             150 Sutter Street
24            P.O. Box 538
         San Francisco, California 94105
25            (415) 398-1889
         Nogara.reporting@gmail.com

1                          I N D E X

2                                                   Page

3       EXAMINATION BY MR. RAAB                      145

4

5                        --oOo--

6

7

8                        EXHIBITS

9     Plaintiffs'

10    Ex 167 Expert Rebuttal Report of Lorin M.      148
             Hitt, Ph.D., 10/10/2023, 79 pages
11

12    Ex 168 Expert Report of Gregory Fanoe,         165
             79 pages
13

14                       --oOo--

15

16

17

18

19

20

21

22

23

24

25

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 12 of 45

1          BE IT REMEMBERED that, on Friday, November 3,

2     2023, commencing at the hour of 10:00 a.m. (Pacific)

3     via Zoom remote videoconference, before me, THOMAS J.

4     LANGE, a Certified Shorthand Reporter in and for the

5     State of California, personally appeared

6                    LORIN M. HITT, Ph.D.

7     called as an expert witness herein, who, having been

8     duly sworn, was thereupon examined and interrogated as

9     hereinafter set forth.

10                    --oOo--

11               APPEARANCES OF COUNSEL

12    For the Plaintiffs:

13          GUTRIDE SAFIER LLP
            By: STEPHEN M. RAAB, Esq. (Pro hac vice)
14          305 Broadway, 7th Floor
            New York, New York 10007
15          stephen@gutridesafier.com

16
      For the Defendants:
17
            O'MELVENY & MYERS LLP
18          By: ERIC ORMSBY, Esq.
            Two Embarcadero Center, 28th Floor
19          San Francisco, California 94111
            415.984.8700
20          eormsby@omm.com

21    Also Present:

22          DAVID HO, Zoom Host and Exhibit Technician

23

24

25

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 13 of 45

1    he must consider the full set of costs and expenses

2    that would likely have to exist in order to serve

3    California consumers."

4          Why is a cost-base method not indicative of

5    value?

6    A.  So cost and value are not the same thing.

7    So the cost structure -- if you think that outcomes

8    are, yeah, supply and demand, this is the supply

9    side.  The demand side is distinct.  The demand side

10   is the part that is associated with consumer value.

11   Q.  Do you know whether California uses

12   actuarial principles to regulate the price of

13   insurance?

14   A.  I understand that travel insurance is a

15   regulated product in California.  Beyond that, I

16   don't know the details.

17   Q.  So you don't know one way or the other

18   whether actuarial principles are used to set travel

19   insurance prices?

20   A.  So I generally am familiar with the term

21   actuarial principles which apply to the pricing and

22   assessment of insurance.  But that's not a part of

23   the -- you know, I wasn't asked to evaluate the

24   actuarial or insurance side.  I was evaluating the

25   consumer value perspective.

Case 3:21-cv-00751-TLT   Document 157-5   Filed 11/21/23   Page 14 of 45

1      Q.  Is it your understanding that actuarial

2   pricing methods are cost based?

3      A.  I understand that costs factor into that

4   calculation.  I don't -- I think we discussed this in

5   a similar question previously.  I don't know the full

6   scope of what goes into the actuarial calculations.

7   But cost is clearly one component.

8      Q.  Do you know whether Mr. Fanoe's method is an

9   application of actuarial principles?

10      A.  I understand that I think he claims that's

11   the case.  I -- I don't have the expertise to

12   evaluate whether that is true or not.

13      Q.  I'm just trying to clarify when you say

14   cost-based method that you characterize his method

15   as, whether you're distinguishing that from an

16   actuarial method or not.  I just want to know your

17   approach to that.

18      A.  So I wouldn't be considering it --

19   considering one way or the other the actuarial

20   method.  So when I'm saying a cost-based method, he's

21   assessing the cost and using that to draw

22   conclusions.  That's the input.

23         And my discussion focuses on the fact that

24   the consumer side is distinct from the cost side.

25      Q.  Okay.  Is the rate approved by the

Case 3.21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 15 of 45

1  California Department of Insurance for the sale of

2  Travel Guard policies indicative of the value of

3  those policies?

4       MR. ORMSBY:  Object to form.

5       THE WITNESS:  So again, I don't -- I don't

6  know what considerations they take into determining

7  what those rates are, so I can't answer one way or

8  another.

9       Q.  BY MR. RAAB:  If -- do you believe that

10 actuarial pricing of insurance is one way of

11 measuring the value of the insurance coverage, even

12 if it's not how an economist would do it?

13      A.  So I don't know quite how to answer that

14 directly.  But let me give you an answer and you can

15 ask it again if I don't touch on it.  So value means

16 a lot of different things to different people.

17      When I'm referring to the term value, I'm

18 thinking of consumer utility, which is the value

19 consumers get.  So my report is focused on the value

20 that consumers get.  I don't know whether the

21 actuarial pricing does or does not include a

22 significant component of consumer-value assessments,

23 but what I'm saying is that a method that's based

24 solely on the producer costs without any further

25 apparatus is not going to give you anything about --

1    is not going to give you consumer value, which is

2    distinct in the sort of supply-demand framework on

3    which economists rely.

4         Q.  When you say consumer value, you mean

5    consumer utility in the economics framework?

6         A.  Yes.  As we discussed before, the value is

7    measured in utility terms.  You can sometimes

8    translate it into dollars via a concept called

9    willingness to pay, but that's the economic concept.

10        Q.  Do your opinions in this report depend on

11   the assumption that the price of the assistance

12   services are not subject to insurance rate

13   regulations?

14        A.  I don't think I make that assumption one way

15   or the other, so I'm focusing on the consumer value

16   of what they purchased and how that may have

17   compared, yeah, given the various allegations of

18   misconduct.  I'm not making any other inferences

19   beyond that.

20        Q.  So if the Court were to determine that

21   assistance service pricing is subject to insurance

22   rate regulations, you would still argue that

23   actuarial approach would not be an appropriate way to

24   measure the value of those services?

25        MR. ORMSBY:  Object to form.

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 17 of 45

1          THE WITNESS:  So let me break that into two

2     pieces.  If we're talking about the value consumers

3     received relative to what they would have received

4     absent the misconduct, then the economic framework on

5     value is the appropriate way to think about it.

6          A court could rule any number of things as

7     to what the appropriate metric for recovery might be,

8     and that may or may not be an economic -- or may or

9     may not involve the economic framework.  To the

10    extent it does, I may be involved in that.  To the

11    extent it doesn't, I may not.

12    Q.  BY MR. RAAB:  Now, looking at paragraph 48

13    of your report, is it your opinion that the proper

14    way to estimate the cost of providing assistance to

15    California insureds is to determine how much it would

16    cost to operate each of the Travel Guard assistance

17    centers, assuming California insureds were the only

18    customers?

19    A.  So that's one possible variation of the

20    calculation I did.  What I would say is that taking

21    into account the cost to serve the California

22    consumer should include cost from the entire network.

23    One appropriate set of costs you could assess for the

24    entire network is the actual real-world cost to

25    provide that network.

1    customers?

2         A.  Well, this is not something I've done in

3    preparation.  But one of the steps you would take is

4    to do a detailed evaluation of what costs are fixed

5    and what costs are variable.  That would be a

6    starting point to do that assessment.

7             I don't think anybody knows what that

8    breakdown is right now.  Nobody has attempted to do

9    so.  But I do know, for example, that this is the

10   cost they incurred to provide that entire network.

11   And in order to provide global services as they

12   advertise, one of the things they decided to do is

13   have a global network.  This is one metric of that.

14        Q.  But then in your model you still take those

15   costs and allocate only a portion of those costs to

16   California insureds; correct?

17        A.  That's correct.  I tried to stay as close to

18   Mr. Fanoe's methods on things where I don't have -- I

19   don't necessarily agree that they should be

20   apportioned based on cases, for example, but I don't

21   have an alternative.  So in those cases, I would

22   stick with whatever the assumptions he's relied on in

23   doing his calculations.

24        Q.  But you didn't stick exactly with his

25   assumptions because you used a different allocation

1   proportionally, as he did in a number of the

2   calculations that he uses for his -- for his price

3   and refund assessments.

4        Q.  Is it your understanding that Mr. Fanoe

5   allocated only the cost of the Stevens Point center

6   when he was allocating assistance expenses?

7        A.  So he was using Stevens Point in the cases

8   there as a benchmark under some various assumptions

9   about what other costs would be.  This he discusses

10  in his report, but he principally uses Stevens -- and

11  one other side comment.  He actually doesn't use the

12  actual number.  He uses his own personal assessment

13  of what fraction of the actual number he's going to

14  include in his calculation.

15       But he relies on the Stevens Point center as

16  the representative block of costs, then allocates --

17  knocks it down a little bit and then allocates that

18  based on other factors in his model.

19       (Interruption by the reporter.)

20       THE WITNESS:  Is there a question?  I don't

21  think I heard it.

22       Q.  BY MR. RAAB:  I'll repeat it.  Were you ever

23  trained as an actuary?

24       A.  So I've taken classes that had actuarial

25  principles discussed, but I was never trained as an

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 20 of 45

1    actuary.  I don't hold any such certification.

2        Q.  Have you worked as an actuary?

3        A.  No.

4        Q.  Do you know how actuaries allocate costs?

5        A.  No, not in general.  So I'm focusing my

6    analysis on the economic principles.  I'm not focused

7    on actuarial principles.

8        Q.  In particular, do you know how actuaries

9    allocate costs in cases where they have cost totals

10   only for a broader region than the particular region

11   they are focused on?

12       A.  I don't have a opinion on how actuaries do

13   that.  All of the analysis I've done is based on

14   economic principles.

15       Q.  Do you know whether it is consistent with

16   actuarial principles and experience to allocate costs

17   to a region proportional to the claims associated

18   with that region, relative to total claims?

19       A.  I don't have an opinion one way or the other

20   on the actuarial opinions.  Again, I'm using my

21   judgment.  The calculations I'm offering are based on

22   economic principles.

23       Q.  And in your opinion, is it consistent with

24   economic principles to allocate costs to a region

25   proportional to the claims associated with that

Case 3.21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 21 of 45

1  ideal.

2      Q.  And is the ratio of total California service

3  revenue to total nationwide service revenue an

4  appropriate thing to consider in allocating costs?

5      A.  Again, revenue -- this is one way in which

6  you can do it.  I think the best way to allocate cost

7  is allocate costs as directly as possible.  And in a

8  variable margin environment, revenue is not

9  necessarily ideal.  But it's a figure you can

10  consider, certainly.

11      Q.  Between the ratio of California revenue to

12  total nationwide revenue or the ratio California

13  service revenue to nationwide service revenue, which

14  one is more problematic in terms of variable profit

15  margins?

16      A.  I believe that they both potentially have

17  issues.  In general, if you're trying to allocate

18  cost, it's better to get things that are directly

19  related to cost instead of inferring revenue, cost

20  for revenue, which can add this market component.  So

21  I don't have a strong opinion which is better or

22  worse in this particular context.

23      There may be other reasons which are driving

24  to use one or another if this was your choice, but I

25  don't have a strong opinion as to which one is

1  potentially worse.

2  Q.  Do you have an opinion that it would be

3  better to use the service revenue ratio in allocating

4  cost than the total revenue?

5  A.  I don't think I have a strong opinion about

6  that.  I think if we're talking about allocation of

7  service, of noninsurance travel-related services, the

8  one that is most closely aligned with the concept of

9  nontravel-related cost is probably the revenue from

10  that.  I mean you have three choices if you're going

11  to use a revenue-based allocation.

12       You can allocate based on insurance revenue,

13  total revenue, or assistance revenue.  I believe

14  Mr. Fanoe, when he did his allocation, he used

15  insurance revenue.  I think of the three, that's

16  probably the worst.  When I did the re-calculation, I

17  used assistance revenue since that seems more closely

18  aligned to the product at issue.

19       I haven't thought carefully of the

20  advantages or disadvantages of the other, but I think

21  of the three, the most closely aligned at least with

22  this case would be with the nonassistance.

23  Q.  I want to think about those three ratios.

24  So it's insurance premium, total revenue, and service

25  revenue.  Why do you believe that the ratio of

1   California service revenue to total service revenue

2   more closely reflects the costs of providing

3   assistance services than the other two ratios?

4        A.   So I think it's -- I think they all have

5   issues about the disconnect from revenue and cost

6   that we have talked about before.  The reason for

7   considering a services revenue is that is actually

8   the product that is being -- in the counterfactual,

9   that's the product that we're concerned about, the

10  one that is going to have the change in price

11  discount, refund, whatever it is; and you know from

12  an economic standpoint, that metric is probably more

13  closely aligned because it's the same product.

14        And the ratio of those two products does

15  vary across individuals.  So using, for example,

16  insurance rather than not, will tend to give larger

17  recoveries to people with low-cost plans and where

18  the assistance services fees are slightly larger in

19  proportion, and I think that's not really

20  economically aligned with the facts in the case where

21  we're focused on nonassistance services.

22        Q.   Do you know how the service revenue relates

23  to the cost of operating assistance centers to

24  provide the assistance services?

25        A.   I don't have a specific -- again, revenues

1    are different than costs.  So all of those are

2    imperfect attempts to do an allocation.  I don't know

3    exactly what the direct relationship is between the

4    assistance center cost and the revenues especially

5    since a lot of it is fixed cost.  And that is going

6    to bring the disconnect.  I don't think anybody has a

7    proper characterization of the two things.  But there

8    is probably a weak coupling of that because the large

9    nonfixed costs.

10        Q.  Let's turn to back to Exhibit 167 which is

11   your report and let us go to Exhibit 4 which is page

12   72 of the PDF, I believe.

13        A.  Exhibit 4, yes.

14        Q.  Generally speaking, what is Exhibit 4?

15        A.  So it's an analysis of the claims data that

16   shows the claims in the various service centers that

17   are associated with California consumers and the

18   total number of claims processed in each of these

19   centers.  And it calculate the ratios, some ratios

20   and other things, but it's focused on the

21   distribution of claims across different service

22   centers.

23        Q.  Do you know how much it costs to operate

24   each of these service centers each year?

25        A.  I don't think that's data that I considered.

Case 3.21-cv-09751-TLT    Document 157-5    Filed 11/21/23    Page 25 of 45

 1  their footprint to provide global services.

 2          I didn't try to construct the counterfactual

 3  what Travel Guard would look like exactly if they

 4  reconfigured the way they handled their claims and

 5  what options there are.  This is just to indicate

 6  there may be significant fixed costs globally that

 7  influence the result, that influence the calculation,

 8  that Mr. Fanoe's calculation of treating everything

 9  as variable and only focusing on Stevens Point likely

10  understates the total cost of service.

11     Q.  BY MR. RAAB:  Under the list of service

12  center locations, there is a bolded line for percent

13  of total claims from service centers that serviced

14  California customers.  And it identifies that percent

15  as 90.5 percent.

16          What is the significance of that percent of

17  total claims?

18     A.  So I've chosen to be conservative to say

19  that there is a portion of the service network that

20  was never used for California, and I'm using one way

21  to exclude those from the calculation.  It's slightly

22  more conservative; it's 90 versus 100.  It doesn't

23  make that much difference.  But the idea is since we

24  have no evidence that a California customer could be

25  serviced out of those other service centers, I'm

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 26 of 45

1    excluding those from the calculation.

2         Q.  And then do you use that 90.5 percent to

3    allocate Travel Guard's total global assistance

4    expenses to this list of service centers?

5         A.  Yes.  That's again consistent with the way a

6    number of other calculations are done in both

7    Mr. Fanoe's report and some other documents for

8    allocating costs.  As I mentioned before, I don't

9    have a better way of doing so so I'm just following

10   the existing method that others have proposed.

11        Q.  Why not just use the actual cost of

12   operating the centers in this list to get the cost of

13   service expenses for these centers?

14        A.  I'm not sure I had complete data on what the

15   actual costs were, that I think -- at least some of

16   the data I've seen on the costs are actually

17   allocations, so I don't believe I had better data on

18   this.  If such data were there, that could be another

19   way to do it.

20        Q.  Okay.  And if you do not have such data, is

21   using the percentage of claims associated with these

22   centers a reasonable way of allocating total global

23   cost to these centers?

24        A.  So again, in keeping with the method, the

25   approach I was trying to take, if I did not have a

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 27 of 45

1    better number that I thought was reliable, I tried to

2    adopt the assumption that was as close to Mr. Fanoe's

3    method as possible.  So that's why I chose to do so.

4    I do have some misgivings about this as an allocation

5    metric.

6            But I don't have a better alternative.  And

7    since my analysis is intended to indicate how these

8    assumptions affect Mr. Fanoe's calculation, I try to

9    stick with what would be the equivalent assumption

10   whenever I could in places where I don't have better

11   information.

12        Q.  And then do you have a ratio of total

13   California noninsurance travel assistance service

14   revenue to total nationwide noninsurance travel

15   assistance service revenue to further allocate cost

16   to California insureds?

17        A.  Yes, and that's in fact Mr. Fanoe's method,

18   as I understand.

19        Q.  And you identify that ratio or percent as

20   23.8 percent; correct?

21        A.  Yes, I believe that's his figure as well.

22        Q.  How is this ratio relevant to cost

23   allocation?

24        A.  So I think we had a discussion on this

25   before that ideally to allocate cost, you would want

Case 3:21-cv-09751-TLT Document 157-5 Filed 11/21/23 Page 28 of 45

1    But there's evidence to suggest that this

2    very large segment of exclusions that he's made may

3    not be wholly appropriate and that my opinion is that

4    that assumption -- that set of assumptions he makes

5    excluding these do matter in the final calculation.

6    Q.  Did you do any work that specifically

7    analyzed travel assistance services prior to your

8    engagement in this case?

9    A.  So travel -- I mean I'm familiar with them

10   generally.  But the first time I spent a lot of time

11   with either -- with travel assistance services --

12   other than, you know, acknowledging that they were

13   part of a set of services that were sold by online

14   travel agents, so I did consider them in the past.

15   But I didn't do a deep dive into the specifics of how

16   these operate until this case.

17   Q.  In what context did you deal with that in

18   your work or profession prior to your engagement in

19   this case?

20   A.  So I've done a fair amount of work in the

21   travel industry and online travel agents in

22   particular.  And so one of the things that I have

23   noted in the past is that travel insurance is part

24   of -- one of the things that online travel agents in

25   particular do sell as part of their regular

Case 3.21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 29 of 45

1    operations.  And so I considered it in that respect.

2          But again, as I said, I didn't do a deep

3    dive into the particulars of the operations

4    underlying those kinds of products.

5          Q.  What do you mean by online travel agents?

6    Can you give me some examples?

7          A.  Travelocity.

8          Q.  Okay.  What were you analyzing when you were

9    looking at those online travel agents?

10         A.  So I've done a fair amount of work -- on my

11   research side I've done a fair amount of work on --

12   back in the early days of pricing online travel

13   agents.  And I was -- had done -- for at least 15 or

14   so years, a portion of my information strategy class

15   would be devoted to talking about online travel as a

16   separate industry and some of the business practices

17   there.

18         Q.  And in that work, did you specifically

19   analyze how travel insurance offers on those websites

20   were priced?

21         A.  I think I would -- the -- I would

22   acknowledge the fact that these services are offered

23   on these services.  Again, I don't do a deep dive in

24   either the pricing or operations of those services,

25   other than to acknowledge that they're there and part

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 30 of 45

1      MR. ORMSBY:  Object to form.

2      THE WITNESS:  I wouldn't -- I wouldn't be so

3  specific.  I have a general understanding that

4  commission rates, you know, tend to be related to the

5  product.  They can vary tremendously.

6      But I wouldn't try to say I pin it down

7  specifically to California any more than my general

8  understanding that some of these commission rates can

9  be relatively high as a proportion of the premium.

10    Q.  BY MR. RAAB:  Where does that come from,

11  your understanding that some of the commission rates

12  can be relatively high?

13    A.  Well, so one is just having seen the prices

14  here.  But also, for example, in certain kinds of

15  life products and other products, you can have

16  commission rates that are effectively the first-year

17  premium or have, you know -- or require consumers to

18  surrender, if they cancel a policy, 50 to a hundred

19  percent of the first-year premium if they cancel,

20  which is represented as a distribution charge.

21      So those could be substantial as a

22  proportion of the premium.

23    Q.  Do you have a general understanding of the

24  distribution of commission rates for travel

25  insurance?

Case 3:21-cv-09751-TLT    Document 157-5    Filed 11/21/23    Page 31 of 45

1    A.  So I have not done an investigation of the

2   distribution of insurance -- of the commission rates

3   for travel insurance, nor was it necessary for doing

4   any of the things I was doing in my analysis.

5    Q.  So, you know, if you were to plot commission

6   rates against, let's say, number of policies sold at

7   that rate, you would not have a sense of how many

8   policies are sold at a given commission rate in the

9   U.S.; correct?

10    A.  That is not something I do and it's not

11   something I needed to do for the purposes of reaching

12   opinions in my report.

13    Q.  Do you know what commission Travel Guard

14   pays United Airlines for sales of Travel Guard

15   policies through United?

16    A.  My understanding is that the -- it is

17   essentially a 58.3 percent commission on the total.

18    Q.  Do you know what percent commission Travel

19   Guard pays to other online distributors?

20    A.  I haven't looked at those very recently.  I

21   understand that they are in the same vicinity but I

22   don't believe they are the same number.  But, again,

23   I haven't looked at those documents in a while so I

24   don't have any specific recall.

25    Q.  Do you know if Travel Guard pays certain

1   distribution partners as low as 20 or 30 percent

2   commissions on sales of Travel Guard policies?

3       A.  I don't recall specific numbers but I do

4   understand that, you know, each of these arrangements

5   can be different.  And so, you know, what is a pure

6   distribution charge versus what might be related to

7   something else that is also reflected in the

8   commission would have to be a factor in there.

9           So I'm not sure this is necessarily apples

10  to apples, but I haven't done that full scan recently

11  of what the range of commissions are.

12      Q.  Do you know whether the commission rate

13  Travel Guard pays to United and the rate it pays to

14  Expedia are high relative to the commissions it

15  typically pays to other distributors?

16      A.  Not having done that analysis, I don't want

17  to say one way or the other.  I'm familiar with the

18  United number because it's used in my calculations..

19  I haven't done the other ones, so I don't know.

20      Q.  Let's look at Plaintiffs' Exhibit 167, which

21  is your rebuttal report, and look at paragraph 37.

22      A.  Okay.

23      Q.  The first sentence in paragraph 37 states:

24  "Even if the total price of a travel insurance plan

25  were to change (as incorrectly implied by Mr. Fanoe's

1    model), it is unlikely that the amount of the

2    commission paid to third-party distribution partners

3    would change (or if they changed, that they would

4    change by much)."

5         Do you see that sentence?

6    A.   Yes.

7    Q.   What is the basis for that opinion?

8    A.   The basis for that opinion is my

9    understanding of incentive contracts for distribution

10   services, which is well within the realm of

11   economics.  There is a citation below to one of the

12   oldest treatments of that.  There is much more modern

13   treatment as well that is consistent.

14        And the second observation is that this is a

15   competitive industry.  And in a competitive industry,

16   distribution partners like United would have other

17   alternatives.  And they reached an agreement with

18   Travel Guard at a certain set of terms.

19        In competitive industries generally you

20   would expect that the terms of the others would be

21   similar.  And so if, for example, Travel Guard does

22   not -- Travel Guard fundamentally changed what their

23   commission structure would be, it would open up an

24   opportunity for another potential vendor to come in.

25   Q.   If Travel Guard simply lowered the prices of

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 34 of 45

1    its plans but leaves its contract with United alone

2    and the commission rate alone, are you saying that

3    changes the commission structure?

4         A.   No.   What I'm saying is that hypothetical is

5    very unlikely to prevail in a competitive market.

6              So if United has the opportunity -- so the

7    commission rate that is negotiated with United is

8    based on some expectations as to what this

9    arrangement is going to look like.   As discussed in

10   the literature, there is going to be some value

11   created and divided up based on the contributions of

12   both partners to allocate whatever gains there are

13   from this arrangement.

14             If you change the amount of compensation

15   that they are going to get but don't change anything,

16   for example, of what United would be doing -- for

17   example, they still have to allocate the space on

18   their website -- there is no reason to believe that

19   that contract remains on those terms.   Because United

20   had some expectation in negotiating that 58.3 rate of

21   what they would receive from doing this versus, for

22   example, going to an Allianz or somebody else.

23             Now you're going to change the total value

24   of that agreement to them.   There is no reason to

25   believe that contract would stay the same at the same

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 35 of 45

1    rates.

2         Q.  Have you ever studied whether a decrease in

3    the price of a service or product results in an

4    increase in the commission rate for the sale of that

5    product?

6         A.  I don't recall specific circumstances where

7    I examined that, but it is consistent with the

8    baseline model that is used for incentive

9    contracting, especially in a competitive industry.

10        Q.  Did you review any particular studies or

11   publications explaining that you would expect a

12   commission rate to increase if the price of the

13   product or service decreased in preparing your

14   report?

15        A.  So I quote the -- one specific document

16   here, but I'm generally familiar with the whole area

17   of economics called principal-agent theory, which I

18   extensively did research and teaching it.  And an

19   implication of that particular framework is that in a

20   competitive industry you would get a result that says

21   that the total compensation to the distribution

22   partners, since nothing else changes to them, the

23   effort required doesn't change at all.  Their total

24   compensation is what they are -- is what is going to

25   govern whether or not they will accept or not accept

Case 3:21-cv-00757-TLT   Document 157-5   Filed 11/21/23   Page 36 of 45

1    the relationship with Travel Guard relative to

2    somebody else.

3           So if you change that total -- if you change

4    the total amount of compensation, it's going to

5    violate what's called a participation constraint and

6    they are going to either have to renegotiate it and

7    get back to the same expected value or they are going

8    to go to somebody else.

9       Q.   So this opinion is largely based on the

10   assumption that United could earn more money from

11   another travel insurance provider if Travel Guard

12   reduced the prices of its policies and therefore

13   reduced United's total expected compensation; is that

14   right?

15      A.   So I wouldn't treat that as necessarily an

16   assumption.  What I'm saying is, is that this is a

17   competitive market, that United has multiple

18   alternatives in a competitive market.  Those

19   alternatives are likely to be very similar.

20          So one of the things they could do is switch

21   distribution partners.  The other thing they could do

22   also is simply not offer travel insurance at all and

23   find some other use for the real estate, as they say,

24   on their web page for distribution of some other

25   product.

1    distribution partners need to be willing to

2    participate in whatever this arrangement is.

3            This section of my report is solely focused

4    on whether or not it is plausible that they will

5    continue to distribute on the same terms under the

6    same circumstances.

7            If we were constructing an economic analysis

8    as to comparing consumer value in the actual world

9    versus consumer value in a but-for world where

10   something has changed, you need to both consider

11   consumer reaction and the value change to them and

12   the producer reaction in order to figure out what the

13   equilibrium price would be and therefore what they

14   would transact at.  If that's the condition, then

15   producer behavior is absolutely critical.

16           There could be any number of theories or any

17   number of other determinations by a finder of fact

18   that some other calculation would be appropriate.

19   And I'm not speaking to those.  I'm speaking to

20   whether or not that this reflects the actual economic

21   injury in the sense of consumer harm based on the,

22   you know, allegations of improper conduct.  And what

23   I'm saying is, is that this is an important part of

24   this and that the -- you have to take in both sides.

25           He hasn't done so, so it doesn't reliably

1    that can exist.  And this is one of the reasons.

2         Q.  Do you know that insurers must report their

3    historical and projected expenses and revenues to the

4    California Department of Insurance and get approval

5    for the rates they want to charge?

6              MR. ORMSBY:  Object to form.

7              THE WITNESS:  I understand that there's a

8    rate approval process that is based in part on

9    historical or projected costs.  I don't know the

10   details of what else goes in the calculation or the

11   mechanics of that.

12        Q.  BY MR. RAAB:  Do you know whether an

13   insurer's total expenses that are referenced in a

14   rate filing including commissions are controlled by

15   an efficiency standard in California?

16             MR. ORMSBY:  Same objection.

17             THE WITNESS:  My analysis is totally focused

18   on the economics of producer and consumer conduct.  I

19   can't speak to the regulatory framework and how that

20   interacts.

21        Q.  BY MR. RAAB:  Let's turn to Exhibit 3 of

22   your report.  This appears to be page 71 of the PDF

23   for Plaintiffs' Exhibit 167.

24        A.  Yes.

25        Q.  Just behind both Exhibits 2 and Exhibit 3 to

1   which is simply that this is something different.

2   These are different things and that there is no

3   reason to believe that the profit margin should be

4   exactly the same thing for these different items.

5       Q.  But you didn't do an analysis of the travel

6   insurance industry to identify what a typical profit

7   margin on assistance services is in the market; is

8   that correct?

9       A.  That's correct.  I'm not attempting to offer

10  a counterfactual.  I'm simply stating that he's

11  assuming it's exactly the same.  I don't believe that

12  has any basis.  I didn't offer a counterfactual.

13      Q.  Are there parts of Mr. Fanoe's opinions or

14  report that you believe use an economic approach to

15  valuing assistance services but that you believe do

16  so in a faulty manner?

17      A.  So there's one place where I think he does

18  branch into economics.  I don't know if he would

19  think of it this way.  But the way I read it is

20  there's a section where he says, I believe, that the

21  cost to provide these things are an indication of

22  value.  And it's right toward the beginning.  I could

23  find the passage.

24          But essentially he says the costs are an

25  indication of value.  That as an economic matter is

1    not correct, standing by itself.  And he doesn't

2    provide anything that would indicate that that

3    actually works.  In most cases it's not true.

4          So that's an economic assertion, which I

5    disagree with.  I think other than that, nothing else

6    comes to mind.

7    Q.  So other than that, is it your understanding

8    that the rest of his opinions do not apply to an

9    economic model at all?

10   A.  I think -- I haven't really thought of it

11   this way, so I -- I would be reluctant to give a --

12   you know, an off-the-cuff answer that it's

13   all-encompassing.

14         But I think the main place where I disagree

15   with something he makes as an economic assertion is

16   the one I talked about.  I think there are number of

17   places where I think that the appropriate metric for

18   assessing injury or determining what the recovery is

19   or whatever it is, is economic cost.  But he hasn't

20   done the necessary things to do that.

21         But whether he represents that as an

22   economic analysis, I'm not sure.  But I think that

23   one -- that's probably the one place.  And then I

24   think we have a broader disagreement if that's the

25   appropriate metric or that's relevant to this case.

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 41 of 45

1    He hasn't done the necessary things to get there.

2    He's done something else, and I would say it's just

3    not the same thing as an economic analysis.

4        Q.  So would it be fair to say just in general

5    he has not undertaken an economic analysis of harm to

6    consumers?

7        A.  I would say that's fair with the exception

8    of when he makes assertions related to value based on

9    cost.  I think that's wrong.  But other than that, I

10   think that's fair.  Although, again, I'm just

11   thinking about it now so I don't know if that's a

12   definitive answer.  But sitting here right now, that

13   seems to be right.

14       Q.  Are you expressing any opinion as to whether

15   an economic analysis is required to measure

16   restitution under California law?

17       A.  No, that's not for me to decide.

18           MR. RAAB:  Okay.  I do not have any more

19   questions today.

20           MR. ORMSBY:  I have no further follow-up.

21           MR. RAAB:  Okay.  We can go off the record.

22           (The proceedings concluded at 1:01 p.m.)

23

24                       --o0o--

25

Case 3:21-cv-09751-TLT   Document 157-5   Filed 11/21/23   Page 42 of 45

1                    CERTIFICATE OF WITNESS

2

3          I, LORIN M. HITT, Ph.D., hereby declare

4    under penalty of perjury that I have read the

5    foregoing deposition testimony and that the same is a

6    true and correct transcription of my said testimony

7    except as I have corrected pursuant to my rights

8    under the Federal Rules of Civil Procedure.

9

10

11         _____

12                    Signature

13

14

15         _____

16         Date Signed

17

18

19                    --oOo--

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing proceedings in the

4    within-entitled cause were reported at the time and

5    place therein named; that said proceedings were

6    reported by me, a duly Certified Shorthand Reporter

7    of the State of California, and were thereafter

8    transcribed into typewriting.

9        I further certify that review of the transcript

10   by the witness was requested.  I am not of counsel

11   or attorney for either or any of the parties to said

12   cause of action, nor in any way interested in the

13   outcome of the cause named in said cause of action.

14       IN WITNESS WHEREOF, I have hereunto set my hand

15   this 9th day of November, 2023.

16

17

18   _____

19   THOMAS J. LANGE
     California CSR No. 4689
20

21

22

23

24

25

1    MR. LORIN M. HITT, Ph.D.                November 9, 2023
     c/o Eric Ormsby, Esq.
2    O'Melveny & Myers LLP
     2 Embarcadero Ctr, 28th Fl
3    San Francisco, CA 94111
     Email: Eormsby@omm.com
4
     Re: Miller vs. Travel Guard, et al.
5    Date of Deposition: November 3, 2023

6    Dear Mr. Hitt:

7    Please be advised that pursuant to the Federal Rules
     of Civil Procedure, the transcript of your deposition
8    is ready for your review.

9    You have 30 days following the date of this notice to
     read, correct, and sign your transcript unless the
10   attending parties and the deponent agree on the record
     or otherwise in writing to a longer or shorter time
11   period.  The deponent may change the form or the
     substance of the answer to a question, and may either
12   approve the transcript of the deposition by signing
     it, or refuse to approve the transcript by not signing
13   it.  You are not required by law to read and sign your
     deposition transcript.  All parties will be informed
14   of the corrections.  The original transcript will then
     be sealed and sent to the examining attorney pursuant
15   to the applicable law.

16   You may review and make corrections by signing and
     returning the attached form.  Should you have any
17   question regarding these instructions, please call.

18   Sincerely,

19   NOGARA REPORTING SERVICE
     150 Sutter Street
20   P.O. Box 538
     San Francisco, CA 94105
21   415.398.1889

22   Cc: All counsel, original deposition

23

24

25

DEPONENT'S CORRECTION SHEET

Note:  To add testimony, indicate "Add" and print the exact words you wish to add.   To delete testimony, indicate "Delete" and print the exact words you wish to delete.

DEPOSITION OF:       LORIN M. HITT, Ph.D.
DATE OF DEPOSITION:  November 3, 2023

I, LORIN M. HITT, Ph.D., have the following changes to make to my deposition transcript:

| PAGE | LINE | CHANGE (Add/Delete) |
|------|------|---------------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

_____   _____
Signature: LORIN M. HITT, Ph.D.    Date