# EXHIBIT E

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5

6   TAMIKA MILLER and JULIANNE
    CHUANROONG, on behalf of
7   themselves, the general
    public, and those similarly
8   situated,

9             Plaintiffs,

10  v.                          No. 3:21-cv-09751-TLT

11

    TRAVEL GUARD GROUP, INC.,    **CERTIFIED COPY**
12  AIG TRAVEL, INC., and
    NATIONAL UNION FIRE
13  INSURANCE COMPANY OF
    PITTSBURGH, PA.,

14

              Defendants.
15  _____/

16   Remote Expert Deposition of

17      ROBERT E. HOYT, Ph.D.

18   Wednesday, October 25, 2023

19  (TRANSCRIPT PROVISIONALLY DESIGNATED AS
    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER)
20

21  REPORTED BY:  CINDY TUGAW, CSR #4805

22

23          NOGARA REPORTING SERVICE
               150 Sutter Street
24               P.O. Box 538
          San Francisco, California 94105
25               (415) 398-1889

Case 3:21-cv-08751-TLT    Document 157-6    Filed 11/21/23    Page 3 of 33

1                        I N D E X

2                                        Page Number

3     EXAMINATION BY MR. RAAB                      4

4     EXAMINATION BY MR. RAAB (Resumed)           91

5                      ---o0o---

6                   E X H I B I T S

7     Plaintiffs'

8     Exhibit 156    Expert Report of              8
                     Robert E. Hoyt, Ph.D.
9
      Exhibit 157    Rebuttal Expert Report of    13
10                   Robert E. Hoyt, Ph.D.

11    Exhibit 158    Document Bates stamped        33
                     HOYT-000001 to HOYT-000004
12
      Exhibit 159    Document entitled, "The       34
13                   Economics of Travel
                     Insurance"

14

15                     ---o0o---

16

17

18

19

20

21

22

23

24

25

1           BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition and on Wednesday, the 25th day

3    of October, 2023, commencing at the hour of 8:59

4    o'clock a.m. (PDT), via Zoom remote

5    videoconference, before me, CINDY TUGAW, a

6    Certified Shorthand Reporter in the State of

7    California, personally appeared,

8                ROBERT E. HOYT, Ph.D.,

9    called as a witness by the Plaintiffs, having been

10   by me first duly sworn, was examined and testified

11   as hereinafter set forth.

12                ---o0o---

13                APPEARANCES OF COUNSEL

14   For the Plaintiffs

15        GUTRIDE SAFIER, LLP
          305 Broadway, 7th Floor
16        New York, New York 10007
          BY:  STEPHEN M. RAAB, Attorney at Law
17        (415) 639-9090 x109
          stephen@gutridesafier.com
18

19   For the Defendants
          O'MELVENY & MYERS, LLP
20        Two Embarcadero Center, 28th Floor
          San Francisco, California 94111
21        BY:  MATT POWERS, Attorney at Law
          (415) 984-8700
22        mpowers@omm.com

23

     Also Present:
24
          David Ho, Zoom Host
25        Nogara Reporting Service

1    I've been the chair of the audit committee long

2    enough to be involved in those twice where our

3    regulator, our lead regulator, is the State of

4    Ohio.

5            So their team comes in and interviews

6    folks throughout the organization, but they do

7    speak with the chair of the audit committee, and

8    I've done that twice.  So that's a portion of what

9    we discuss to -- is around regulatory oversight,

10   filings, things of that sort.

11       Q.  Other than in your role in governance and

12   oversight as a member of the board, are you aware

13   of any other context in which you've helped prepare

14   rate filings on behalf of an insurer?

15       A.  No.  I believe I mentioned the things,

16   yes.

17       Q.  Have you previously assisted with the

18   review of any rate filings on behalf of any

19   insurance department?

20       A.  No, I'm not involved in that.  I don't

21   know where -- what type of outreach they might

22   make, but I have not been involved directly in

23   that, no.

24       Q.  Have you participated in any market

25   conduct examinations?

1        A.   Okay.  Yes, I'm there.

2        Q.   Okay.  So in this paragraph, you mention

3   that you're working on a study of travel insurance,

4   correct?

5        A.   Yes.

6        Q.   Did you originate the idea for that study?

7        A.   The outreach came from -- from the USTIA,

8   the United States Travel Insurance Association,

9   that is mentioned there.  And that was -- the

10   initial precipitation of that particular project

11   was just some discussions around whether or not

12   we -- I, particularly, but certainly ultimately

13   some engagement with a colleague, would be able to

14   do some -- some research around themes within the

15   industry.

16        Q.   When was that outreach?

17        A.   This has been a somewhat slow developing

18   project, but to the best of my recollection, it was

19   just prior to the pandemic or somewhere in that

20   vicinity.  Maybe late 2019.  I don't recall

21   exactly.  But that's probably about right.

22        Q.   So who from the USTIA reached out to you?

23        A.   Some -- somebody from the board of that

24   group, to the best of my knowledge.

25        Q.   Was there anyone else involved in the

1    say, surveys, for example?

2         A.  No surveys were conducted up to this

3    stage, no.

4         Q.  And have you sent requests or received

5    data from particular participants in the travel

6    insurance market about their sales?

7         A.  Nothing related to that.  Only -- only

8    public information, yes.

9         Q.  Have you drafted any analyses or reports

10   for the study?

11        A.  Nothing other than what, again, had been

12   shared in the academic presentation that I made

13   allusion to.  We've collected information and

14   gathered ideas, but nothing has been -- has been

15   distributed yet, no.

16        MR. RAAB:  Okay.  David, if you could put a

17   link to Exhibit 158.

18             (Plaintiffs' Exhibit 158 marked for

19             identification.)

20        MR. RAAB:  Q.  Let me know when you have this

21   exhibit open.

22        A.  Okay.  Yes, I do.

23        Q.  Do you recognize this document?

24        A.  Yes.

25        Q.  What is it?

Case 3:21-cv-08751-TLT   Document 157-6   Filed 11/21/23   Page 8 of 33

1      A.  Discussion in some of the reports that we

2  had reviewed that were publicly available.

3      Q.  The publicly available reports you're

4  referencing, to your knowledge, were those

5  industry-authored reports?

6      A.  They were surveys of the industry.  We

7  also did look at that travel study that was done by

8  the Academy of Actuaries US travel insurance

9  report.  I don't recall right now whether they made

10  allusion to these points or not, but that was

11  something that we had reviewed as well.

12      Q.  Have you done any research in connection

13  with this case into customer demand or value

14  associated with assistance services?

15      A.  I do not recall having specific -- seeing

16  specific information around those points.  The

17  demand piece I do believe that there was some

18  information about the trend in sales, and I had

19  made some reference to that.  But I did not do

20  anything other than that that's mentioned in the

21  reports.

22      Q.  Okay.  And before your engagement in this

23  case, had you done research into customer demand

24  for travel insurance?

25      A.  The reference here and elsewhere in this

1    presentation, the one about growing demand, we did

2    have information that we presented there in terms

3    of the fact that there had been growth and demand

4    in travel insurance, but that was very consistent

5    with what I had called out in one of the reports.

6         Q.  What data was that based on, your

7    observation about growing demand?

8         A.  I don't recall the exact reference on

9    that, but it was reporting -- industry reporting

10   data on what the overall sales had been.

11        Q.  Okay.  So sales volume?

12        A.  Correct.

13        Q.  If we turn to the next page, this provides

14   some information about consumer satisfaction.  Do

15   you know where this data came from?

16        A.  Again, at this moment I do recall this

17   being from one of the broader reports that we had

18   access to, but I was not living up to academic

19   standards in terms of reference on the page here,

20   but I don't recall specifically.

21        Q.  Do you know which consumers were surveyed

22   for purposes of this data?

23        A.  I don't -- I don't recall the scope on

24   that other than that it would be in the travel

25   insurance space.  But I don't specifically recall

1    the scope.

2         Q.  You don't know how they were selected for

3    survey, correct?

4         A.  At this time, I don't recall that, no.

5         Q.  And you don't know how many consumers were

6    surveyed?

7         A.  I do not recall that, no.

8         Q.  If we look at Exhibit 156, which is your

9    July 26th report.

10        A.  Yes.

11        Q.  And go to page 8 of the appendix, which I

12   believe is page 51 of the PDF.

13        A.  There were three appendices.  When you

14   say -- you mean my CV or --

15        Q.  Yes.  So we're on Exhibit 156, page 51 of

16   the entire PDF, which is page 8 of Appendix A.

17        A.  Okay.  I'm there.

18        Q.  Under "Works Submitted But Not Yet

19   Accepted and Works In-Progress," there's reference

20   to "The Economics of Travel Insurance" as a working

21   paper, and the authors are yourself and Joshua

22   Frederick.

23             Do you see that reference?

24        A.  Yes.

25        Q.  Is that the document we were just

1    Q.  Do you know whether the price elasticity

2    of travel insurance offered on online checkout

3    pages might be different from the price elasticity

4    of travel insurance offered through travel agents

5    or on aggregator sites where you can see multiple

6    different travel insurance plans from different

7    providers?

8    A.  Again, price elasticity here is suggesting

9    the general reaction of demand to changes in price.

10   But, yes, it could vary through different segments

11   of the market.  And as noted, I don't have specific

12   information on that.

13        Again, the aggregate would suggest,

14   though, that demand generally makes insurance

15   economic sense that it would be relatively price

16   elastic, which is what we estimated here with these

17   numbers.  But I don't have numbers for specific

18   subparts.

19   Q.  Do you know what publication you drew this

20   data from?

21   A.  Again, I do not recall at this moment.  I

22   do recall that it was data that were available

23   broadly, but I don't recall which specific

24   publication it came from, no.

25   Q.  And you can't confirm whether certain

1    segments of sales were or were not included in the

2    data, correct?

3         A.  I do not have information that I recall on

4    that, no.

5         MR. POWERS:  Object to the form.

6         THE WITNESS:  I thought I answered.  Didn't I

7    answer that one?  Maybe not.

8         MR. RAAB:  Q.  You did.  I'm just checking my

9    outline right now.

10        A.  And you're fine.  I just want to make sure

11   you guys weren't waiting on me.  Fine.  Thank you.

12        Q.  Does your study of the travel insurance

13   market concern whether or how consumers distinguish

14   assistance services from travel insurance?

15        A.  We did not, in the work that we had done

16   previously, focus on distinctions between the two

17   other than to observe that it's pretty much the

18   standard for a bundling to occur, but we had not

19   separately focused on -- on distinctions or

20   analysis around those subparts, no.

21        Q.  Have -- other than this study where the

22   grant was provided by the US Travel Insurance

23   Association, have you done any other work on that

24   question of whether consumers distinguish between

25   assistance services and travel insurance coverage?

1        MR. POWERS:  Object to the form.

2        THE WITNESS:  I had not separately undertaken

3   any work on that theme, no.

4        MR. RAAB:  Q.  Have you done any work as part

5   of this study or outside of it on whether consumers

6   value assistance services?

7        A.  In the context of travel insurance, no, I

8   have not.

9        Q.  As part of this study or in other work

10  you've done, have you studied how insurance

11  companies or their agents themselves distinguish

12  between assistance services and travel insurance?

13       MR. POWERS:  Object to the form.

14       THE WITNESS:  I don't believe I've done

15  anything that would be focused on that, no.

16       MR. RAAB:  Q. Have you tracked the number of

17  hours you've spent on this study?

18       A.  On the studies that we've been talking

19  about, this particular reporting that we did for

20  the travel insurance, is that the question?

21       Q.  Yes, sorry.  To clarify it, I mean about

22  the study we've been discussing where the funding

23  came from the US Travel Insurance Association.

24       A.  We have not been keeping a log of time

25  spent, which would be pretty typical of our

1    activity around other research projects.  So, no, I

2    don't have a log of that.

3        Q.  Okay.  Do you have any estimate of how

4    many hours you may have spent on that study to

5    date?

6        A.  I do not know.  It's been over an extended

7    period of time, so, therefore, I really don't know

8    exactly how much that might be.

9        Q.  Have you ever communicated with an

10   insurance department or regulator regarding travel

11   insurance?

12       A.  I don't believe that I've had any direct

13   communication around travel insurance with any of

14   the regulatory departments, no.

15       Q.  Is travel insurance heavily regulated to

16   protect consumers?

17       MR. POWERS:  Object to the form.

18       THE WITNESS:  I would say all lines of

19   insurance, particularly those that are facing the

20   consumer level, which in the industry often is what

21   would be referred to as personal lines, but

22   certainly consumer focus lines, insurance

23   regulation generally focuses on pricing, on

24   solvency and then on coverage issues.  So terms and

25   conditions is a -- it might be call in the

1    states as part of that rate filing.

2            Any allowance for profit that might be

3    permitted as part of that rate filing, those would

4    all be the expense piece, the loss piece.  So the

5    loss piece would be part of that as well that would

6    be reviewed by the department, whether it's an

7    actuary or the team of rate filing review people.

8        Q.  Do you know whether it typically takes

9    multiple months for a determination to be made on a

10   rate filing in California?

11       A.  I do not know what a typical period would

12   look like in California.  I -- the insurance

13   company that I'm involved with does not write

14   business in California, so we don't have any direct

15   experience with that.  So I do not know what the

16   typical period would be.  And there can be

17   variation, of course, in terms of if there's

18   staffing pressures and so forth.  But I don't

19   recall seeing any specific information on that

20   either around California.

21       Q.  Did you review rate filings or rate filing

22   records for purposes of preparing your reports in

23   this case?

24       A.  I did allude to several in my report,

25   maybe in both reports, and those are noted if I

1    did.  I did review those particular filings.  There

2    certainly -- and some by other insurers in the

3    California insurance space.  But what I relied upon

4    I did call out in the list and in reference in the

5    two reports.

6         Q.  And just based on those rate filing

7    records that you reviewed, does it appear that the

8    prior approval process is fairly involved in

9    California?

10        A.  That -- that is my sense, both prior, pun

11   intended, prior to the -- to this matter, but

12   certainly in some of the information that I saw

13   would be suggestive that it's a fairly extensive,

14   rigorous process, yes, that's my sense.

15        Q.  Right.  I mean, it's not that we have

16   exact numbers, but just this is not a process that

17   seems to involve just a little bit of work and it's

18   resolved within a couple of weeks, right?

19        A.  That's very likely.  I just didn't know

20   specifically about timeline in California.  I do

21   know that rate filings actually would be pretty

22   extensive at least in the information that's

23   submitted even in some of the other states that are

24   not as -- not necessarily using prior approval but

25   that are asking for filings.  A fair amount of

1    connected by the cause.

2         MR. RAAB:  Q.  In the situation where the one

3    single event leads to both an insurance benefit and

4    an assistance service, in that kind of situation,

5    what's the basis for saying that the assistance

6    service is not insurance?

7         MR. POWERS:  Object to the form.

8         THE WITNESS:  Because as I was alluding to, it

9    isn't necessarily the case that that service can

10   only be used in the case of a loss.  And I think,

11   in the reading of what the nature of some of those

12   non-insurance assistance services are, would

13   suggest that it isn't necessarily connected to a

14   loss.

15        It could be the case that in a particular

16   situation where a travel protection plan was in

17   force that both things were utilized, but I think

18   that's the distinctiveness we just don't really see

19   in -- in lines of -- consumer facing lines of

20   insurance like auto and homeowners that are more

21   typical.

22        MR. RAAB:  Q.  Do you have experience

23   distinguishing between insurance and non-insurance

24   services and benefits?

25        MR. POWERS:  Object to the form.

1          THE WITNESS:  Again, I have, as I've discussed

2     previously in other questions, a lot of experience

3     with the insurance industry, but I have not been

4     necessarily queried to separate the two previously.

5     But I think the context here is one that I was

6     comfortable with, given my knowledge on the

7     insurance side, and my broader knowledge of the

8     industry generally.

9          MR. RAAB:  Q.  Is there a generally accepted

10    method for distinguishing between insurance and

11    non-insurance services and benefits?

12         MR. POWERS:  Object to the form.

13              Go ahead.

14         THE WITNESS:  Again, I've alluded to the

15    notion that a loss precipitating event tends to be

16    most typical of insurance-related payments under

17    insurance contracts.  But I don't know that I would

18    say there's an absolute standard with regards to

19    that separation.

20         MR. RAAB:  Q.  But it's your understanding

21    that your general familiarity with the insurance

22    industry is a basis for your opinions on being able

23    to say whether, in this case, assistance services

24    are insurance or non-insurance?

25         MR. POWERS:  Object to the form.

1          MR. POWERS:  Object to the form.

2          THE WITNESS:  I may overstate it as -- I'm not

3    stating it as an opinion purely, but I do think

4    that the insurers would have some discretion around

5    this.  As was observable by me in some of the

6    materials that I cited in the -- in the report --

7    in the reports, there was an indication that in

8    regulatory review there was some discussion back

9    and forth with the California department as to

10   whether or not a particular benefit would go into

11   one category or the other.

12          So it is my general sense that there would

13   be some discretion, but certainly the -- the

14   pattern is very much in line with what we've been

15   talking about previously.

16          MR. RAAB:  Q.  Do you know whether consumers

17   distinguish between insurance benefits and

18   assistance services?

19          MR. POWERS:  Object to the form.

20          THE WITNESS:  I do not know the level to which

21   consumers may make those distinctions.  They're

22   being offered to purchase at a price which

23   ultimately they're making a decision at that point

24   around that price that is offered to them.  And in

25   my own experience, people don't always know all

1    that's in their insurance policies, even ones that

2    they've had a lot of experience with.

3          But I don't -- I don't know to what extent

4    consumers would distinguish between all those

5    things as being either insurance or non-insurance,

6    but I do believe that they value the services in

7    total that are offered in travel protection plans.

8    And the growth in policy purchases would certainly

9    be consistent with that.

10         MR. RAAB:  Q.  Have you investigated or

11   studied the question of whether consumers

12   distinguish between insurance benefits and

13   assistance services?

14         A.  I have not specifically studied consumers

15   distinguishing between that, no.

16         Q.  Do you know whether consumers considered

17   the total price of a travel insurance plan to just

18   be travel insurance or whether they understand that

19   the total price has an insurance premium component

20   and an assistance fee component?

21         MR. POWERS:  Object to the form.

22         THE WITNESS:  I believe, based on what I have

23   studied, too, in insurance generally, that

24   consumers purchase based on a price that's being

25   offered for the services that are included.  And

1    distinguishing between those two components, as I

2    mentioned, I hadn't specifically studied that, but

3    certainly I don't know that consumers would make

4    that distinction.

5        MR. RAAB:  Q.  I'm sorry, did you say that you

6    don't have a reason to believe that consumers would

7    make that distinction?

8        A.  That they -- correct.  That they -- I do

9    not have a reason to believe that they would make a

10   distinction necessarily between assistance services

11   and insurance in the way that the regulators

12   categorize or at least evaluate that.  I believe

13   they make a decision based on price and their view

14   either from experience or review as to what the

15   services are that the policy, you know, loss

16   payment but also non-insurance assistance services

17   that they believe would be offered in the policy or

18   the plan.

19       Q.  What's the basis for that last statement

20   that you believe consumers considered the value of

21   the non-insurance services that would be included

22   in the plan?

23       A.  Well, I do cite to some examples of

24   consumers that have provided specific feedback.

25   Obviously, there would most certainly be many more

1    of those.  But I think it's consistent with what we

2    would understand generally in insurance, but also

3    in this specific context that they are specifically

4    calling out non-insurance assistance services as

5    things that they had a valued experience with and,

6    therefore, had attributed value to that.

7         Q.  So you're referring to customer feedback

8    after having received assistance services, correct?

9         A.  Yes.

10        Q.  But do you have any data or insight into

11   how consumers may perceive or value assistance

12   services at the point of sale?

13        MR. POWERS:  Asked and answered, I think.

14        THE WITNESS:  Again, not -- not a specific

15   allocation of that because it's not clear they

16   would necessarily make the same distinctions that

17   we would talk about in the insurance and risk

18   management context.  But, ultimately, they're

19   offered a price.  They're either attracted to the

20   product or they're not.  And certainly everybody

21   doesn't -- doesn't purchase coverage in this case,

22   so that was the context of my statement.

23        MR. RAAB:  Q. Are you aware that National

24   Union Fire Insurance Company, which I'll call

25   NUFIC, entered into a regulatory settlement

1    California does not have disclosure requirements

2    relating to the bundling of travel insurance with

3    assistance?

4         A.   I think I tried to be careful to state I'm

5    not suggesting that there might not be other

6    provisions out there, but I did not discover any

7    and was not aware of any.

8         Q.   Okay.  Is there any other basis for this

9    portion of your opinion other than footnote 48?

10        A.   Again, in other testimony I don't -- I

11   didn't discover anything where there were

12   indications that they hadn't, that there was some

13   requirement and they didn't comply with it.  But,

14   again, that's the extent here of the context of the

15   review.

16        Q.   Let us move forward a few pages.  Page 23

17   of the PDF.  We'll look at paragraph 59.

18        A.   Yes.

19        Q.   The first sentence statement, "Market

20   research from Travel Guard as well as third-party

21   research firms also finds consumer demand for

22   travel insurance and non-insurance assistance

23   services."

24             Is it your opinion that consumers demand

25   non-insurance assistance services together with

1    their travel insurance?

2         MR. POWERS:  Object to the form.

3         THE WITNESS:  I'm simply stating what I

4    observed in the market and, again, references here

5    that the bundled, which is the standard and pretty

6    much universal in the industry, or at least very

7    common, to the best of my knowledge, is a

8    combination of bundle of travel insurance

9    components and non-insurance assistance services,

10   and as we've talked about in some other contexts,

11   the growth and demand there would be consistent

12   with them having a demand for that kind of travel

13   protection plan.

14        MR. RAAB:  Q.Did you look at any data or

15   comparisons of the sale of just travel insurance

16   versus the sale of travel insurance with assistance

17   service bundled in?

18        A.  I did not.  And, again, as I've mentioned

19   before, the bundling is fairly -- is pretty much

20   the standard in the industry, to the best of my

21   knowledge, to the extent that there are some

22   examples of that, that wasn't apparent to me.  But

23   to answer your question, no, I didn't undertake to

24   look at what demand there might be for travel

25   insurance without the other assistance services.

1    Q.  Okay.  So, yeah, that's all I wanted to

2    clarify is whether you had looked at or have some

3    basis in your work for evaluating consumer demand

4    for a bundled product versus just travel insurance

5    without assistance.

6    A.  Understood.  Yes.  I'm stating here that

7    what is being offered and what consumers are

8    purchasing, there does seem to be significant

9    consumer demand for that, but I did not undertake

10   to break the two apart.  And, again, as I comment

11   on in some other places in the report, it isn't my

12   understanding that that's something that would be

13   available.  But it's possible.  I did not study

14   that.

15   Q.  And your understanding is the market

16   pretty much only offers the bundled travel

17   insurance with assistance, correct?

18   A.  It is my sense, from my review and study

19   of the market, that that is the standard practice,

20   yes.

21   Q.  Do you have any background expertise in

22   assessing consumer demand?

23   MR. POWERS:  Object to the form.

24   THE WITNESS:  Well, again, it would depend on

25   the context.  But certainly in the insurance space

1    back and forth that did occur around this, so I'm

2    not sure if I can be able to characterize all of

3    that.  The point of my reference here was simply to

4    highlight that the department in this example would

5    have been aware of the existence of these

6    non-insurance assistance services.  And the

7    discussion with the rate analyst in that case would

8    be suggestive of that.

9            But I wasn't necessarily suggesting that

10   the department was making an affirmative

11   determination about whether something was there or

12   in the other category, so -- but that was the point

13   of this statement.

14        Q.  Do you have an understanding as to whether

15   the California Department of Insurance typically in

16   a rate review is trying to determine whether

17   particular categories of costs are insurance or

18   non-insurance costs?

19        MR. POWERS:  Object to the form.

20        THE WITNESS:  I can't speak to each and every

21   case.  Again, in many situations outside of travel

22   insurance, there would not be many things that

23   would be non-insurance assistance services because

24   that's something that is not particularly common in

25   auto and homeowners which would be where a

1    department like California would be most active.

2    They'd be most active dealing with those kinds of

3    reviews.

4            So I would suspect in those areas it would

5    not be that common that they would be presenting --

6    that the insurer would present some of that

7    information or even that they would be reviewing it

8    in from that perspective.  More about the costs

9    that are being provided and whether or not the

10   department views those as indicative of the

11   requested ultimate rate request in the -- in the

12   filed rate component.

13       MR. RAAB:  Q. Right.  And I'm just trying to

14   understand whether you know, based on your

15   experience, whether it's similarly true with a

16   travel insurance rate filing that the department

17   would be looking to see if, you know, the cost

18   justified the requested rate according to all the

19   regulations and standards or whether in travel

20   insurance they are also typically as a practice

21   trying to determine whether a cost qualifies as

22   insurance or non-insurance.

23       A.  Again, I couldn't say definitively the

24   balance there.  But the focus certainly would be on

25   the -- what's included in the insurance piece,

1    that's relevant to the file rate, their focus would

2    certainly be on whether they believe there was

3    sufficient justification for the filed rate.

4         And then in California, at least until

5    very recently, there would be focus on, well, it

6    doesn't matter what those expenses were, the

7    premium is too high.  That has happened a lot in

8    auto insurance and homeowners in California.  But,

9    again, the focus would be on the insurance

10   component.

11        Q.  Aside from what you've seen in the filings

12   you've reviewed for this case, do you have any

13   reason to believe that California regulators have

14   made a decision one way or another as to whether

15   bundling is consistent with their rate approval,

16   whether there are any limits to the amounts that

17   can be bundled with the insurance rates, either of

18   those two issues?

19        Have you seen any evidence other than the

20   filings you've reviewed in this case about those

21   two subjects?

22        MR. POWERS:  Object to the form.

23        THE WITNESS:  I'm not aware of any evidence

24   that would -- that they would have made an

25   affirmative determination around whether something

1     went in the non-insurance assistance services or

2     whether it went into the insurance piece.

3            And certainly in the materials I reviewed

4     the focus was on the insurance component which is

5     consistent with California's stance around travel

6     insurance relative to the RSA, the regulatory

7     settlement agreement.  So I'm not aware of anything

8     else, no.

9        MR. RAAB:  All right.  Why don't we take a

10    ten-minute break, and I'll see if I have any final

11    questions.

12       THE WITNESS:  Okay.  Very good.  Thank you.

13            (Brief recess.)

14       MR. RAAB:  I have no further questions today.

15    I'm done for day.

16       MR. POWERS:  All right.  Great.

17       THE WITNESS:  Thank you very much.

18            (Whereupon, the deposition

19            concluded at 2:52 p.m. PDT.)

20                 ---oOo---

21

22

23

24

25

1                   CERTIFICATE OF WITNESS

2                        ---o0o---

3

4          I, ROBERT E. HOYT, Ph.D., hereby declare

5    under penalty of perjury that I have read the

6    foregoing deposition testimony; and that the same

7    is a true and correct transcription of my said

8    testimony except as corrected pursuant to my rights

9    under Rule 30 of Federal Rules of Civil Procedure.

10

11

12          _____
                          Signature
13

14          _____
                            Date
15

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SAN FRANCISCO )

3         I, CINDY TUGAW, a Certified Shorthand

4    Reporter of the State of California, duly

5    authorized to administer oaths pursuant to Section

6    8211 of the California Code of Civil Procedure, do

7    hereby certify that

8                ROBERT E. HOYT, Ph.D.,

9    the witness in the foregoing deposition, was by me

10   duly sworn to testify the truth, the whole truth

11   and nothing but the truth in the within-entitled

12   cause; that said testimony of said witness was

13   reported by me, a disinterested person, and was

14   thereafter transcribed under my direction into

15   typewriting and is a true and correct transcription

16   of said proceedings.

17        I further certify that I am not of counsel

18   or attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22        Dated the 8th day of November, 2023.

23

24

                  CINDY TUGAW
25                CSR No. 4805 (California)

1  Robert E. Hoyt, Ph.D.
   c/o O'Melveny & Myers
2  Two Embarcadero Center, 28th Floor
   San Francisco, CA 94111
3  Attn:  Matt Powers, Esq.

4  Date:  November 8, 2023
   Re:  Miller vs. Travel Guard, et al.
5  Deposition Date:  Wednesday, October 25, 2023

6  Dear Dr. Hoyt,

7          Please be advised the original transcript
   of your deposition is ready for your review.
8          Pursuant to Rule 30 of the FRCP, you
   have 30 days following the date of this notice to
9  read, correct if necessary, and sign your
   transcript unless the attending parties and the
10 deponent agree on the record or otherwise in
   writing to a longer or shorter time period.  The
11 deponent may change the form or the substance of
   the answer to a question, and may either approve
12 the transcript of the deposition by signing it, or
   refuse to approve the transcript by not signing it.
13 You are not required by law to read and sign your
   deposition transcript.  All parties will be
14 informed of the corrections.  The original
   transcript will then be sealed and sent to the
15 examining attorney pursuant to the applicable law.
           You may either come to our office to read
16 and sign the original transcript, or you may
   contact your attorney or the attorney who arranged
17 for you to be present at your deposition.  If they
   have ordered a copy of the transcript, you may
18 review their copy and make corrections by
   submitting, signing and returning the attached
19 form.  If you choose to review your transcript at
   our office, please call first to make an
20 appointment.  Should you have any question
   regarding these instructions, please call.

21

   Sincerely,
22

23 NOGARA REPORTING SERVICE
   150 Sutter Street - P.O. Box 538
24 San Francisco, California 94105
   (415) 398-1889
25 cc:  All counsel, original deposition

1                    Deponent's Correction Sheet

2     To add testimony, indicate "Add" and print the exact
      words you wish to add.  To delete testimony, indicate
3     "Delete" and print the exact words you wish to delete.

4     Deposition of:  ROBERT E. HOYT, Ph.D.
      Proceedings date:  October 25, 2023
5
      I, ROBERT E. HOYT, have the following changes to my
6     proceedings transcript:

7     PAGE    LINE        CHANGE (Add/Delete)

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23
                                    Date: _____
24    _____

25    ROBERT E. HOYT, Ph.D.