# EXHIBIT J

DocuSign Envelope ID: B05BD0C4-BB35-4DD8-A227-5964AB6D55ED

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Rajiv Thairani (State Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Stephen M. Raab (*pro hac vice*)
stephen@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090 x109

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMIKA MILLER and JULIANNE CHUANROONG, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRAVEL GUARD GROUP, INC., AIG TRAVEL, INC., and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,<br><br>Defendants. | CASE NO. 3:21-cv-09751-TLT<br><br>EXPERT REPORT OF JOEL LAUCHER |

EXPERT REPORT OF JOEL LAUCHER;
CASE NO. 3:21-CV-09751-TLT

## I. Introduction

1. I have been engaged by Gutride Safier LLP, on behalf of Plaintiffs Tamika Miller and Julianne Chuanroong, to provide an independent expert opinion related to a class action lawsuit related to travel insurance products offered by the defendants in this case ("Defendants" or "Travel Guard"). I understand that Plaintiffs allege that Defendants improperly charge California consumers more than the insurance premiums that Defendants are authorized to charge according to their approved rate filings, and that Defendants contend the amounts they charge above the authorized premiums are fees for the "non-insurance" assistance services included in the products. Plaintiffs allege the amounts above the authorized premiums are (a) illegal premiums and/or illegal agent fees, (b) unfair charges, and/or (c) deceptive charges, as consumers believe they are paying only insurance premiums.

2. I have been asked by Plaintiffs' counsel to provide opinions regarding: (a) whether, in particular filings, the California Department of Insurance ("CDI") determined that Defendants' assistance services were "non-insurance," precluded Defendants from including the costs of their assistance services in their rate filings, or specifically approved Defendants' practice of automatically bundling a charge for assistance services into the single price for their travel insurance; (b) whether such determinations are made in a typical rate review; (c) whether, in other contexts, insurers include the expense of providing customer service to their insureds (who may have questions about benefits, claims, or potentially covered incidents/contingencies), or the expense of developing and maintaining referral networks, within their general operating expenses, which are covered by the rates approved by the CDI; and (d) whether Defendants' practice of bundling assistance fees with approved insurance rates into a larger total price for their insurance plans is consistent with my opinions on matters (a)-(c) above and with the CDI's objectives and expectations in reviewing and approving rates.

3. Plaintiffs' counsel has retained my services at the hourly rate of $535 per hour for deposition or trial testimony; $400 per hour for other work; and $150 per hour for travel. My compensation is not contingent on the results of my work or any outcome of the litigation.

4. A list of the materials which I have reviewed in forming my opinions for this report is attached hereto as **Exhibit A**.

DocuSign Envelope ID: B05BD0C4-BB35-4DD9-A227-5964AB6D55ED

5. I have not authored any formal publication, as I understand the term, in the previous 10 years. I have not testified as an expert at trial in the previous four years. I have testified as an expert at a deposition once in the past four years, in the case of *Edd King et al. v. National General Insurance Company et al.*, Case No. 4:15-cv-00313-DMR (N.D. Cal.). In the past four years, I have also been deposed in one instance as a fact witness in an ongoing litigation between the California FAIR Plan and the CDI, which was a litigation initiated during my tenure at the CDI. I have written work-related materials such as the "Top Ten Tips for Finding Residential Insurance," published on the CDI website as well as insurance-related blogs and responses to consumers' coverage or claims issues that are published on the United Policyholders website.

## II.  Qualifications

6. I have 35 years of experience as an insurance regulator with the California Department of Insurance ("CDI"). This includes extensive experience in rate regulation and market conduct examinations. My titles included, among others: Chief Deputy Commissioner; Deputy Commissioner of the Rate Regulation Branch (which was charged with the review of and the approval or rejection of rate applications such as the ones at issue in this litigation); and Division Chief of the Market Conduct Branch. Prior to working for the CDI, I worked as a commercial insurance underwriter for five years.

7. My background at the CDI includes extensive experience in the Rate Regulation Branch resolving rate filing submissions where consumer groups had intervened in the process as well as other high profile rate filings. In that role, I also developed a simplified metric, based on a review of the annual statements for the most recent three years of the loss ratios for each property and casualty insurer, to determine whether that information indicated that an insurer's rates had become excessive. Where that determination was made, the insurer was ordered to make a rate filing to reduce its premium rates. My roles in the Market Conduct Branch included extensive experience verifying that insurers consistently and fairly applied their rates and rating plans and complied with claims-handling statutes and regulations. I have had innumerable interactions with the insurance industry regarding compliance issues or concerns. I have also drafted legislative and regulatory proposals that have become law, including (a) the requirement that all personal auto policies identify and communicate in the policy declaration pages the

1  most impactful rating factors used to calculate the individual insured's premium and (b) the requirement that insurers provide a bi-annual notice with homeowners' policies about important considerations for selecting your coverage.

8.  I retired from the CDI in September 2020. Since that time, I have worked as an independent consultant, primarily for the nonprofit United Policyholders assisting consumers with their insurance issues.

9.  My current *curriculum vitae* is attached as **Exhibit B**.

10. The opinions set forth below are based on (a) the documents referenced below and (b) my knowledge and experience as a regulator and insurance consultant as set forth above and in my CV, including my familiarity with (i) the CDI's standards, processes, and goals in reviewing and approving rate filings and (ii) property-casualty insurers' provision of various customer services—beyond the handling of claims or requests for basic policy information—within their general operating expenses covered by their insurance premiums.

### III. Expense Issues Identified in NUFIC's 2013-2014 Travel Insurance Filing

11. I have reviewed a file bearing production numbers MILLER-0000001–MILLER-0001314, which is a record of a rate filing for a travel insurance program submitted by National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") to the CDI (SERFF # CLTR-129260325, CDI # 13-8736). I reviewed, in particular, the record of the CDI's approval of the filing (page MILLER-0000006), and records of the CDI's objections to the filing and NUFIC's responses to those objections (pages MILLER-0000008–MILLER-0000038). I also reviewed the file for further context and information regarding the matters discussed below.

12. In this filing, the CDI's rate analyst advised NUFIC that "any Company's expenses are CAPPED by the calculated Efficiency Standard." The rate analyst noted that the filing identified total expenses of 39.84% but that NUFIC "is ONLY permitted to utilize efficiency standard of 37.86%." (MILLER-0000014 (emphasis in original communication from the analyst).)

13. On April 8, 2014, NUFIC responded to this objection by stating:

|   |   |
|---|---|
| 1 | Travel Program provides insurance protection and also has a very large non- |
| 2 | insurance services component. The non-insurance services include such things as |
| 3 | 24/7 support and concierge services, assistance with flight arrangements, |
| 4 | translator services, help finding physicians, etc. The Company needs to offer both |
| 5 | the non-insurance services and insurance coverage as part of the Travel program |
| 6 | both to meet the expectations of travelers and to meet the competition. The cost of |
| 7 | the non-insurance services is a significant portion of the overall program cost. We |
| 8 | ask for a waiver from the Efficiency Standard to allow for this. (MILLER- |
| 9 | 0000027.) |

14. On May 30, 2014, the CDI's rate analyst responded by noting that "a company may request a variance if they are in need of a waiver form the efficiency standard" but that "the filing must provide substantial, detailed support and justification for each variance request." The rate analyst noted that NUFIC "does not have adequate historical Loss experience" to satisfy the requirements for a variance and therefore "the CDI is unable to grant the request for Variance at this time." (MILLER-0000011–MILLER-0000012.)

15. On June 27, 2014, NUFIC submitted certain supporting documentation in response to the CDI's concerns. (MILLER-0000024–MILLER-0000025.)

16. On July 7, 2014, the rate analyst noted that a prior filing identified total expenses as 31% (and thus a Loss Cost Multiplier ("LCM") of 1.449) but that this filing identified total expenses of 39.84% (and a Loss Cost Multiplier of 1.9283). The rate analyst stated that NUFIC "does not have experience writing this business that would compel the company to 'increase' the rates by 33.07%" and asked NUFIC to submit a revised rate manual ("exhibit 17") to reflect a LCM of 1.449. (MILLER-0000008.)

17. On July 11, 2014, NUFIC responded that "rates have been reduced and the LCM has been reduced to 1.6093" and that "[t]his reduction was accompanied by removal of non-insurance services from the insurance program, thereby reducing premium and expenses associated with the non-insurance

services." NUFIC further stated that it had "changed Exhibit 17 to reflect the new LCM." (MILLER-0000022.)

18. On July 17, 2014, the CDI approved the filing as follows: "Only the changes specifically indicated in the application set forth above, as it may have been amended, are approved." The CDI further stated "If any portion of the application or related documentation conflicts with California law, that portion is specifically not approved." (MILLER-0000006.)

19. I have reviewed the following statements made by Defendants' expert Robert E. Hoyt in his report, dated July 26, 2023 (ECF No. 98-6):

   i. "In fact, in Defendants' rate filing submitted on November 6, 2013 and approved on July 17, 2014, the California Department of Insurance exercised its authority to require insurers to only include costs related to travel insurance in their rate filings. . . . The California Department of Insurance ultimately denied the request to include the cost of non-insurance assistance services in Defendants' calculation of a rate for their travel insurance, but did not prohibit Defendants from offering and charging for non-insurance assistance services." (Hoyt Report ¶ 86.)

   ii. "[T]he California Department of Insurance exercised its authority to determine what costs can and cannot be included in the calculation of insurance rates. The decision by the California Department of Insurance not to allow costs for non-insurance assistance services to be included in the insurance rate calculation directly contradicts Plaintiffs' and Mr. Fanoe's claim that Defendants mischaracterized these costs and that these costs should be instead characterized as costs related to insurance. . . . [I]n their rate filings, Defendants specifically include 'help finding physicians' as an example of the non-insurance assistance services that the California Department of Insurance ultimately refused to allow Defendants to include in their calculation of insurance rates." (Hoyt Report ¶ 88.)

20. Based on my review of this insurance filing and my extensive expert experience with the CDI, including the review of and the approval or rejection of rate applications such as the ones at issue in

DocuSign Envelope ID: B05BD0C4-BB35-4DD9-A227-5964AB6D55ED

this litigation and in verifying that insurers consistently and fairly applied their rates and rating plans, these are misrepresentations of the communications from the rate analyst.

21. First, the CDI's rate analyst did not determine that expenses associated with the alleged assistance services were "non-insurance." A determination of whether a particular category of costs is insurance-related or not insurance-related is not a standard part of a rate review. Moreover, NUFIC did not detail the specific expenditures it was including in its rate filing, or include detailed justifications of specific expenditures, and thus the analyst could not have determined whether specific costs were appropriate or inappropriate, or whether specific expenses were, in fact, "non-insurance." Only when an insurer submits a request for a variance are there particular categories of expense that are specifically considered in connection with that variance request. There is no evidence in this filing that the rate analyst considered or made a specific determination with respect to the assistance services referenced in the filing as to whether they were reasonable, allowable, or inappropriate. The only determination that was made was that the standard expense factor, as developed through the efficiency standard process for this line of business, was the required factor for approval of this rate application.

22. Second, the rate analyst also did not preclude NUFIC from including the cost of the alleged assistance services in the expenses referenced in the filing. The analyst simply noted that the total expenses in the filing were higher than what was permitted under the applicable efficiency standard and indicated that NUFIC's request for a variance would be rejected because the request would lack credible historical data.

23. The CDI's rate analyst specifically indicated that an insurer needs to file a variance request in order to seek approval for an expense loading that would exceed the "efficiency standard." The efficiency standard is an average expense loading (calculated by line of insurance and marketing system) that otherwise applies to all rate filings for that line of insurance and marketing system, expressed as a percentage of earned premiums. See Cal. Code Regs. tit. 10 § 2644.12 (providing that the efficiency standard "shall be expressed as a maximum allowable ratio of historic underwriting expenses, including adjusting and other expenses, to historic earned premiums, which represents the fixed and variable cost for a reasonably efficient insurer to provide insurance and to render good service to its customers"). Here,

the rate analyst noted that the efficiency standard applicable to NUFIC's rate filing was 37.86% but that the expenses identified in NUFIC's filing were 39.84% of premiums.

24. The rate regulations are standards applicable to all property casualty insurers admitted to do business in California. Because the efficiency standard is an **average** of all insurers' expenses for the line of coverage, there are many insurers that thus receive an expense loading that is less than their historical average costs. Some of those insurers may receive approvals for variances, but those that do not obtain such approvals either need to find ways to reduce costs and operate more efficiently or must simply operate at some level of loss or at a lower profit margin to the extent their actual expenses exceed the applicable efficiency standard. The efficiency standard is a measure of **total** expenses and, in applying the efficiency standard, the CDI is concerned with the amount of overall expenses, not with identifying which particular categories of expenses to include or exclude from a particular rate filing or approval. Once their rate filings are approved, insurers still have complete flexibility in determining **how** to spend their expense loading: that is, how much to spend on marketing, commissions, salaries, customer services, etc.

25. Throughout my tenure as Deputy Commissioner of the Rate Regulation Branch and Chief Deputy Commissioner at the CDI: (a) the CDI expected the final rates approved by the CDI would be the final rates consumers would be required to pay for the insurance plans sold pursuant to that filing; and (b) the primary focus, purpose, and process of a rate review was to ensure that the ultimate price charged to consumers complied with subchapter 4.8 of chapter 5 of title 10 of the California Code of Regulations (§§ 2641.1–2648.4) ("Subchapter 4.8") in order to achieve the purpose of Proposition 103 (see Cal. Code Regs. tit. 10 § 2641.1 & Prop. 103, §§ 1, 2). Certain types of expenses are expressly excluded from usage in ratemaking. See Cal. Code Regs. tit. 10 § 2644.10. Aside from the specific exclusions of these categories of expenses, whether particular costs are insurance-related or not insurance-related was not a determination typically made, or even analyzed, when CDI rate analysts applied the efficiency standard in the CDI's standard rate review process, as that is not a determination or consideration that is referenced or required in the application of the efficiency standard or in Subchapter 4.8.

26. Typically, if an insurer requests a variance for a higher expense load in order to provide particular services and the CDI rejects the variance request, the CDI expects that this determination to reject an increased expense loading leaves the insurer with four options:

    i. to not provide the services at all;

    ii. to find a way to provide some or all of the service within the efficiency standard (perhaps by reducing other costs);

    iii. to absorb the costs of those services until the insurer has the necessary data to support a variance to the efficiency standard; or

    iv. if consistent with California law, to offer to provide the services to consumers for an explicit, separate, and optional charge for those services.

27. There isn't an option that includes the insurer simply adding the costs to the insurance premium; that would be contrary to the expectations and objectives of the CDI in a case where it specifically restricted the expenses to the efficiency standard, communicated that an approved variance would be the only means of including a higher expense factor in the rate calculation, and advised the insurer that its program was not eligible for a variance. Such action would undermine the prior approval process.

### IV. The CDI Did Not Approve Defendants' Practice of Selling Travel Insurance for a Price Exceeding the Approved Rate or Defendants' Practice of Automatically Bundling a Charge for Assistance Services into the Single Price for Their Travel Insurance

28. In addition to the filing discussed above, I have also reviewed: (a) a record of a rate filing for a travel insurance program submitted by NUFIC to the CDI in 2015 (SERFF # AGDE-130159956, CDI # 15-6339) (MILLER-0001315–MILLER-0001366); (b) a record of a rate filing for a travel insurance program submitted by NUFIC to the CDI in 2017 (SERFF # AGDE-130975998, CDI # PF-2017-00646) (MILLER-0001444–MILLER-0001708); and (c) a record of another rate filing for a travel insurance program submitted by NUFIC to the CDI in 2017 (SERFF # AGDE-130979540, CDI # 17-2873) (MILLER-0001709–MILLER-0002006).

29. These filings contain some limited references to "non-insurance" services. See MILLER-0001366 (noting "[p]olicies would also contain non-insurance services at a cost calculated separately from any insurance benefits") and MILLER-0001445 and MILLER-0001559 (sample policy forms that identify various assistance services as "non-insurance" services).

30. However, I did not find any specific determination by the CDI with regard to the non-insurance services that the applicant mentioned in its description of its offerings.

31. In reviewing a rate filing, the assigned CDI rate analyst is focused on the rates under review and what level of rate (or rate change) is both supported by the data and allowable under the rate formula and criteria set forth in Subchapter 4.8, in order to approve the filing. I know this from my years of experience as Deputy Commissioner of the Rate Regulation Branch. Consistent with this standard practice, the CDI's determinations on these filings appear to be strictly limited to the rates under review and what rates or levels of rate changes the rate analysts believed to be supported and thus warranting approval.

32. It was the applicant that distinguished between insurance and "non-insurance" services. There is no evidence that the CDI's rate analysts agreed with that distinction or determined that the alleged assistance services were "non-insurance." Again, a determination of whether a particular category of costs is insurance-related or not insurance-related is not a typical part of a rate review and there is no evidence in this filing that the rate analysts considered or made such a determination with respect to the assistance services referenced in these filings. Accordingly, based on my understanding of the CDI's processes and the purpose and effect of rate reviews, and based on my review of these filings, the CDI expressed no opinion, explicitly or implicitly, as to whether specific services are insurance-related or not insurance-related or whether any of the specified services should be included on the same contract as the insurance coverages.

33. Certainly, there is no approval that was provided for Defendants to sell travel insurance for a total price exceeding the approved rate or to automatically bundle a charge for assistance services into a single price that included the premium for their travel insurance. There was no explicit approval of or even consideration given to the insurer charging a fee for non-insurance services, or the way in which

1    the insurer would do so, as that was beyond the scope of the analyst's review. Specific determinations
2    about alleged "non-insurance" service fees—including how the insurer distinguished insurance and
3    assistance expenses, whether such distinctions were appropriate and whether the alleged services were
4    truly non-insurance, and whether and how the insurer might present such alleged "non-insurance"
5    services to consumers or charge for them—would have been outside the scope of the standard review and
6    approval of these filings. Accordingly, the analysts likely and logically would have believed that such
7    questions about "non-insurance" service fees were beyond the scope of their review and approval of these
8    filings.

9    **V.    Insurers May Provide Customer Service to Insureds and May Develop Referral**
10   **Networks, Within Their General Operating Expenses, Which Are Covered by the Rates**
11   **Approved by the CDI**

12   34.    In my experience, property-casualty insurers typically provide various customer
13   services—beyond the handling of claims or requests for basic policy information—within their general
14   operating expenses covered by their insurance premiums. I have seen numerous examples of insurers
15   providing such services without charging extra for them in my roles as a regulator and in my current role
16   at United Policyholders. For example, auto insurers will typically spend time to develop networks of
17   repair shops in various locations that they may recommend to their insureds. And insurers who provide
18   homeowners insurance may answer questions from their insureds when an incident or damage occurs,
19   and may also recommend contractors or even help coordinate the involvement of a contractor to assist
20   with the situation. Insurers may also send representatives to community events promoting and
21   recommending risk mitigation activities. Insurers' costs that are built in their approved rates may also
22   include the costs for inspection services, sometimes for the outputs of wildfire risk models. Some insurers
23   provide limited firefighting services. Irrespective of these various related activities, for admitted insurers
24   in the State of California the total premium to be charged must be based on the approved rates.

25   35.    Although these customer service functions go beyond telling a customer simply to submit
26   a claim form and any required supporting documents to process a claim, the services are in the insurer's
27   self-interest and are typically included within the insurer's general operating expenses (and are thus
28

covered by the insurance premium) for at least two reasons: (a) good customer service and customer satisfaction are selling points because existing customers are also potential repeat customers and serve to refer friends and family to the insurer that provides good service; and (b) such services (developing networks to use for referrals for repair work, expediting the resolution of potential claims, and monitoring repair work) are ways to control and contain potential covered losses and associated adjustment costs.

36. Based on my experience with the customer service functions other insurers provide in other circumstances, and based on my review of descriptions of Defendants' assistance services contained in Kruzitski Exhibit 01, Kruzitski Exhibit 02, Kruzitski Exhibit 05, Kruzitski Exhibit 06, and related portions of the transcript of the deposition of Jennifer Kruzitski, many of Defendants' assistance services—including Defendants' medical assistance services, their assistance with lost or delayed luggage, and their assistance with customers' changes in travel arrangements (if prompted by an unexpected event)—are similar to the types of services that other insurers provide to their insureds within their approved rates. In fact, in this case, it appears that is what would have happened had not the insurer been limited to the cap on expenses that is intrinsic to the California prior approval process.

**VI.  Defendants' Conduct Is Inconsistent with the CDI's Approvals, Objectives, and Expectations**

37. In my opinion, Defendants' decision to bundle a charge for assistance services in the total price for their travel insurance plans was contrary to the CDI's specific denial of NUFIC's request for a variance to charge a higher rate in filing SERFF # CLTR-129260325.

38. In my opinion, a practice of automatically bundling an unreviewed and unapproved charge on top of an approved insurance rate and presenting that higher rate as the price of the insurance plan to consumers is inconsistent with and would undermine the prior approval process of reviewing and approving insurance rates based on actuarial principles, efficiency standards, and other metrics and requirements, as set forth in Subchapter 4.8, that are intended to protect consumers.

1  Executed this 18th day of September, 2023

DocuSigned by:

*Joel Laucher*
CD1FD99DFC5A445...

_____
Joel Laucher

12
EXPERT REPORT OF JOEL LAUCHER;
CASE NO. 3:21-CV-09751-TLT

# EXHIBIT A

## Exhibit A: Materials Reviewed and Considered

MILLER-0000001–MILLER-0001314

MILLER-0001315–MILLER-0001366

Expert Report of Robert E. Hoyt, PhD., July 26, 2023 ("Ex. 5 Powers Decl (Hoyt Report)") (ECF No. 98-6)

**Tritz Deposition**

    05-12-23 [PROVISIONALLY CONFIDENTIAL] JOSEPH TRITZ – TRANSCRIPT

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 44

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 45

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 46

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 47

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 48

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 49

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 50

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 51

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 52

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 53

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 54

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 55

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 56

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 57

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 59

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 63

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 64

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 65

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 66

    [PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 67

[PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 68

[PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 70

[PROVISIONALLY CONFIDENTIAL] Joseph Tritz_Exhibit 75

**Kruzitski Deposition**

09-08-23 JENNIFER KRUZITSKI – TRANSCRIPT

Jennifer Kruzitski Exhibit 01

Jennifer Kruzitski Exhibit 02

Jennifer Kruzitski Exhibit 03

Jennifer Kruzitski Exhibit 04

Jennifer Kruzitski Exhibit 05

Jennifer Kruzitski Exhibit 06

California Code of Regulations, title 10, chapter 5, subchapter 4.8

# EXHIBIT B

# Curriculum Vitae for Joel Laucher

Joel Laucher
156 Walford Drive
Moraga, CA 94556

Insurance related experience includes 5 years as a commercial insurance underwriter (Commercial Union Insurance Companies, Great American Insurance Companies) from 1980-1985 followed by 35 years as an insurance regulator with the California Department of Insurance. The roles at the Department of Insurance included the following:

May 1985 – February 1989 Associate/Senior Insurance Rate Analyst: conducting on-site market conduct examinations of the rating and underwriting practices of insurers doing business in California.

March 1989 – February 1996, Bureau Chief, Field Rating and Underwriting Bureau: managing the twenty-eight field market conduct examiners.

March 1996 – January 2002, Division Chief, Consumer Services and Market Conduct: managing the consumer complaint and market conduct operations.

February 2002 – August 2010, Division Chief, Market Conduct (after Consumer Services was split off into its own Division).

September 2010 – June 2016, Deputy Commissioner, Rate Regulation: managing the prior approval of rate applications process that applies to property-casualty insurers.

July 2016 – January 2019, Chief Deputy Commissioner: managing all CDI operations.

January 2019 – September 2020, Senior Advisor: working with the Commissioner to interact with communities throughout the state and provide presentations on relevant insurance issues.

Experience included representing the Department of Insurance in an a wide array of activities and actions including quarterly meetings of the National Association of Insurance Commissioners, national and regional meetings of the Association of Insurance Compliance Professionals, All Industry Day events, legislative hearings by the Senate and Assembly Insurance Committees, the Little Hoover Commission, community meetings and townhall events including many post-catastrophe events, environmental protection organization events, and many other diverse public interest group gatherings.

Experience also includes innumerable interactions with insurance industry over compliance issues or concerns and resolutions of formal legal noncompliance actions many involving significant financial penalties. I have also drafted legislative and regulatory proposals that have become law including the requirement that all personal auto policies identify the impactful rating factors used to calculate the insured's premium and a bi-annual notice included with homeowners' policies about important considerations for selecting your coverage.

After retirement from the State of California:
September 2020 to present, Independent Consultant: majority of work has been with non-profit United Policyholders working on claims issues and providing information to consumers at local assistance and disaster recovery centers as well as on working on issues related to the availability and affordability of homeowners coverage issues for regions with wildfire risk.

Education: B.A. Literature, UC Santa Cruz 1978
Designations: Market Conduct Management, (MCM): training in effective market conduct operations.