IN THE MATTER OF
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH PA
NAIC # 19445

## REGULATORY SETTLEMENT AGREEMENT

This Regulatory Settlement Agreement ("Agreement") is entered into as of this 2 4 day of January, 2018 by and between National Union Fire Insurance Company of Pittsburgh Pa. (hereinafter "Company"), the Signatory Lead States and the insurance regulators who, on behalf of their agencies, have executed the form of "Participating State Adoption" set forth as Exhibit A, pursuant to the definitions, terms and conditions set forth below.

**A.   Recitals**

1.    At all relevant times the Company has been a licensed insurance company domiciled in the State of Pennsylvania and authorized to write Travel Insurance in the Participating States. The Company has offered and sold Travel Insurance policies in the Participating States.

2.    Beginning in 2014, the Lead States initiated a review of Travel Insurance practices relating to underwriting and rating, policyholder service, claims, producer licensing, marketing and sales, complaints, and operations/management in the various U.S. jurisdictions and across the travel insurance industry generally (the "Review"). As part of the Review, market conduct examination warrants were issued by the Missouri Department of Insurance to various market participants regarding the practices referenced above. Other participants, such as the Company, were subjected to Investigation.



EXHIBIT
**67**
JOSEPH TRITZ
05-12-2023
Cindy Tugaw, CSR 4805

CONFIDENTIAL

3.    The Participating States specifically acknowledge that a Company's acquiescence to this Agreement is not indicative of whether the Company engaged in any of the practices identified herein; indeed, it is specifically acknowledged that the Participating States expect all relevant market participants to adhere to the standards set forth in this Agreement, regardless of whether any such findings have been made and even in the absence of such findings.

4.    The Company has cooperated with the Lead States and their examiners and consultants during the course of the Review by making its books and records available to the Lead States, responding to questions from, and meeting on multiple occasions with the Lead States and their consultants, and making its personnel and agents available to assist as requested by the Lead States.  The Company asserts that at all times relevant to this Agreement, the Company and its officers, directors, employees, agents and representatives acted in good faith and in a manner they believed to be in the best interest of the Company's policyholders and in compliance with all applicable Insurance Laws.

5.    The Company denies any wrongdoing or activity that violates any applicable laws or regulations, but in light of the complicated issues raised and the probability that long-term litigation and/or administrative proceedings would be required to resolve any disputes between the Parties hereto, the Parties have agreed to resolve all issues relating to the Investigation and the regulatory issues through this Agreement.  The Participating States and the Company voluntarily enter into this Agreement solely for the purpose of reaching a compromise and settlement to fully and finally resolve the issues raised in the Investigation without the need for a hearing or further administrative action.

6.    All matters encompassed within the scope of this Agreement and addressed in this Agreement, shall be fully and finally resolved according to the terms of this Agreement without

2

CONFIDENTIAL                                                                          MILLER-0012668

further regulatory or administrative processes or any actions, requirements or monetary payments beyond those enumerated herein.

7.    The terms and conditions of this Agreement will apply in all of the Participating States unless inconsistent with a Participating State's Insurance Laws in which case the inconsistent provision of the Agreement will be rendered ineffective only in the Participating State(s) whose Insurance Laws conflict with the provision.

8.    This Agreement sets forth (B) Definitions, (C) Business Reforms, and (D) Other Provisions.

**B.    Definitions.**

1.    "Administrators" means both Third Party Administrators, as defined by the law in each Participating State and Managing General Agents, as defined by the law in each Participating State.

2.    "Agreement" means this Regulatory Settlement Agreement, including all Exhibits.

3.    "Assistance Services" means one or more of the following non-insurance services that may be distributed by Distribution Participants or other entities including, but not limited to:

- Multilingual Assistance that is not related to the purchase of Travel Insurance by the consumer nor related to the handling of a Travel Insurance claim;

- Concierge Services, including restaurant referrals, arranging for the purchase of event tickets and excursion and recreation reservations, relaying urgent messages or providing information relating to the purchaser's trip;

- Any other service that is furnished in connection with planned travel and is not

3

CONFIDENTIAL

MILLER-0012669

directly or indirectly related to Travel Insurance, the administration of Travel Insurance coverage or covered under a policy of Travel Insurance.

4.    "Company" means National Union Fire Insurance Company of Pittsburgh, ~~Pennsylvania~~ *Pa.,* and all affiliated entities including parents and subsidiaries, successors, assigns, officers, directors and employees.

5.    "Distribution Participants" means all producers, as defined by the law in each Participating State, Limited Lines Travel Insurance Producers, Travel Retailers, Business Entities as defined by the law in each Participating State, which may include  travel websites, tour operators, airlines, cruise lines, vacation package promoters, sellers of event tickets, hoteliers, property management companies, timeshare operators, rental car companies, other travel and tourism suppliers, and  other entities  selling or offering the Company's Travel Insurance.

6.    "Effective Date" means the date the Signatory Lead States notify the Company that all of the following conditions have been met:  a) The Agreement has been executed by the Company; b) The Agreement has been executed or adopted by at least thirty (30) jurisdictions; and c) the conditions of the Confidential Addendum have been fulfilled.

7.    "Investigation" means the market conduct investigation conducted by the Lead States reviewing the Company's Travel Insurance practices conducted in conjunction with the Review.

8.    "Execution Date" means the date the Agreement is signed by the Managing Lead State.

9.    "Illusory Travel Insurance" means an insurance policy that could never result in payment of any claim for an insured under the policy.

4

                                                     MILLER-0012670

10. "Insurance Law" means the Insurance Statutes, Rules, Regulations and case law in effect in each Participating State. For purposes of this Agreement, the term shall also include bulletins, notices and official interpretations of law in effect in a Participating State unless reliance on such bulletins, notices or official interpretations is prohibited by a Participating State's law. The term shall not include any informal correspondence between a Participating State and the Company, nor shall the term include product, rate or form filings made in a Participating State or correspondence in regard to such filings. However, the Participating States agree that to the extent that such informal correspondence is made under the auspices of and pursuant to a Participating State's Insurance Laws, Company may sell its products, consistent with the terms of this Agreement, in that Participating State in which it has fulfilled all of the regulatory rate and form filing requirements in that state, until such time that said Participating State revokes such filing pursuant to its laws, or the Company makes a new, replacement filing in that Participating State, in which it has fulfilled all of the regulatory rate and form filing requirements in that state.

11. "Lead States" means the states of Missouri, Minnesota, Ohio, Oklahoma, Pennsylvania and Utah.

12. "Limited Lines Travel Insurance Producer" means, unless otherwise defined by Insurance Laws in a Participating State, a (i) licensed managing general agent or third party administrator, or (ii) a limited lines insurance producer.

13. "Managing Lead State" means the Missouri Department of Insurance, Financial Institutions and Professional Registration.

14. "Monitoring Time Period" begins on the Effective Date and ends three years from the date the Company has adopted and implemented each of the Business Reforms set forth in

5

CONFIDENTIAL

Section C of this Agreement.

15.   "Opt-Out Marketing Plan" means, unless otherwise defined by the law in a Participating State, an offer or agreement to sell or provide the Company's Travel Insurance, in a way under which the customer's silence or failure to take affirmative action (such as checking or unchecking a box to remove coverage), to reject the Company's Travel Insurance results in a) Travel Insurance coverage becoming effective or b) the Company or any of its Distribution Participants collecting or attempting to collect payment from the customer for the Travel Insurance.

16.   "Participating States" means the Managing Lead State, the Signatory Lead States and the states and U.S. territories that have executed the "Participating State Adoption" form in Exhibit A within forty five (45) days of the Execution Date.  Participating States shall include the Managing Lead State and the Signatory Lead States, unless otherwise or separately identified.

17.   "Parties" means collectively Company, Signatory Lead States and Participating States.

18.   "Self-Funding Insurance Coverages" is where a Distribution Participant, without a valid certificate of authority to engage in the business of insurance, undertakes to engage in the business of insurance as defined by the Insurance Law in any of the Participating States.   "Self-Funding Insurance Coverages" does not include Assistance Services or Travel Cancellation Fee Waivers.

19.   "Signatory Lead States" means the Lead States that execute this Agreement.

20.   "Travel Cancellation Fee Waiver" means, unless otherwise provided by Insurance Law, a contractual agreement between a Distribution Participant and its customer where the

6

MILLER-0012672

Distribution Participant waives its own products/services (including pre-purchased packages of travel products/services for which the Distribution Participant is contractually obligated) and refunds all or part of the full purchase price without regard to the reason for cancellation.

21.    "Travel Insurance" means insurance coverage for personal risks incident to planned travel, including, but not limited to:

- Interruption or cancellation of trip or event;
- Loss or delay of baggage or personal effects;
- Damages to accommodations or rental vehicles;
- Sickness, accident, disability or death occurring during travel and any related medical services;
- Missed connection;
- Emergency evacuation and repatriation and any related emergency services;
- Accidental death and dismemberment;
- Repatriation of remains;
- Loss due to travel delay;
- Any other contractual obligation to indemnify a specified amount to the traveler that constitutes insurance under the law in any of the Participating States.

"Travel Insurance" does not include:

- Major medical plans which provide comprehensive medical protections for travelers with trips lasting six (6) months or longer, including, but not limited to, those working overseas as expatriate or military personnel deployed overseas;
- Assistance Services; or
- Travel Cancellation Fee Waivers.

7

CONFIDENTIAL

22.    "Travel Retailer" means, unless otherwise defined by Insurance Laws in a Participating State, a business entity that makes, arranges or offers travel services and may offer and disseminate Travel Insurance as a service to its customers on behalf of and under the direction of a Limited Lines Travel Insurance Producer.

C.    **Business Reforms.**

The Company agrees that to the extent the following business reforms have not already been adopted by the Company the Company will adopt and implement such business reforms subject to Section A(7). The Company will have six (6) months from the Effective Date to adopt and implement such business reforms, unless a different date is prescribed herein.

<u>**Distribution Participants**</u>

1.    <u>Licensing and Registration.</u>    Company agrees to ensure that all Distribution Participants, through which its Travel Insurance products are distributed, will be properly licensed or registered, where required, under applicable state Insurance Law. Company will ensure that for all Distribution Participants operating on its behalf, all registries will be maintained according to the Insurance Laws of each of the Participating States. Company also agrees that it will not provide compensation to any entities or individuals offering or selling Travel Insurance on its behalf or to provide compensation to any entity or individual unless such entity or individual is lawfully permitted to receive such compensation in accordance with applicable state Insurance Law. Within thirty (30) business days after the Effective Date, Company further agrees to provide a notice in the form of Exhibit B, along with non-confidential sections of this Agreement, to all Distribution Participants who are required to be licensed or registered under the Participating State's Insurance Laws and involved in the sale or distribution of its Travel Insurance. Company further agrees to work in good faith with its licensed and registered

8

CONFIDENTIAL

MILLER-0012674

Distribution Participants to ensure that Exhibit B is provided to all Distribution Participants that offer or sell Company's Travel Insurance. Within forty five (45) business days after the Effective Date, Company will provide the Signatory Lead States with a list of all Distribution Participants provided with Exhibit B.

      2.    <u>Third Party Oversight.</u>  Company agrees to audit all Administrators operating on its behalf with respect to Travel Insurance pursuant to the terms of this section.  During the Monitoring Time Period, such audits will occur at least twice annually and will review business practices, adherence to contractual obligations, compliance with any fiduciary duties established pursuant to applicable state law, and separation of funds according to the requirements of applicable state law.  At least one of the two audits per year will be conducted at the office of the entity, which is being audited.  Details of each audit, including the audit plan, date performed, items reviewed, concerns noted, if any, and corrective action taken, if any, will be documented and retained by Company during the Monitoring Time Period and thereafter in accordance with applicable record retention laws in the Participating States.  Company also agrees to develop and maintain a procedure manual for conducting such audits.  After the expiration of the Monitoring Time Period, Company agrees to audit all Administrators operating on its behalf as required by applicable state Insurance Law .  Company further agrees, during the Monitoring Time Period, to notify Signatory Lead States of any changes in Administrators acting on its behalf.  This includes Administrators with new contracts and Administrators that have contracts terminated with the Company.

<b><u>Rates and Forms</u></b>

      3.    <u>Filing and Timing.</u>  Company agrees to review its policy forms, rates, and rules used in connection with the sale of Travel Insurance and the results of the actuarial review conducted as part of this Investigation  to determine if the policy forms, rates and rules comply

9

MILLER-0012675

with state Insurance Law in each of the Participating States and with the Participating State's implementation of this Agreement. The Company will file, re-file, or certify existing filings for its policy forms, rates, and rules in the Participating States on or before nine (9) months from the Effective Date, where necessary to be in compliance with a Participating State's Insurance Law and the Participating State's implementation of this Agreement. Company will have twelve (12) months after such filings are approved or accepted to implement related requirements, including, but not limited to, provisions relating to emergency medical transportation and repatriation of remains, for that product under Participating State Insurance Law and subject to Section A(7) under this Agreement. The Company may request additional time to implement the related requirements, and the Signatory Lead States agree to consider such requests in good faith. The Company may request confidential treatment of rating and underwriting information that it files pursuant to the Insurance Laws of the Participating States. Company further agrees that on or before twelve (12) months from the Effective Date, it will provide the Signatory Lead States with a list of all Participating States where it does not intend to refile or file policy forms, but intends to write Travel Insurance business, and a list of all Participating States where it intends to file or re-file its policy forms, rates or rules.

4.    Filed Rate Elements.  Pursuant to the filing and timing provisions specified in Section C (3) above, Company agrees that in all Participating States, it will follow that state's filing requirements as set out in the state's Insurance Law, including, if required, filing all elements used in its rating process such that rates can be replicated based upon its rate filings.

5.    Policy Details.  All coverage benefits, limits, exclusions and deductibles shall be contained in a written document, or where not prohibited by state Insurance Law, in an electronic

CONFIDENTIAL                                                                                    MILLER-0012676

document provided to the policy purchaser at the time of purchase. Limits include, but are not limited to, per person, per accident, and aggregate coverage limits, if applicable.

6.    <u>No Unfair Discrimination.</u> Company agrees not to utilize any unfair discrimination, as defined by the Insurance Laws in each Participating State, in its Travel Insurance rate and rule filings for use in the Participating States.

7.    <u>Rate Filings.</u> Pursuant to the filing and timing provisions specified in Section C (3) above, in Participating States where Travel Insurance rate filings are required, Company agrees to comply with each Participating State's Insurance Laws, and, where required, to file specific rates, factors, and inputs for rating each coverage or coverages that are actuarially justified, including all elements used in the development of Travel Insurance premium rates for any coverage. The filings shall include clear definitions of all terms used. Company also agrees to ensure that the calculation of Travel Insurance premiums charged by the Company or by Distribution Participants to individuals insured under the Company's coverages are not excessive, inadequate or unfairly discriminatory.

8.    <u>Consistent Rates.</u> Pursuant to the filing and timing provisions specified in Section C (3) above, where required by Participating State Insurance Laws, the Company agrees that the premium charged to the insured for Travel Insurance will not vary between Distribution Participants when the trip cost, state of residence, coverages, and all other factors are the same. Where required by a Participating State's Insurance Law, the Company will maintain a means to identify the forms and rates used by each Distribution Participant and for each amount charged to an insured, and the amounts charged must be able to be independently calculated by a Participating State based on the forms and rates identified (and any other factors used in determining the amount charged).

11

CONFIDENTIAL

MILLER-0012677

9.      Charges and Fees.   Pursuant to the filing and timing provisions specified in Section C (3) above, Company agrees that the cost of its Travel Insurance will be the filed rate. Company agrees that it will not engage in unfair discrimination, as defined by the Insurance Laws of each Participating State, and will prohibit its Distribution Participants from engaging in unfair discrimination, as defined by the Insurance Laws of each Participating State, in the application of any premium or fees charged for Travel Insurance, at any point in the sales transaction for the sale of the Company's Travel Insurance coverage.   Pursuant to the filing and timing provisions specified in Section C (3) above, any fees charged for the sale of the Company's Travel Insurance coverage that are charged to a consumer must relate directly back to a charge incurred or a service provided.

10.     Self-Funding Insurance Coverages.   Company agrees that on or before December 31, 2017, it will prohibit any Distribution Participant operating, selling, or conducting business on its behalf from Self-Funding Insurance Coverages, including but not limited to, trip cancellation, trip interruption, emergency medical transportation, repatriation of remains or other coverages unless the entity that is self-funding has a valid certificate of authority issued by the applicable Participating State Department of Insurance.   Company further agrees to include in Exhibit B, a written notice along with non-confidential sections of this Agreement, to all Distribution Participants, who are required to be licensed or registered under the Participating State's Insurance Laws and are involved in the sale or distribution of the Company's Travel Insurance, informing each Distribution Participant that state Insurance Laws for Self-Funding Insurance Coverages must be complied with if any coverage is unauthorized insurance.   Company agrees to report to the Signatory Lead States, during the Monitoring Time Period, any instances where they

CONFIDENTIAL

MILLER-0012678

become aware that Distribution Participants, offering or selling the Company's Travel Insurance, are self-funding any insurance coverages in contravention of the terms of this section.

11.    Free Insurance.  Except as permitted by law, Company agrees that it will not provide and will prohibit its Distribution Participants, in the sale of the Company's Travel Insurance, from providing basic Travel Insurance coverage free of charge, but then charge a fee for any upgraded Travel Insurance product or service.  Company further agrees that it will not advertise and will prohibit its Distribution Participants from advertising that its Travel Insurance is free for children or included at no additional cost when a surcharge or any additional charge is placed on coverage for adults.

12.    Free Look Refunds.  Where a Travel Insurance contract contains a free look provision, in the event of a valid cancellation of Travel Insurance during the free look period, Company agrees to refund all amounts collected, including premium and fees, for Travel Insurance from the purchaser by the Company or a Distribution Participant, unless the Insurance Law of a Participating State provides otherwise.  No contract that contains a free look provision shall allow any Distribution Participants to keep any fees collected from the purchaser for the sale of the Company's Travel Insurance if a valid cancellation of the Travel Insurance occurs. Refunds shall be made within thirty (30) days of the cancellation of the Travel Insurance unless the time for making refunds is prescribed by the applicable Participating State's Insurance Law.

13.    Insurance Documents to Comply with State Law.  Company agrees that all Travel Insurance-related documents, including but not limited to, policy forms, endorsements, and certificates of insurance, will be in compliance with applicable state Insurance Law in each of the Participating States.  Company further agrees that its claims manuals, underwriting procedures

CONFIDENTIAL

MILLER-0012679

manuals, and related documents follow the contracts of Travel Insurance issued and are in compliance with applicable state Insurance Law in each of the Participating States.

### Sales Practices

14. <u>Unfair Discrimination.</u>  Company agrees that it will not engage in unfair discrimination, as defined by the Insurance Laws of each Participating State, and will prohibit its Distribution Participants from engaging in unfair discrimination, as defined by the Insurance Laws of each Participating State, in the application of any Travel Insurance premium or fees charged, at any point during the sale of the Company's Travel Insurance coverage.  Any premium or fees for the Travel Insurance coverage that is charged to a consumer must relate directly back to the filed rating plan.  Pursuant to the filing and timing provisions specified in Section C (3) above, the Company agrees that any premium or fees charged to a consumer by the Company or by a Distribution Participant for the Company's Travel Insurance coverage must relate directly back to an approved rate filing or a service provided.  Company also agrees to prohibit any Distribution Participants from charging a separate fee, including a producer service fee, for Travel Insurance in addition to the Travel Insurance premium or to add any charges or fees for any of the Company's Travel Insurance products or related insurance services without a separate written agreement with the insured, unless permitted by a Participating State under its Insurance Law. Company agrees to report to the Signatory Lead States, during the Monitoring Period, any instances of which the Company becomes aware of where Distribution Participants charge a separate fee in addition to the Travel Insurance premium, for the Company's Travel insurance, without a separate written agreement with the insured.

15. <u>Prohibited Sales Practices.</u>  Company agrees that it will not engage in any deceptive, fraudulent or misleading sales practices, as defined by the Insurance Laws of the

CONFIDENTIAL

MILLER-0012680

Participating States, in connection with the sale of the Company's Travel Insurance and will prohibit its Distribution Participants from engaging in any deceptive, fraudulent or misleading sales practices, as defined by the Insurance Laws of the Participating States, in connection with the sale of the Company's Travel Insurance. Company further agrees that it will not offer or sell Travel Insurance policies using an Opt-Out Marketing Plan in any Participating State unless the use of such Opt-Out Marketing Plan is permitted by the Participating State's Insurance Law, and will prohibit its Distribution Participants from offering or selling the Company's Travel Insurance policies using an Opt-Out Marketing Plan in any Participating State unless the use of such Opt-Out Marketing Plan is permitted by the Participating State's law.

16.    <u>Compulsory Insurance.</u>    Except as permitted by the Insurance Laws of a Participating State, Company agrees that it will not require or mandate, and will prohibit its Distribution Participants, in the sale of Company's Travel Insurance, from requiring or mandating the purchase of the Company's or any specific insurance company's Travel Insurance product offered by its Distribution Participants as a condition for the purchase of the trip or travel package. Nothing in this Section is meant to prohibit a consumer from exercising their freedom of choice to choose any Travel Insurance product.

17.    <u>Illusory Travel Insurance.</u>    Company agrees that it will not offer or sell Illusory Travel Insurance Coverage and will prohibit its Distribution Participants, in the sale of the Company's Travel Insurance, from offering or selling Illusory Travel Insurance Coverage.

18.    <u>Advertising and Marketing.</u>    Company agrees to ensure that all Travel Insurance related sales materials, advertising materials, marketing materials and other client-facing documents comply with the Insurance Laws of the Participating States to the effect that they: a) are consistent with all insurance-related documents, including but not limited to, forms,

15

MILLER-0012681

endorsements, policies and certificates of insurance, b) reflect filed rates, c) do not contain ambiguous language where such language is not permitted by a Participating State's  law, and d) are not untrue, deceptive or misleading.

19.    Policy Interpretation.  Any disputes regarding Travel Insurance policy language will be interpreted consistent with each Participating State's Insurance Law governing the interpretation of insurance contracts.

20.    Trusts.  Pursuant to the filing and timing provisions specified in Section C (3) above, Company agrees that it will not sell, and will prohibit its Distribution Participants, in the sale of the Company's Travel Insurance, from selling its Travel Insurance through a trust in a Participating State where the Participating State does not authorize the sale of Travel Insurance through a trust.

21.    Group and Blanket Coverage.  Pursuant to the filing and timing provisions specified in Section C (3) above, Company agrees that it will not sell Travel Insurance, containing property and casualty benefits, and will prohibit its Distribution Participants from selling Company's Travel Insurance, containing property and casualty benefits, on a group or blanket basis in a Participating State where the Participating State prohibits the sale of Travel Insurance, containing property and casualty benefits, on a group or blanket basis.  Company further agrees that where the sale of Travel Insurance, containing property and casualty benefits, on a group or blanket basis is not prohibited by a Participating State, any coverage documents based on a group or blanket policy will not be issued to residents of a Participating State that prohibits Travel Insurance containing property and casualty benefits on a group or blanket basis to be sold in the Participating State.  All sales of the Company's Travel Insurance to residents of

CONFIDENTIAL

MILLER-0012682

Participating States that prohibit the sale of Travel insurance containing property and casualty benefits on a group or blanket basis shall be on an individual basis.

**Claims and Claims Practices**

22.    <u>Handling of Claims.</u>  Company agrees that claims for Travel Insurance benefits, including pre-existing conditions claims, will be adjudicated based on the Insurance Laws of the Participating State where the purchaser resides and based on the relevant insurance policy language.   Company agrees that unless otherwise specified or subject to another term, condition or exclusion under the policy, a pre-existing condition waiver waives all pre-existing conditions.

23.    <u>Coordination of Benefits.</u> Company shall pay claims in accordance with Participating State's coordination of benefit laws, when applicable.

**Record Retention**

24.    Company agrees that it will maintain documentation of its underwriting, rating, complaint, and claims files in accordance with applicable state law in the Participating States.

**Insurance and Assistance Services**

25.    Pursuant to the filing and timing provisions specified in Section C (3) above, and where prohibited by law in a Participating State, Company agrees not to combine and package the cost of Assistance Services or Travel Cancellation Fee Waivers with the cost of Travel Insurance in its rate filings and in the sale of its Travel Insurance to consumers, and will prohibit its Distribution Participants from combining and packaging the cost of Assistance Services or Travel Cancellation Fee Waivers with the cost of Travel Insurance in the sale of its Travel Insurance to consumers.  Pursuant to the filing and timing provisions specified in Section C (3) above, and where combining and packaging the cost of Assistance Services or Travel Cancellation Fee Waivers with the cost of Travel Insurance is not prohibited by law in a Participating State,

17

CONFIDENTIAL

Company agrees that it will provide all disclosures in connection with the sale of the combined and packaged product that are required by Insurance Law in a Participating State

### Premium Tax

26.     Company agrees that it will pay premium tax on all sales of Travel Insurance.

27.     Unless otherwise provided for by law, Company agrees to report premiums collected by the Company and by Distribution Participants, and to pay premium tax for Travel Insurance premiums, that are included in a policy and in a rate filing, to the appropriate Participating State, based on the state of residence of a) the primary Travel Insurance policyholder for sales of individual policies, b) the blanket Travel Insurance policyholder for sales of blanket policies that are permitted under Section C (21), and c) the primary Travel Insurance certificate holders for sales of group policies that are permitted under Section C (21).   Company further agrees to obtain and maintain documentation of specific identifying information necessary to determine the state to which premium tax should be reported, including but not limited to, the policyholder's or certificate holder's name, address and zip code pursuant to the applicable Participating State's law.

### Miscellaneous

28.     Company agrees that, in connection with the offer or sale of its Travel Insurance, it will comply with anti-rebating laws in the Participating States and will require its Distribution Participants to comply with anti-rebating laws in the Participating States.   Company agrees to monitor Distribution Participants to ensure compliance with anti-rebating laws in the Participating States in connection with the offer or sale of its Travel Insurance.

CONFIDENTIAL

MILLER-0012684

29.    Company agrees that it will adopt and implement in each of the Participating States, except Pennsylvania, all Forward Looking Guidelines For Rate Filings contained in the Merlinos & Associates Report for National Union Fire Insurance Company of Pittsburgh, PA dated September 7, 2017, which is part of the confidential work papers for Investigation Number 234507, to the extent that such Forward-Looking Guidelines are consistent with the Insurance Laws in the Participating States.

**D.    Other Provisions**

1.    <u>Authority to Execute.</u> The Parties represent and warrant that the person(s) executing this Agreement on behalf of each Party has the legal authority to bind the Party to the terms of this Agreement.

2.    <u>Full and Final Agreement.</u> This Agreement, including exhibits and the Confidential Addendum, represents the entire understanding between the Company and the Participating States with respect to the subject matter contained herein and supersedes any and all prior or existing understandings, agreements, plans and negotiations, whether written or oral, between the Company and any Participating State. This Agreement constitutes full and final resolution of the issues raised in the Investigation in each of the Participating States.

3.    <u>Monitoring.</u> During the Monitoring Time Period, the Company shall provide the Signatory Lead States with semi-annual reports, in a format acceptable to the Signatory Lead States, beginning six (6) months from the Effective Date addressing the implementation and execution of the requirements of this Agreement. Each report shall be delivered to the Signatory Lead States within thirty (30) days following the end of the applicable reporting period. During the Monitoring Time Period, the Signatory Lead States may provide feedback to the Company regarding its meeting the requirements of this Agreement.

CONFIDENTIAL

MILLER-0012685

4.    <u>Confidentiality of Monitoring.</u>  The monitoring of the Company for compliance with the terms of this Agreement constitutes an ongoing investigation by each of the Signatory Lead States pursuant to each of their respective jurisdiction's laws.  To the extent permitted by State law, all audit reports, statistical reports, work papers, documents and any other information produced, obtained, or disclosed in connection with the Review and any follow-up investigation of the Company contemplated under this Agreement, regardless of the manner of production or disclosure, shall be given confidential, trade secret, and privileged treatment, shall not be subject to subpoena, and shall not be made public, and are not public records subject to disclosure. Nothing in this Agreement is intended to, nor shall it, preclude Participating States from sharing records and other information relating to the Investigation or Review, the Agreement or disclosing the results of compliance with the Agreement to other regulatory or law enforcement entities to the extent permitted by State law.

5.    <u>Monitoring Costs.</u>  During the Monitoring Time Period, the reasonable costs and expenses of the Signatory Lead States related to the monitoring of the Company's compliance with this Agreement, including the costs and expenses of conducting the ongoing review referenced in Section D (4), shall be borne by the Company.

6.    <u>No Additional Exams.</u>  During the Monitoring Time Period, if the Company complies with all provisions contained in this Agreement, the Participating States agree they will not initiate any market conduct examinations, investigations and/or reviews relating to any of the issues subject to this Agreement other than the ongoing review by the Signatory Lead States referenced in Section D (4) above.

7.    <u>Enforcement.</u>  The execution of this Agreement by the Signatory Lead States and the timely adoption of this Agreement by the Participating States pursuant to Section D (23)

20

CONFIDENTIAL                                                                MILLER-0012686

constitute the entry of an Order by each Lead and Participating State. Any enforcement action brought by any Participating State shall be in conformity with the provisions of this paragraph. If a Participating State believes that the Company has breached a provision of this Agreement, including, but not limited to, the Business Reforms that Participating State shall provide written notice of the alleged breach to the Company and will also notify the Signatory Lead States that the alleged breach has occurred. Company shall have the opportunity, within fifteen (15) business days of receipt of such notice, to present evidence in writing and/or through appearance before the state insurance regulator in an attempt to rebut the allegation(s) or to seek an extension to address the alleged breach. Company shall then have ninety (90) business days from the date of receipt of the state's determination of the alleged breach to cure the alleged breach, unless extensions are agreed to. The Participating State and the Company agree to act and negotiate in good faith to resolve any alleged breach of the Agreement. A breach constitutes a breach of the entire Agreement only if the breach is deemed material, which for purposes of this Agreement means a significant, substantial failure in the performance of the Agreement, and central to the entire Agreement. A breach may be deemed material in a Participating State without being material in all Participating States. A material breach of this Agreement shall constitute the violation of an Order where determined in any Participating State in which the material breach occurs. A Participating State shall not pursue any enforcement action against the Company until the 90 day cure period has expired, but may then seek, without limitation, to enforce the provisions of this Agreement through administrative or legal enforcement actions and may seek penalties for violations of this Agreement. Any enforcement action brought by any Participating State shall be governed by the laws and regulations of that Participating State. The Company reserves all rights and defenses that may be available with respect to such an enforcement action.

CONFIDENTIAL

MILLER-0012687

8.   Expiration of this Agreement.  The provisions contained in Section C of this Agreement will expire on the later of five (5) years from the Effective Date or the end of the Monitoring Time Period.

9.   Governing Law.  This Agreement shall be governed by, and interpreted in accordance with each Participating State's law.  Any action or proceeding to enforce the provisions of this Agreement brought by any Participating State shall be governed by the laws and regulations of such Participating State.

10.   Release.  Each Participating State hereby agrees to and does release the Company and any of its parents and subsidiaries, successors, assigns, officers directors and employees from any and all claims, sanctions, losses, demands, interest, penalties, actions or other causes of action that each Participating State may have, prior to the Effective Date, by reason of any matter, cause or thing whatsoever, regarding or relating to this Investigation and the issues raised in this Investigation or encompassed by the scope of this Agreement or as a result of any practices revealed by the Investigation, to the extent such practices commenced prior to the Effective Date of this Agreement.  Notwithstanding the foregoing, this Agreement is not intended to, nor may it be construed to, limit a Participating State's authority to investigate, examine or act upon any noncompliance of the Company with Insurance Laws or regulations regarding matters not within the scope of this Agreement.  Further, nothing in this Agreement limits the authority of the Participating States to conduct any regulatory functions, including but not limited to dealing with specific instances of consumer complaints, licensing of insurers, Administrators, producers and other entities, or rate and form filing reviews which occur as part of Participating State's normal product filing review process.  This Agreement is not intended and may not be construed to limit the authority of any Participating State to investigate, examine

22

CONFIDENTIAL

MILLER-0012688

and take appropriate action as to matters outside the scope of this Agreement. Except as provided herein, nothing in this Agreement shall be construed to waive or limit any rights the Participating States may have to regulate the Company or to seek such other remedies for a violation of law or regulation.

11.    Subsequent Law.    If a Participating State adopts an Insurance Law relating to or conflicting with any provision of this Agreement, then application of such provision of this Agreement shall be superseded by such Insurance Law as it applies in that Participating State (and that state alone), and that all other unaffected terms and conditions of the Agreement shall remain in full force and effect.

12.    Non-Admissibility.    Neither this Agreement nor any part thereof, nor any act performed or document executed pursuant to or in furtherance of this Agreement, is now or may be deemed in the future to be an admission of or evidence of liability or any wrongdoing by the Company or any of its parents and subsidiaries, successors  assigns, officers, directors and employees.

13.    No Admission of Liability.    This Agreement does not constitute an admission of liability, violation, or wrongdoing by the Company and the Company expressly denies that any of its actions or alleged actions were knowingly committed or represented a pattern and/or business practice that would violate the insurance unfair trade practice laws, claims settlement laws, or any other applicable statutes or regulations of any of the Participating States. Neither this Agreement nor any part thereof, nor any related negotiations, statements or court proceedings shall be offered by the Company, the Signatory Lead States, the Participating States or any third party as evidence of an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the

CONFIDENTIAL

MILLER-0012689

Company or the Participating States, as a waiver by the Company or the Participating States of any applicable defenses, including without limitation any applicable statute of limitations or statute of frauds; or as a waiver by the Participating States of any regulatory authority regarding the matters or issues addressed in the Investigation.

14.     No Impairment of Legal Activity.   This Agreement does not impair, restrict, suspend or disqualify the Company from engaging in any lawful business in any jurisdiction, based upon, or arising out of, the Investigation regarding any alleged act or omission of the Company.

15.     No Impact on Current Travel Insurance.   Nothing in this Agreement or any of its terms and conditions shall be interpreted to alter in any way the terms or the validity of any of the Company Travel Insurance policies or certificates issued prior to the Effective Date. Nothing in this Agreement shall be interpreted to release the Company from its obligation to pay claims in accordance with policy provisions.   Further, nothing in this Agreement shall be interpreted to relieve the Company of its obligations to process consumer complaints in accordance with applicable law.

16.     Extensions.   The Signatory Lead States and the Company may mutually agree, in writing, to any reasonable extensions of time that might become necessary to carry out the provisions of this Agreement.   In the event the Company believes it will be unable to meet a deadline under the Agreement, the Company will promptly, but in no event less than fourteen (14) business days prior to the deadline in question, inform the Signatory Lead States.   The Company will use its reasonable best efforts to meet any such deadline as soon as practicable. The Signatory Lead States agree that they will consider all requests for extensions from the Company in good faith.

24

CONFIDENTIAL

17.    Amendments.  No amendments shall be made to this Agreement except in writing and where agreed to by the Company and the Signatory Lead States on behalf of the Participating States.  Nothing in this Agreement is meant to prohibit a Participating State from entering into a separate agreement with the Company regarding its Travel Insurance practices and procedures in that state.

18.    Notice and Request for Modification.  The Lead States will notify the Company of any Agreements or terms of Agreements that they enter into with any other Travel Insurance companies that is inconsistent with the Business Reforms adopted in this Agreement.  Upon receipt of such notice, Company may seek a modification to this Agreement relating to the Business Reform at issue from the Signatory Lead States, and the Signatory Lead States will not unreasonably withhold consent to such a request for modification.

19.    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be deemed an original and all of which, when taken together, shall constitute one and the same Agreement.  Execution and delivery of this Agreement may be performed by e-mail or facsimile transmission.

20.    Headings.  The section headings herein are intended for reference and shall not by themselves determine the construction or interpretation of this Agreement.

21.    Severability.  If any term or provision of this Agreement is determined by any court, regulatory or governmental agency to be illegal, unenforceable or invalid in whole or in part for any reason, such illegal, unenforceable or invalid provision or part thereof shall be deemed stricken from this Agreement, and such provision shall not affect the legality, enforceability or validity of the remainder of this Agreement.  Additionally, in the event that a court, regulatory or governmental agency determines that the Company has failed to satisfy a

CONFIDENTIAL

MILLER-0012691

provision of this Agreement, pursuant to the Enforcement provision in paragraph D (7), it is the intent of the Parties that the remainder of this Agreement and its corresponding obligations and provisions are not affected thereby and remain in effect.

22.    Preservation of Rights.   This Agreement shall not confer any rights upon any persons or entities other than the Parties to it or extinguish any such rights, and the Agreement is not intended to be used for any other purpose.   Nor shall the Agreement be deemed to create any intended or incidental third-party beneficiaries, and the matters addressed herein shall remain within the sole and exclusive jurisdiction of the Participating States.

23.    Participating State Adoption.    States may adopt this Agreement and become Participating States only if they execute and return to the Signatory Lead States a Participating State Adoption in the form of Exhibit A on or before forty five (45) days from the Execution Date.


        IN WITNESS WHEREOF THE PARTIES HAVE EXECUTED THIS AGREEMENT
AS OF THE DATE SET FORTH AFTER EACH OF THEIR NAMES.

            [SIGNATURE PAGES IMMEDIATELY FOLLOW]

CONFIDENTIAL

MILLER-0012692

**National Union Fire Insurance Company of Pittsburgh Pa.**

By:_____

Title:_____Senior Vice President_____

Date:_____10/6/17_____

27

CONFIDENTIAL

**Missouri Department of Insurance, Financial Institutions and Professional Registration**

By: _Chlora Lindley Myers_

Title: _Director_

Date: _January 24, 2018_

CONFIDENTIAL

MILLER-0012694

**Minnesota Department of Commerce**

By: _James Connor_

Title: _Deputy_

Date: _10.20.19_

CONFIDENTIAL

MILLER-0012695

Targeted Multi-State
National Union Gd

**Ohio Department of Insurance**

By: _____

Title: _____ Director _____

Date: _____ 12/6/17 _____

30

MILLER-0012696

**Oklahoma Insurance Department**

By: _Joel L Sander_
(Joel L. Sander

Title: Deputy Commissioner, Finance

Date: October 18, 2017

CONFIDENTIAL

MILLER-0012697

Pennsylvania Insurance Department

By: _____

Title: _____

Date: _____

33

CONFIDENTIAL

MILLER-0012698

Utah Insurance Department

By: _____

Title: _____

Date: _____

33

CONFIDENTIAL

MILLER-0012699

**Exhibit A**
**PARTICIPATING STATE ADOPTION**
of
**REGULATORY SETTLEMENT AGREEMENT**

MARKET CONDUCT EXAMINATION OF
TRAVEL INSURANCE PRACTICES

IN THE MATTER OF
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH PA.
NAIC #19445

On behalf of [STATE INSURANCE REGULATORY AGENCY], I, [EXECUTING OFFICIAL], as [EXECUTING OFFICIAL'S TITLE], hereby adopt, agree, and approve the Regulatory Settlement Agreement dated [EFFECTIVE DATE] by and between the above-named Company and the regulatory agencies named therein.

[STATE INSURANCE REGULATORY
AGENCY]
By:_____
Title:_____
Date:_____

Please return this form to:

Stewart Freilich, Senior Regulatory Affairs Counsel
Missouri Department of Insurance, Financial
Institutions and Professional Registration
PO Box 690
Jefferson City, MO 65102
Stewart.freilich@insurance.mo.gov

34

CONFIDENTIAL

MILLER-0012700

**Exhibit B**
**Content of Notice to Distribution Participants**

To:     Distribution Participants

From:   National Union Fire Insurance Company of Pittsburgh Pa.

Re:     Regulatory Settlement Agreement

Dear Colleagues:

In 2014, several state insurance departments initiated market conduct examinations and investigations of the travel insurance industry generally.  To resolve these examinations and investigations, participating states insurance departments have offered the opportunity for many of these insurance companies to enter into a Regulatory Settlement Agreement (the "Agreement") without any admission of wrongdoing.  Indeed, the Participating States specifically acknowledge that a Company's acquiescence to this Agreement is not indicative of whether the Company engaged in any of the practices identified herein; and further acknowledge that the said Participating States expect all relevant market participants to adhere to the standards set forth in this Agreement, regardless of whether any such findings have been made against the Company and even in the absence of such findings.    Attached is a copy of (or link to) the Agreement, executed by National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC" or "Company") including all non-confidential exhibits thereto, which we are required to provide you pursuant to Section C (1) thereof. Please note the requirements contained in the Agreement as they relate to Distribution Participants.

All travel insurance companies have a duty to ensure that their Distribution Participants (including agents and administrators such as TPA's and MGA's) comply with all applicable laws and regulations for agents and administrators who are acting on the Company's behalf.  Pursuant to the terms of the Agreement, NUFIC hereby notifies you of the following specific regulatory requirements addressed in and to be governed by the terms of the Agreement:

- The solicitation and purchase of insurance is governed by applicable state law and anyone found violating state law may be subject to license revocation, administrative fines, civil penalties and other remedial actions provided for by applicable state law.

- No one may charge a separate fee for travel insurance in addition to the travel insurance premium or add any charges or fees for any of the Company's travel insurance products or related services without a separate written agreement with the insured, unless permitted by applicable law, and must comply with all state anti-rebating laws in connection with the sale of travel insurance.

- No one may offer or sell travel insurance policies using an opt-out marketing -plan unless using opt-out for insurance is permitted by applicable law.

35

CONFIDENTIAL

- No one may undertake to engage in underwriting or taking risk that would be considered the business of insurance, as defined by law, without a valid certificate of authority to do so, unless permitted by applicable law.

- No one may represent that the purchase of a specific company's travel insurance is compulsory, or is required or mandated as a condition for the purchase of a trip or travel package, unless permitted by applicable law.

- Where prohibited by the Insurance Laws of the applicable Participating State, no one may sell in the same package or include or require in the sale of travel insurance the costs of non-insurance assistance services or travel cancellation fee waivers to consumers, or conversely sell in the same package or include or require in the sale of non-insurance assistance services or travel cancellation fee waivers, the cost of travel insurance.

NUFIC is required to work in good faith with its licensed and registered distribution participants to ensure that this Notice is provided to all distribution participants that offer or sell Company's travel insurance. Please forward a copy of this Notice to all travel retailers and business entities offering or selling NUFIC's Travel Insurance. Please contact [insert name of company contact and contact information] if you have any questions.

36

CONFIDENTIAL

MILLER-0012702

Governor Eric R. Greitens
State of Missouri



Department of Insurance
Financial Institutions
and Professional Registration
Chlora Lindley-Myers, Director

DIVISION OF INSURANCE MARKET REGULATION

March 28, 2018

VIA ELECTRONIC MAIL
Kara Baysinger
Dentons US LLP

**RE:    *Modification to the RSA dated December 12, 2017***

Dear Kara:

Pursuant to Section D (18) of the Regulatory Settlement Agreement (RSA) dated January 24, 2018 between National Union Fire Insurance Company of Pittsburgh PA (NUFIC) and the Signatory Lead States of Missouri, Minnesota, Ohio, Oklahoma, Pennsylvania and Utah, the Signatory Lead States will notify the Companies of any Agreements or terms of Agreements that they enter into with any other Travel Insurance Companies that is inconsistent with the Business Reforms adopted in Section C of the RSA.  Upon receipt of such notice, NUFIC may seek a modification to the RSA relating to the Business Reform at issue from the Signatory Lead States, and the Signatory Lead States will not unreasonably withhold consent to such a request for modification.

NUFIC seeks a modification to the first sentence of RSA Section C (10) based on language contained in Agreements with other Travel Insurance Companies that is inconsistent with the language contained in the NUFIC RSA.  The Signatory Lead States consent to NUFIC's request for modification of the first sentence of Section C (10).

The Signatory Lead States and NUFIC hereby agree to modify the terms of the first sentence of Section C (10) of the RSA dated January 24, 2018 between National Union Fire Insurance Company of Pittsburgh PA and the Signatory Lead States to read as follows:

"Company agrees that on or before 6 months after the Effective Date, it will prohibit any Distribution Participant operating, selling, or conducting business on its behalf from Self-Funding Insurance Coverages, including but not limited to, trip cancellation, trip interruption, emergency medical transportation, repatriation of remains   or other coverages unless the entity that is self-funding has a valid certificate of authority issued by the applicable Participating State Insurance Department."

CONFIDENTIAL

MILLER-0012703

The RSA dated January 24, 2018 between NUFIC and the Signatory Lead States remains unchanged in all other respects.

Stewart Freilich
Senior Regulatory Affairs Counsel
Missouri Department of Insurance,
Financial Institutions and
Professional Registration

On behalf of the Signatory Lead States

[Print Name and Title]

JEFFREY C. RUTLEDGE
SENIOR VICE PRESIDENT

On behalf of National Union Fire
Insurance Company of Pittsburgh PA

2

CONFIDENTIAL

MILLER-0012704



Governor Eric R. Greitens
State of Missouri

Department of Insurance
Financial Institutions
and Professional Registration
Chlora Lindley-Myers, Director

DIVISION OF INSURANCE MARKET REGULATION

April 16, 2018

Kara Baysinger
Dentons US LLP
One Market Plaza
Spear Tower, 24th Floor
San Francisco, CA 94105

RE:    *Modification to the RSA dated January 24, 2018*

Dear Ms. Baysinger:

Pursuant to Section D (18) of the Regulatory Settlement Agreement (RSA) dated January 24, 2018 between National Union Fire Insurance Company of Pittsburgh PA (NUFIC) and the Signatory Lead States of Missouri, Minnesota, Ohio, Oklahoma, Pennsylvania and Utah, the Signatory Lead States will notify the Companies of any Agreements or terms of Agreements that they enter into with any other Travel Insurance Companies that is inconsistent with the Business Reforms adopted in the RSA. Upon receipt of such notice, NUFIC may seek a modification to the RSA relating to the Business Reform at issue from the Signatory Lead States, and the Signatory Lead States will not unreasonably withhold consent to such a request for modification.

On April 10, 2018, the Signatory Lead States notified NUFIC that agreements with other travel insurers contained a term that is inconsistent with Section C (29) of the NUFIC RSA. NUFIC responded by seeking a modification of Section C (29) of the RSA to conform to similar provisions contained in RSA's with other travel insurers.

The Signatory Lead States and National Union Fire Insurance Company of Pittsburgh PA hereby agree to modify the terms of Section C (29) of the RSA dated January 24, 2018 between NUFIC and the Signatory Lead States to read as follows:

"Company agrees that it will adopt and implement in each of the Participating States, except Pennsylvania, all Forward Looking Guidelines for Rate Filings contained in the Merlinos & Associates Report for National Union Fire Insurance Company of Pittsburgh PA dated September 7, 2017, which is part of the confidential examination workpapers for Investigation Number 234507, to the extent that such Forward Looking Guidelines are required by the Participating State in a filing and are consistent with the Insurance Laws in the applicable Participating State, and with the understanding that this requirement to follow the guidelines is subject to each Participating State's enforcement of the RSA and that a Participating State can choose not to require the Company to follow these guidelines"

CONFIDENTIAL

MILLER-0012705

Stewart Freilich
Senior Regulatory Affairs Counsel
Missouri Department of Insurance,
Financial Institutions and
Professional Registration

On behalf of the Signatory Lead States

[Print Name and Title]

STEVEN R HAZE.

VICE PRESIDENT

On behalf of National Union Fire
Insurance Company of Pittsburgh PA

2

CONFIDENTIAL

MILLER-0012706