# EXHIBIT K

**United States District Court**
**Northern District of California**

| | | |
|---|---|---|
| TAMIKA MILLER and JULIANNE CHUANROONG, et al., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 3:21-cv-09751-TLT |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TRAVEL GUARD GROUP, INC. et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

# Expert Rebuttal Report of Lorin M. Hitt, Ph.D.

## October 10, 2023

CONFIDENTIAL

# Table of Contents

I.      Qualifications .................................................................................................... 1

II.     Summary of Opinions ....................................................................................... 1

III.    Background and Class Definition ..................................................................... 4

        A.      Summary of Allegations and Class Definition ................................... 4

IV.     Assignment and Materials Considered ............................................................ 5

V.      Background and Summary of Plaintiffs' Expert Reports ............................... 6

        A.      Fanoe Class Certification Report Summary ....................................... 6

        B.      Fanoe Merits Report Summary ........................................................... 6

                1.      Mr. Fanoe's Primary Method................................................... 7

                2.      Mr. Fanoe's Alternative Method.............................................. 7

VI.     Mr. Fanoe Makes Critical Assumptions about Cost Structure and the Industry that are
        Deeply Flawed, Imply a But-For World that Cannot Exist, and Render His Damages
        Model Unreliable .............................................................................................. 8

        A.      Mr. Fanoe's Damages Calculations are Disconnected From Fundamental
        Economics and Industry Market Realities and When Adjusted Result in Significant
        Reduction to the Calculation of Refund Owed ............................................... 9

        B.      Mr. Fanoe Includes a Commission that is Unreasonably Low, Would Likely
        be Unacceptable to Third-Party Distributors, and Instead Should Reflect the
        Commissions Paid in the Actual World ........................................................ 10

                1.      Flaws with Mr. Fanoe's Commission Assumption.............................. 10

                2.      Impact to Mr. Fanoe's Calculation of Refund Owed Using Actual
                Commissions Paid.......................................................................... 13

        C.      Mr. Fanoe Inappropriately Allocates Costs based Only on California Cases
        and Excludes "Insurance" Costs Without Basis; He Instead Must Account for the Cost
        Structure of Providing a Global Support Network ...................................... 14

                1.      Flaws with Mr. Fanoe's Cost Allocation Assumptions ...................... 14

                2.      Impact to Mr. Fanoe's Calculation of Refund Owed Using Costs
                Associated with Service Centers that Service California Consumers ............ 19

        D.      Mr. Fanoe Incorrectly Apportions Costs Based on Insurance Premium
        Revenue as Opposed to Non-Insurance Premium Revenue ......................... 19

                1.      Flaws with Mr. Fanoe's Insurance Premium Based Apportionment... 19

                2.      Impact to Mr. Fanoe's Calculation of Refund Owed Using Assistance
                Service Revenue Apportionment ................................................... 20

VII.    Mr. Fanoe's Damages Calculations are Unreliable and Cannot be Used to Assess
        Class-Wide Damages ..................................................................................... 20

A.    Mr. Fanoe's Damages Method Continues to Incorrectly Use "Prices" Not Actually Paid by Consumers and Incorrectly Assume That Non-Insurance Assistance Services have Zero Value ............................................................................................. 20

B.    Mr. Fanoe's Damages Methodology Would Award Damages to Putative Class Members Who Were Not Harmed ................................................................................. 22

C.    Mr. Fanoe's Adjustments to His Alternative Method Fail to Address The Conceptual Flaws Outlined in the Hitt Report and Further Rely on Arbitrary and Unfounded Assumptions ............................................................................................. 24

VIII.    Mr. Fanoe Offers No Method to Reliably Calculate Individual Damages ................. 25

A.    Mr. Fanoe's Method Implies a But-For World That Cannot Exist ................. 25

B.    Empirical Evidence Suggests That a Disclosure of Price Components Would Have No Impact on Consumer Behavior ..................................................................... 26

C.    Mr. Fanoe's Analysis Fails to Identify Unharmed Class Members ................ 28

## I.    Qualifications

1.    I previously submitted a report in this matter ("Hitt Report") that includes a detailed discussion of my qualifications.  An updated copy of my Curriculum Vitae is attached as **Appendix A**, and an updated list of testimony is attached as **Appendix B**.

## II.    Summary of Opinions

2.    First, I should note that all of the opinions previously offered in the Hitt Report remain unchanged.  Mr. Fanoe's damages analysis as presented in the Expert Report of Gregory Fanoe, submitted on September 18, 2023 ("Fanoe Merits Report") remains largely unchanged from the Declaration of Gregory Fanoe in Support of Plaintiffs' Motion for Class Certification, submitted on June 23, 2023 ("Fanoe Class Certification Report").  Therefore, all of my criticisms outlined in the Hitt Report continue to apply to the opinions set forth in the Fanoe Merits Reports.  Mr. Fanoe's proposed methodology (both the primary and alternative refund methods) continues to be flawed and unreliable to any assessment of economic injury experienced by Class members.  Neither the price paid for the bundled travel protection plan nor the component "price" attributed to non-insurance travel assistance services (with or without a deduction for the "actuarially reasonable" profit) corresponds to or provides any information about the value of non-insurance travel assistance services to consumers.

3.    Mr. Fanoe's damages analysis involves a refund of all or most of the non-insurance travel assistance services fee to all consumers.  Such an approach is inappropriate because the fee component for non-insurance travel assistance services is not a price that actually was, or could be, paid by consumers for those assistance services.  Nor does it represent a measure of consumer value of these services as noted earlier.  For consumers who received the benefit of having non-insurance travel assistance services either in realized outcome (e.g., they used assistance services) or in expectation (e.g., they had a chance of being protected against an adverse event and received the "peace of mind" associated with that protection) a full refund would represent a windfall.  Furthermore, a partial refund would represent a windfall for all consumers who valued these services above their "actuarially reasonable price."

4.    Mr. Fanoe's damages calculation suffers from numerous flaws that render his damages model (both his primary and alternative methods) unreliable.  In my opinion, there

are three changes that (at a minimum) should be made. Those changes relate to: (1) the commission; (2) the estimate of expenses to provide non-insurance travel assistance services to the Class, and (3) the apportionment of costs to an individual.

5. As I explained in the Hitt Report, Mr. Fanoe's damages calculations are disconnected from fundamental economics and industry realities. To demonstrate how sensitive Mr. Fanoe's model is to his unfounded assumptions, I calculate the effects of making the following three changes: (1) the but-for commission is set to the actual commission; (2) all costs associated with a service center that serviced a California case are included in operations costs, and (3) assistance service costs are apportioned using a ratio of assistance service revenue rather than insurance premium revenue.

6. When all three of the above changes are implemented, while keeping all of Mr. Fanoe's other assumptions and model structure the same, the calculated refund owed to Ms. Chuanroong declines from $5.28 to $0.81, a reduction in total refund owed of 84.7%.[1]

7. There are critical flaws in each of Mr. Fanoe's three assumptions, which support my alternative calculation of the total refund owed, and further demonstrate the impact of making even just one of those changes individually.

8. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████.[2]

9. ███████████████████████████████████████
███████████████████████████████████████████

---
[1] Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $0.81, a reduction in total refund owed of 83.8%.
[2] Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $2.08, a reduction in total refund owed of 58.3%.

10. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ [3]

11.     While Mr. Fanoe has made some slight modifications to his alternative method, these modifications do not address the criticisms outlined in the Hitt Report.  Mr. Fanoe has offered no analysis to determine the economic injury to Class members, nor does his analysis provide any information about how consumers may be in a different economic condition due to the challenged conduct.  Mr. Fanoe's methodological changes do not improve the reliability of his "actuarially reasonable price" since they involve modifications of his assumptions based on additional unsupported assertions and speculation.

12.     None of Mr. Fanoe's calculations are informative about consumer economic harm. Even if one were to accept Mr. Fanoe's proposed damages methodology as a reliable

[3] Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $4.43.

calculation, this methodology fails to provide a reliable way of measuring any individual Class member's damages in this matter. In fact, neither Plaintiffs nor Mr. Fanoe provide any analysis that causally connects the damages calculated by Mr. Fanoe to any individual's actual economic losses.

13.     If the alleged wrongdoing was related to a lack of disclosure, neither Plaintiffs nor Mr. Fanoe have provided any evidence of consumer harm. To the contrary, as demonstrated in the Hitt Report, empirical evidence suggests a disclosure of price components would likely have no impact on consumer behavior.

14.     Lastly, given that Mr. Fanoe's analysis is entirely unrelated to consumer behavior, or any economic loss that may have occurred (at the individual level), there is no feasible way to reliably identify which consumers were harmed, and if so, by how much. Therefore, even if one were to assume the damages calculated by Mr. Fanoe were correct in aggregate (which is not true for reasons discussed throughout the Hitt Report and in this report), Mr. Fanoe has failed to identify or offer a methodology to identify potentially unharmed Class members who will necessarily receive windfall payments when they have zero economic loss.

## III.    Background and Class Definition

### A.    Summary of Allegations and Class Definition

15.     The Hitt Report provides a detailed discussion of the allegations in this matter and background information on each of the Defendants in this case.[4]

16.     I understand that the following classes as to Plaintiffs' UCL (unfair and unlawful) claims have been certified:[5]

> a.    All natural persons who, using a California address, purchased a travel insurance plan from Defendants at any point from December 17, 2017, until the present, and who were charged a fee for Travel Guard's supposed non-insurance travel assistance service on top of the applicable insurance premium rate Defendants were authorized to charge (the "Class").

---

[4] Expert Report of Lorin M. Hitt, Ph.D., July 26, 2023, ("Hitt Report"), Section III.A.
[5] Order on Motion for Class Certification and Related Daubert Motions, *Tamika Miller, et al., Plaintiffs, v. Travel Guard Group, Inc., et al., Defendants., Case No. 3 21-cv-09751-TLT*, September 15, 2023 ("Class Certification Order"), p. 30.

CONFIDENTIAL

b. All Class members who purchased Defendants' travel insurance plans through a third-party travel retailer's online purchase path (the "Online Purchase Subclass" or "Subclass").

## IV.    Assignment and Materials Considered

17.    I was asked by counsel for Defendants to evaluate and respond to the Fanoe Merits Report and offer an opinion as to the potential damages of the Class as they relate to Plaintiffs' allegations that Class members overpaid for non-insurance travel assistance services.  As part of that assignment, in addition to the work performed in the Hitt Report, I have reviewed the Fanoe Merits Report, additional documents and data, and analyzed the impact to Mr. Fanoe's calculated refunds owed to the Class by changing various assumptions.

18.    In my capacity as an expert in this matter, I am being compensated at my standard hourly rate of $1,200.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  In addition to my standard hourly billing rate, I receive compensation from Cornerstone Research based on its billings for work supporting me.  Neither my hourly compensation in this matter nor my compensation derived from Cornerstone Research billings is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.  All the opinions expressed in this report are entirely my own and are based on my education, experience, and training, as well as my analyses and my review of the case document sources and other materials that I have relied upon in preparing this report.  This report reflects my opinions in this matter at the time of writing.  I reserve the right to update or supplement my opinions as further information is made available to me.

19.    In reaching my conclusions, in addition to the materials considered in connection with the Hitt Report, I have also reviewed certain court filings, Plaintiffs' Expert Reports, documents and financial data produced by Travel Guard, academic research, and Travel Guard's website.  A list of materials considered appears in **Appendix C.**

## V.    Background and Summary of Plaintiffs' Expert Reports

20.    The Hitt Report provides a detailed discussion of the Fanoe Class Certification Report.[6]  Accordingly, in the following paragraphs I provide a brief summary of the Fanoe Class Certification Report before providing a summary of the Fanoe Merits Report.

### A.    Fanoe Class Certification Report Summary

21.    As summarized in the Hitt Report, Mr. Fanoe previously offered two methods (a primary method and an alternative method) for calculating amounts owed to Class members.[7]

22.    Mr. Fanoe's "primary method" for determining "the amounts class members lost as a result of Defendants' wrongful conduct is to calculate the difference between the price actually paid by each class member and the amount of insurance premium authorized for that transaction."[8]  Mr. Fanoe's "alternative method" would be in the event that "the Court determines that the legally approved and capped insurance rates applicable to the insurance sales at issue in this lawsuit are not the proper baselines for calculating amounts owed to class members, and instead accepts Defendants' arguments that Plaintiffs must further account for the value allegedly added to the insurance premium by the inclusion of Defendants' assistance services…"[9]

### B.    Fanoe Merits Report Summary

23.    In the Fanoe Merits Report, Mr. Fanoe purports to calculate damages for the Class. Mr. Fanoe proposes two methods for calculating damages for Class members (both of which are the same as the methods he proposed in the Fanoe Class Certification Report): (1) the primary method, which involves offering the Class a full refund of the "price" of the assistance services, or (2) the alternative method, which he claims "accounts for the value allegedly added to the insurance premium."[10]  Mr. Fanoe further states that this alternative "method of calculating refunds [is] based on standard actuarial principles can be applied to all Class members."[11]  I will discuss each of those methods in detail in the sections that follow.

---

[6] Declaration of Gregory Fanoe in Support of Plaintiffs' Motion for Class Certification, June 23, 2023 ("Fanoe Class Certification Report"), ¶¶ 32–36.  See also, Hitt Report, Section III.B.1.
[7] Hitt Report, ¶¶ 32–36.
[8] Hitt Report, ¶ 33.
[9] Fanoe Class Certification Report, ¶ 17.
[10] Expert Report of Gregory Fanoe, September 18, 2023 ("Fanoe Merits Report"), ¶ 17.
[11] Fanoe Merits Report, ¶ 60.

CONFIDENTIAL

### 1.    Mr. Fanoe's Primary Method

24.    Mr. Fanoe has not modified his original opinion or methodology for calculating damages under the primary method, which would offer a full refund of the non-insurance travel assistance services revenues back to Class members.[12]

### 2.    Mr. Fanoe's Alternative Method

25.    Unlike the primary method, Mr. Fanoe has made changes to the alternative method presented in the Fanoe Merits Report.[13]  Specifically, the following changes have been made:

    a.  **Estimate of Expenses to Provide Assistance Services to the Class:** Mr. Fanoe changed his estimate of non-insurance travel assistance services expenses allocable to California consumers in his Merits Report ██████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████.[15]

    b.  **Exclusion of Purported Insurance Expenses:**  In the Fanoe Merits Report, Mr. Fanoe claims that "certain categories Defendants call 'non-insurance' assistance services are actually insurance services,"[16] including benefits inquiries,[17]  medical assistance cases,[18] luggage assistance cases,[19] and travel arrangement assistance.[20]  In total, Mr. Fanoe excludes █████████ in expenses that he claims are actually insurance expenses, reducing the total amount of assistance services expenses associated with California policies to ████████.[21] In the Fanoe Class Certification Report, Mr. Fanoe estimated that ████% of Travel Guard's assistance costs should be excluded.[22]

    c.  **Commissions**:  Mr. Fanoe utilizes a commission rate of ██████ in both the Fanoe Class Certification Report and the Fanoe Merits Report.[23]  However,

---

[12] Fanoe Merits Report, ¶¶ 13–16.
[13] Fanoe Merits Report, Section IV.
[14] Fanoe Merits Report, ¶ 33.
[15] Fanoe Merits Report, ¶¶ 25, 26, 33.
[16] Fanoe Merits Report, ¶ 39.
[17] Fanoe Merits Report, ¶¶ 40–41.
[18] Fanoe Merits Report, ¶ 42.
[19] Fanoe Merits Report, ¶ 44.
[20] Fanoe Merits Report, ¶ 46.
[21] Fanoe Merits Report, ¶ 47.
[22] Fanoe Class Certification Report, ¶¶ 27–28.
[23] Fanoe Merits Report, ¶ 54; Fanoe Class Certification Report, ¶ 35.

CONFIDENTIAL

Mr. Fanoe also claims that he will "█████████████████████████ █████████████████████████"[24] in the Fanoe Merits Report.

d. **Final Calculation**: These changes result in a newly calculated "actuarially reasonable price" for non-insurance travel assistance services (with the elimination of insurance expenses) that is lower than the price calculated in the Fanoe Class Certification Report. Because the newly calculated "actuarially reasonable price" is lower, the refund Mr. Fanoe calculates is higher. Specifically, in the Fanoe Class Certification Report, Mr. Fanoe calculated an "actuarially reasonable price" of ███,[25] for the non-insurance travel assistance services purchased by Ms. Chuanroong, while in the Fanoe Merits Report, he calculated an actuarially reasonable price of ███ for these services.[26] As such, Mr. Fanoe's "calculated refund" increased from ███ in the Fanoe Class Certification Report to ███ in his Merits Report, with the elimination of insurance expenses.[27]

## VI. Mr. Fanoe Makes Critical Assumptions about Cost Structure and the Industry that are Deeply Flawed, Imply a But-For World that Cannot Exist, and Render His Damages Model Unreliable

26.    Mr. Fanoe's damages calculation contains numerous flaws, which render his damages model (both his primary and alternative methods) unreliable. Mr. Fanoe makes critical assumptions about the costs of third-party distribution, the costs associated with providing a global assistance services network, and the market for travel insurance plans that are deeply flawed. These flawed assumptions result in Mr. Fanoe setting forth a but-for world that cannot exist and a methodology that offers no reliable way to measure the alleged economic injury of Class members.

27.    While there are numerous flaws that render Mr. Fanoe's damages model unreliable, there are three critical assumptions that, when changed, demonstrate that his model is highly sensitive to the assumptions he makes and do not reflect the market realities or potential but-for world that addresses Plaintiffs' allegations. Specifically, the changes are: (1) the

---

[24] Fanoe Merits Report, ¶ 55.
[25] Fanoe Class Certification Report, ¶ 37.
[26] Fanoe Merits Report, ¶ 59.
[27] Fanoe Class Certification Report, ¶ 39; Fanoe Merits Report, ¶ 59. I note that Mr. Fanoe also presents a reasonable price for Travel Guard "without elimination of any insurance expenses" of $0.40, which would reduce his calculated refund to $4.99. Fanoe Merits Report, ¶¶ 57, 59.

commission; (2) the estimate of expenses to provide non-insurance travel assistance services to the Class, and (3) the apportionment of costs to an individual Class member. Importantly, these changes result in dramatically lower estimates of damage even assuming Mr. Fanoe's flawed damages methodology is appropriate, which it is not.

28.     In the sections that follow, I will first describe the impact of changing all three of the above changes in my alternative calculation. Then, I will describe each of those changes, the flaws of each of Mr. Fanoe's assumptions, and then the impact of changing even just one change individually.

###     A.    Mr. Fanoe's Damages Calculations are Disconnected From Fundamental Economics and Industry Market Realities and When Adjusted Result in Significant Reduction to the Calculation of Refund Owed

29.     There are significant and fundamental flaws in Mr. Fanoe's damages calculations and demonstrate that Mr. Fanoe has failed to reflect a realistic but-for world or accurately reflect the market reality Travel Guard would be expected to face. Additionally, Mr. Fanoe's model is highly sensitive to the assumptions he makes – many of which are entirely subjective and lack economic or industry support. To demonstrate the impact of these failures, I make all three of the following changes in my alternative calculation: (1) assumed that the but-for commission would be the same as the actual commission; (2) included all costs associated with a service center that serviced a California case, without further excluding "insurance expenses," and (3) apportioned assistance service costs using a ratio of assistance service revenues rather than a ratio of insurance premium revenues.

30.     As shown in Exhibit 1, when all three changes are implemented, while keeping all other assumptions and model structure the same, the calculated refund owed to Ms. Chuanroong declines from $5.28 to $0.81, a reduction in total refund owed of 84.7%.[28]

31.     In the sections that follow, I will discuss each of the changes in greater detail.

---

[28] ($5.28 - $0.81) / $5.28 = 84.7%. Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $0.81, a reduction in total refund owed of 83.8%. ($4.99 - $0.81) / $4.99 = 83.8%.

**B.      Mr. Fanoe Includes a Commission that is Unreasonably Low, Would Likely be Unacceptable to Third-Party Distributors, and Instead Should Reflect the Commissions Paid in the Actual World**

**1.      Flaws with Mr. Fanoe's Commission Assumption**

32.    First, Mr. Fanoe has incorrectly accounted for commissions.  He calculates commissions by basing them on a simple rate (i.e., percentage) that can be applied to his adjusted "actuarially reasonable price," rather than recognizing the commissions that would likely prevail in the but-for world are the same or similar to the commissions that were paid in the actual world.  In other words, the implied commission Mr. Fanoe calculates under his alternative method is unlikely to be acceptable to travel partners for distribution of Travel Guard's travel insurance plans.

33.    If one were to assume that the commission paid on Ms. Chuanroong's travel protection plan remained unchanged in the but-for world, assuming the ███ commission rate on United Airlines,[29] this would mean that the total commission payment on Ms. Chuanroong's travel insurance plan was ███.[30]  If the ███ commission is separated into the insurance and non-insurance components (based on the proportion of total plan price), then the non-insurance commission portion would be ███, while the insurance portion would be ███.  In fact, Mr. Fanoe uses such a split in parts of his analysis.

34.    Mr. Fanoe's alternative method calculates a commission payment on the non-insurance assistance services portion of only ███.  This results in a total commission payment of ███.  As shown in Exhibit 2, Mr. Fanoe's purported non-insurance travel assistance services commission of ███ represents a ███ reduction on the non-insurance travel assistance services component of the commission and a ███ reduction in total commission.[31]  This assumption is entirely unfounded and is disconnected from the realities of the costs of third-party distribution.

35.    Travel Guard is primarily sold through two channels, direct to consumer sales and sales through its distribution partners, such as United Airlines.  When selling through distribution partners, Travel Guard typically pays the distribution partner compensation for

---

[29] Fanoe Merits Report, ¶ 54.

[30] It should be noted that Ms. Chuanroong's actual commission is $8.16, which reflects 58.3% of Ms. Chuanroong's total purchase price of $14.00.  Mr. Fanoe misstates Ms. Chuanroong's non-insurance travel assistance fee as $5.39, where it was actually $5.93.  For purposes of comparability, I will continue to use Mr. Fanoe's figures, despite the error presented in the Fanoe Merits Report.  See MILLER-0061966.

[31] These numbers are in reference to Mr. Fanoe's model that excludes certain cases he deemed to be "insurance expenses."  In Mr. Fanoe's model that does not exclude cases he deemed to be "insurance expenses," the decline in the non-insurance travel assistance services of the product is 92.7%, and 37.1% in total commissions.  See Exhibit 2.

each travel insurance plan sold.  In other words, the distribution partner acts as an intermediary, who expends effort offering and disseminating the product and is rewarded for those sales through compensation.  Such effort is costly because, among other things, it requires United Airlines to allocate space on its checkout page to offer travel insurance plans – space that could otherwise be used for other United Airlines business purposes (e.g., including offerings of another travel insurance provider).  Academic literature has described these types of commission arrangements as a way for the company, in this case Travel Guard, and the intermediary, in this case United Airlines, to maximize their combined utilities and find an "equitable and stable method for dividing the combined payoff between themselves."[32]  In other words, the commission seeks to represent sufficient payment to the intermediary for their efforts while also representing an amount that does not exceed the incremental gains to the company through that sales channel.  As such, the commission payouts must be beneficial and acceptable to both the company and the intermediary.

36.    Mr. Fanoe has assumed, without basis, that third-party distribution would be unaffected and that travel partners would continue to distribute these travel insurance plans if they were offered a ███ reduction in total commissions paid.[33]

37.    Even if the total price of a travel insurance plan were to change (as incorrectly implied by Mr. Fanoe's model), it is unlikely that the amount of the commission paid to third-party distribution partners would change (or if they changed, that they would change by much).  This is because the terms of the distribution agreement, including the commission rate agreed upon, among other features of these relationships, would also have to change to better reflect the costs required to have third-party distribution.  Mr. Fanoe has provided no evidence that the "price" of the non-insurance travel assistance services materially affects the cost or effort of the travel partners to distribute travel insurance plans.  Therefore, in my opinion, Mr. Fanoe has no basis to conclude (as he does in his damages analysis) that travel partners (e.g., United, etc.) would continue to distribute these travel insurance plans in the face of a ███ commission reduction on the non-insurance travel assistance services

---

[32] Bragg, John M. "Prices and Commissions Based on the Theory of Games", *The Journal of Risk and Insurance* 33, no. 22, (1966), pp. 169–193, pp. 169–170.  ("a three person game" that includes "(1) [t]he Company, whose function is to make available the product to be sold, (2) [t]he Salesman, whose function is to present the product to the Potential Buyer and to attempt the sale thereof, and (3) [t]he Potential Buyer."  This "game" is "characterized by the formation of a coalition of two of the players against the third.  The [company and salesman] in such coalition seek to maximize their combined utilities … The players in the coalition then seek to determine an equitable and stable method for dividing the combined payoff between themselves.")

[33] See Exhibit 2.

CONFIDENTIAL

component of the product, or a ████ commission reduction on the entire commission paid to distribution partners.[34]

38.    Instead, in my opinion, it would be more appropriate to treat the amount of the commission as fixed (i.e., the commissions that were paid in the actual world), rather than treat it as variable (i.e., dependent on the purportedly "actuarially reasonable price"), as Mr. Fanoe has proposed in his damages model).[35]

39.    As discussed in the Hitt Report, the but-for world must be one that could, in fact, exist.[36]  Specifically, in the Hitt Report, I discussed the fact that it was unlikely that Travel Guard could continue to offer these travel insurance plans at the prices implied by Mr. Fanoe's flawed methodology.[37]  In particular, Mr. Fanoe fails to acknowledge that substantial commissions are necessary to gain distribution.  At least in the case of United Airlines, in addition to the costs and efforts required to distribute Travel Guard's travel insurance plans, the travel partner accepts some of the risk of Travel Guard providing insurance services.[38]  Therefore, a potential reduction in commissions of nearly ████ would likely require analysis and consideration on the part of the travel partner to determine if continuing to distribute could remain feasible.[39]  Even if such an arrangement were feasible, it would also likely encourage an evaluation of competing products by other travel insurance providers – to the extent that the travel insurance market is competitive, the next best alternative provider would likely offer commissions that are similar to those realized in the actual world.

40.    That is, if Travel Guard were forced to reduce the prices offered for its travel insurance plans or, alternatively, the products became less attractive to consumers, this could make it difficult for Travel Guard to pay the full commissions required for third-party distribution.[40]  If Travel Guard could not pay the full commissions, it could either lose access to those distribution channels or be entirely replaced by third-party distributors with a competitor's travel insurance plan.  Therefore, the but-for world must reflect the market

---

[34] See Exhibit 2.
[35] Fanoe Merits Report, ¶¶ 54–55
[36] See, e.g., Allen, Mark, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in Reference Manual on Scientific Evidence, Third Edition, (Washington, DC: The National Academies Press, 2011), pp. 425–502, p. 432 ("Because the but-for scenario differs from what actually happened only with respect to the harmful act, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's value arising from other sources.  Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss caused by the harmful act.").  Any but-for world that could not exist inherently would differ from the actual world in more ways than with respect to the harmful act; Hitt Report, Section VII.B.
[37] Hitt Report, ¶¶ 110–111, 115–119.
[38] MILLER-0061229.
[39] See Exhibit 2.
[40] Hitt Report, ¶ 118.

realities of the cost to distribute these plans through third-parties, and Mr. Fanoe has failed to account for or reflect the market realities in his damages methodology. The commission payments implied by Mr. Fanoe (as shown in Exhibit 2) are unlikely to be sufficient to support the third-party distribution that exists in the actual world.

41.     Further, as I note in the Hitt Report, direct distribution through Travel Guard's website is only a small fraction of Travel Guard's overall sales.[41] Therefore, the loss of third-party distribution networks would likely have significant, negative impacts on Travel Guard's business.[42]

### 2.     Impact to Mr. Fanoe's Calculation of Refund Owed Using Actual Commissions Paid

42.     Even if one were to accept Mr. Fanoe's structure for his damages analysis, including all of the other flaws that exist, Mr. Fanoe's failure to appropriately treat the realistic costs of third-party distribution has significant effects on the overall results of his analysis. Instead, it would be more appropriate to treat the commission payment as fixed, and specifically, reflect the amount actually collected on Ms. Chuanroong's transaction. The commission payment should not, as Mr. Fanoe has inappropriately assumed, be variable and change based on his "actuarially reasonable price."

43.     This change, as shown in Exhibit 3, would have a significant impact on the "refund" calculation and ultimately the implied damages owed to Class members. Specifically, by changing the but-for commission payment to be consistent with the commission for the transaction in the real world, changing no other assumptions in Mr. Fanoe's damages model, the refund Mr. Fanoe calculates for Ms. Chuanroong would change from $5.28 to $2.20, a reduction in the calculated refund of 58.3%.[43]

---

[41] Hitt Report, ¶¶ 46–47 (

)

[42] Hitt Report,

[43] ($5.28 - $2.20) / $5.28 = 58.3%. Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $2.08, a reduction in total refund owed of 58.3%. ($4.99 - $2.08) / $4.99 = 58.3%.

C.    Mr. Fanoe Inappropriately Allocates Costs based Only on California Cases and Excludes "Insurance" Costs Without Basis; He Instead Must Account for the Cost Structure of Providing a Global Support Network

1.    Flaws with Mr. Fanoe's Cost Allocation Assumptions

44.    In addition to ignoring the realities of the costs associated with establishing third-party distribution partnerships, Mr. Fanoe also ignores the cost structure associated with providing a global support network for its non-insurance travel assistance services.  In particular, Mr. Fanoe explicitly states that he is attempting to "allocate Travel Guard's annual global assistance expenses *judgmentally*, based on my experience and expertise, considering a review of several indications, such as the proportion of assistance cases with a California address in a given year to the total number of assistance cases handled by Travel Guard globally in that year, the ratio of costs for Travel Guard Group's assistance center to the total costs of Travel Guard's assistance centers globally, and the ratio of California revenues to nationwide revenues."[44]

45.    However, Mr. Fanoe's attempt to apportion Travel Guard's global assistance expenses is unreliable for a number of reasons.  First, his method fails to distinguish between fixed and variable costs, including the fact that Travel Guard may need to operate global service centers in order to provide global assistance services.  In other words, Travel Guard likely has a substantial body of fixed costs in order to offer these services, as it is well understood that this is a scale-driven business.[45]

46.    As discussed in detail in Section V.C of the Hitt Report, providing non-insurance travel assistance services requires using fixed cost resources, such as setting up a call center to receive assistance requests, which generate additional economies of scale.[46]  This fundamental cost structure was further acknowledged by Mr. Robert Gallagher, SVP and COO of Travel Guard Group, Inc., who explained that "assistance is a scalable business…so there are operational efficiencies associated with being able to provide those services to a broader population…to a very large population, actually."[47]  Additionally, having specialized non-insurance travel assistance service should allow a company to provide those services at a significantly lower cost than a consumer could provide the same services themselves, and can

---

[44] Fanoe Merits Report, ¶ 25 (emphasis added).
[45] Hitt Report, ¶ 71.
[46] Hitt Report, ¶ 71.
[47] Hitt Report, ¶ 72.

CONFIDENTIAL

thus pass on a portion of those lower costs to consumers through competition and lower prices.[48]

47.    Moreover, if Mr. Fanoe is going to approach his damages analysis using a cost-based method and use that as indicative of value (which is incorrect),[49] then he must consider the full set of costs and expenses that would likely have to exist in order to serve California consumers.  Mr. Fanoe cannot, as he has done, simply apportion Travel Guard's annual global assistance expenses to the number of California cases (or the other arbitrary metrics he uses) to represent the value of those services to Class members.[50]  Nor can he assume (as he has done) that California cases have the same cost as non-California cases.  The fact that Travel Guard has scale and therefore can amortize these costs is unrelated to and does not change the fact that those costs are needed to serve California customers.

48.    As a result, in order to calculate a more accurate representation of the costs necessary to serve California consumers, some of those fixed costs may need to be allocated in a greater proportion than the California case fraction, reflecting that these are independent of the number of cases.  In other words, if Travel Guard was serving only California, it would need at least some fixed costs to maintain these facilities – whether it had one California consumer or the total amount of Class members.

49.    To start, Mr. Fanoe calculates the allocation of assistance service costs based on California cases, a methodology that is entirely unfounded.  In determining this number, Mr. Fanoe cites that in 2018, ███ of total assistance cases, ███ of cases excluding cases he defines as "inquiries," and ███ of cases he defines as "evacuation claims," were associated with California consumers.[51]  Setting aside the fact that Mr. Fanoe arbitrarily selects ███, or at best, calculates an average across these three "indicators," all of his evidence is related to the ratio of *cases* associated with California consumers, not the ratio of *costs* associated with those consumers.  Mr. Fanoe, however, claims to be allocating expenses to California consumers, not cases.[52]

50.    As such, Mr. Fanoe inherently assumes that the average costs of California cases are equal to the costs of non-California cases.  This assumption is at odds with Mr. Fanoe's observation that "[a]ssistance cases involving a medical evacuation or repatriation of remains

---

[48] Hitt Report, ¶ 72.
[49] Hitt Report, ¶ 93.
[50] Fanoe Merits Report, ¶¶ 24–25.
[51] Fanoe Merits Report, ¶ 29.
[52] Fanoe Merits Report, ¶ 33.

CONFIDENTIAL

can often, depending on the circumstances, be more costly to administer" before noting that California represents ███ of the global cases in these categories.[53] Indeed, Mr. Fanoe also admits that ███████████████████████████████████████████████.[54] Therefore, even setting aside the arbitrary and unfounded assumption that ███ of the expenses were related to California consumers, this assumption is further flawed by Mr. Fanoe's reliance on claims data rather than expense data.

51.    Further, Mr. Fanoe relies on data from Travel Guard's Stevens Point assistance service center to determine that "a reasonable allocation of Travel Guard's annual global assistance expenses to U.S. Travel Guard insureds, based on [his] experience and expertise, is ███."[55] Mr. Fanoe further notes that ███ of U.S. revenue is California revenue, and ███ of U.S. non-insurance travel assistance services revenue is California non-insurance travel assistance services revenue.  Multiplying these two ratios by the ███ of expenses he allocates from Stevens Point, he calculates that ███ of global revenues and ███ of global non-insurance travel assistance services revenues are California based.  He uses these "indications" to further justify his overall service costs allocation of ███.[56]

52.    However, Mr. Fanoe based this solely off of data from the Stevens Point service center.[57] Specifically, Mr. Fanoe claims "[m]ost assistance cases for individual U.S Travel Guard insureds are handled through Travel Guard Group, Inc. (centered in Stevens Point)."[58] Mr. Fanoe's attempt to justify his arbitrarily selected 6% allocation of global assistance expenses to Travel Guard policies associated with California addresses relies on the unfounded assumption that the Stevens Point service center represents all of the assistance cases attributable to the U.S.

53.    However, through my review of the same data that Mr. Fanoe reviewed, I identified ███ different service centers that serviced at least one California case during the relevant timeframe.[59] Collectively, as shown in Exhibit 4, these ███ service centers make up ███ of all non-insurance travel assistance services cases.[60] Mr. Fanoe's model, which only accounts for the costs associated with Stevens Point, fails to account for the costs of other

---

[53] Fanoe Merits Report, ¶ 28.
[54] Fanoe Merits Report, ¶ 28.
[55] Fanoe Merits Report, ¶ 31.
[56] Fanoe Merits Report, ¶ 32.
[57] Fanoe Merits Report, ¶ 31.
[58] Fanoe Merits Report, ¶ 31.
[59] For purposes of this analysis, I restricted the cases data to cases between December 2017 and July 2022 to match the time period of the data Fanoe uses to calculate the ratio of total California revenue to total nationwide revenue and total California service revenue to total nationwide service revenue.  See Exhibit 4.
[60] See Exhibit 4.

CONFIDENTIAL

service centers that provided Travel Guard customers with access to its global assistance services network.  Mr. Fanoe's failure to account for service centers other than Stevens Point is flawed because California consumers benefited from the existence of these additional service centers.  Therefore, in my opinion, it is reasonable to adjust Mr. Fanoe's analysis to instead weight the ratio of California non-insurance travel assistance services revenue to nationwide non-insurance travel assistance services revenues by the costs of any service center that serviced California cases.

54.     To show the flaws in Mr. Fanoe's approach, I analyzed which service centers handled at least one California case, and then calculated the percentage of all assistance service cases handled by those ███ service centers.  I then multiplied that figure by the ratio of (1) California non-insurance travel assistance services revenue to (2) nationwide non-insurance travel assistance services revenues (███)[61] to calculate total assistance service costs attributable to California (consistent with Mr. Fanoe's allocation methodology).  Under this alternative methodology, I find that ███ of service center costs should be allocated to California, an amount higher than Mr. Fanoe's estimated ███ allocation.[62]

55.     Additionally, Mr. Fanoe removes a number of "insurance expenses" from his allocation of assistance services costs without basis.[63]  Mr. Fanoe subtracts costs associated with claims he classifies as "inquiries about benefits and claims," "medical assistance cases," "luggage assistance cases," and "travel arrangement assistance cases" from the costs associated with travel assistance.  Doing so further reduces the costs he claims "Defendants may have provided beyond the services included with the insurance contract and premium"[64] by ███.[65]  After removing these expenses that he arbitrarily deems to be "insurance expenses," the amount apportioned to California assistance expense is only ███ of total global assistance expenses.[66]

56.     Mr. Fanoe's removal of expenses he arbitrarily deems to be "insurance expenses" is unfounded and lacks any analysis beyond his "professional experience and expertise."[67]  While some of the expenses he flags as "insurance expenses" may be triggered by an event covered by the insurance premium, Mr. Fanoe provides no evidence that the individual

---

[61] Fanoe Merits Report, ¶ 32.
[62] See Exhibit 4.
[63] Fanoe Merits Report, ¶¶ 34–47.
[64] Fanoe Merits Report, ¶ 41.
[65] Fanoe Merits Report, ¶¶ 34–47; See Exhibit 1.
[66] Fanoe Merits Report, ¶¶ 33, 47 ███████████████).
[67] Fanoe Merits Report, ¶ 38.

CONFIDENTIAL

assistance service cases he chooses to exclude are indeed "included" as part of Travel Guard's insurance obligation. For example, Mr. Fanoe claims that "[i]n [his] opinion, expenses of medical assistance cases should be excluded from this model."[68]

57.     To the contrary, Travel Guard's assistance services website shows that these cases may, in fact, be related to many possible assistance services above and beyond financial restitution for expenses related to an insured medical claim, such as help locating an English-speaking doctor.[69] Travel Guard staffs "doctors, nurses and EMTs who monitor your medical case to ensure you're receiving proper medical care. Whether you had a quick visit to the ER or you're in the hospital for several days – our team checks in on you regularly."[70] While Travel Guard's travel insurance policies may cover costs associated with medical services during travel, its assistance services provide access to help and support in navigating the logistics associated with unexpected adverse events.[71]

58.     Mr. Fanoe also claims that both travel arrangement assistance and luggage assistance cases should be considered "insurance expenses."[72] However, Travel Guard's assistance services website suggests that the assistance offered exceeds the usual scope of "insurance" for many, if not all, of these cases. In fact, the website highlights that its travel assistance services "can help manage the unexpected while traveling. Your flight is cancelled, luggage is lost, connections are missed – we can help you get back on track with your travels."[73] The website further notes examples of ways in which they offer assistance, such as making rental car reservations, aiding with lost baggage search, and rebooking flights and hotels, among others. Under Mr. Fanoe's methodology, all of these assistance services cases would be considered "insurance expenses," despite evidence that these services go beyond financial restitution for an insured claim. Lastly, even benefits and claims inquiry cases may exceed typical expectations for "insurance" services, since Travel Guard's 24/7 travel assistance hotline can help travelers modify their policies, file claims, and submit requests for refunds or vouchers.[74]

---

[68] Fanoe Merits Report, ¶ 42.
[69] "Assistance Services," *Travel Guard*, available at https://www.travelguard.com/info/assistance-services, accessed October 4, 2023.
[70] "Assistance Services," *Travel Guard*, available at https://www.travelguard.com/info/assistance-services, accessed October 4, 2023.
[71] Hitt Report, ¶ 12.
[72] Fanoe Merits Report, ¶¶ 44–47.
[73] "Assistance Services," *Travel Guard*, available at https://www.travelguard.com/info/assistance-services, accessed October 4, 2023.
[74] "Help Center," *Travel Guard,* available at https://www.travelguard.com/help-center, accessed October 4, 2023.

CONFIDENTIAL

2.      **Impact to Mr. Fanoe's Calculation of Refund Owed Using Costs Associated with Service Centers that Service California Consumers**

59.     Even if one were to accept Mr. Fanoe's structure for his damages analysis, including all of the other flaws that exist, Mr. Fanoe's failure to appropriately account for the extensive costs required to support a global assistance services network that provides assistance services to Class members, as well as his arbitrary decision to exclude expenses from his calculation because he believes they should be insurance expenses, has significant effects on the overall results of his analysis.

60.     Specifically, as shown in Exhibit 5, changing the California cost assumption (and not excluding any "insurance expenses"), while changing no other assumptions in Mr. Fanoe's damages model, the refund Mr. Fanoe calculates for Ms. Chuanroong would change from $5.28 to $3.95.

D.      **Mr. Fanoe Incorrectly Apportions Costs Based on Insurance Premium Revenue as Opposed to Non-Insurance Premium Revenue**

1.      **Flaws with Mr. Fanoe's Insurance Premium Based Apportionment**

61.     When estimating the expenses associated with an individual sale, Mr. Fanoe incorrectly apportions expenses based on the percentage of the total insurance premium revenue attributed to the individual sale, as opposed to the percentage of total assistance services revenue attributed to the individual sale.  Mr. Fanoe allocates ▮▮▮▮▮▮ of his estimate of "expense[s] of providing non-insurance assistance services to the California class"[75] to Ms. Chuanroong by dividing her insurance premium in 2018 by the "total insurance premium…Travel Guard collected from California insureds in 2018."[76]  The insurance premium is an inappropriate basis for this calculation because Mr. Fanoe is attempting to apportion the non-insurance assistance service expenses, not the insurance premium.  In other words, Mr. Fanoe is comparing apples to oranges in his analysis by using insurance premium revenues to apportion costs related to non-insurance assistance service revenues.

62.     As such, it is more appropriate to instead apportion assistance service expenses associated with an individual's purchase based on the proportion of assistance services

---

[75] Fanoe Merits Report, ¶ 50.
[76] Fanoe Merits Report, ¶ 53.

purchased. For example, had Mr. Fanoe used the proportion of assistance services revenue to apportion costs to Ms. Chuanroong, the adjusted ratio would be ████████ of expenses allocated, as opposed to the ████████ from Mr. Fanoe's calculation, which is less than ███ of the adjusted figure.[77]

### 2. Impact to Mr. Fanoe's Calculation of Refund Owed Using Assistance Service Revenue Apportionment

63.     Again, even if one were to accept Mr. Fanoe's structure for his damages analysis, including all of the other flaws that exist, Mr. Fanoe's failure to apportion the costs associated with non-insurance assistance services by using a ratio of insurance premium revenue has significant effects on the overall results of his analysis.[78]

64.     Changing his calculation to apportion costs based on assistance services revenues, as shown in Exhibit 6, while making no other changes to Mr. Fanoe's damages model, would reduce the refund Mr. Fanoe calculates for Ms. Chuanroong from $5.28 to $5.14.[79]

## VII.    Mr. Fanoe's Damages Calculations are Unreliable and Cannot be Used to Assess Class-Wide Damages

### A.    Mr. Fanoe's Damages Method Continues to Incorrectly Use "Prices" Not Actually Paid by Consumers and Incorrectly Assume That Non-Insurance Assistance Services have Zero Value

65.     As outlined in the sections above, it should first be noted that Mr. Fanoe's analysis remains largely unchanged from the Fanoe Class Certification Report. Therefore, all of the criticisms outlined in the Hitt Report continue to apply to the opinions set forth in the Fanoe Merits Reports.

66.     To summarize the opinions outlined in the Hitt Report, Mr. Fanoe's proposed methodology (both the primary and alternative refund methods) continues to be conceptually flawed and unreliable to any assessment of economic injury experienced by Class members.[80] As discussed above, Mr. Fanoe proposes either a full refund or, alternatively, a partial refund

---

[77] Ms. Chuanroong's service fee ($5.39)/Total CA Service revenue (████████) = ████████. See, Deposition of Joseph Tritz, May 12, 2023, with Exhibits, ("Tritz Deposition"), Exhibit 44. I should note that while this may not affect the total calculation of amounts owed to **all** Class members, it does demonstrate the effect on the amounts owed to any individual.
[78] As noted above, Mr. Fanoe should have used the proportion of assistance services revenue (████████) to apportion costs, rather than a ratio of insurance premium revenue (████████).
[79] Under the scenario where Mr. Fanoe does not exclude "insurance expenses," the calculated refund would change from $4.99 to $4.43.
[80] Hitt Report, Section VII.A.

CONFIDENTIAL

that he claims would deduct the "actuarially reasonable price" for non-insurance travel assistance services. Neither the primary method nor the alternative method is informative about consumer value or any change in consumer value associated with the challenged conduct.[81] That is, he does not and cannot calculate the difference in economic condition between the actual world and an alternative "but-for" world absent the challenged conduct.

67.     Economic injury is typically measured as the difference between the value consumers received less the price paid in the actual world compared to the value received less the price paid in the but-for world, absent the challenged conduct. This comparison necessarily requires actual and but-for consumer values and actual and but-for prices. While Mr. Fanoe can observe actual prices paid for the bundle of both insurance and non-insurance travel assistance services, his methodology provides no information about either consumer value or the price paid for non-insurance travel assistance services in either world. Thus, his approach is incapable of assessing economic injury to the class.[82]

68.     As an initial matter, consumers paid a single price for a bundle of insurance and non-assistance services – they never had the option to buy either of these components alone. As a result, while the total price paid may be informative about how consumers value the bundle, neither the price paid for the bundle of travel insurance and non-insurance travel assistance services nor the component "price" attributed to assistance services (with or without a deduction for the "actuarially reasonable" profit) corresponds to or provides any information about how consumers value non-insurance travel assistance services. Class members purchased a travel insurance plan that included both travel insurance as well as non-insurance travel assistance services for a single, total price – this reveals that consumers valued the bundle at least as much as they paid for the bundle, but it provides no information at all on the relative value of the different components.[83] This is true whether or not consumers were aware of the presence of non-insurance travel assistance services or how the total fee was allocated to insurance and non-insurance travel assistance services. Therefore, in my opinion, Mr. Fanoe has used an entirely irrelevant basis to calculate the effect (if any) of the challenged conduct. This renders Mr. Fanoe's analysis inherently unreliable (or at a minimum, irrelevant) for calculating economic injury to all Class members.[84]

---

[81] Hitt Report, Section VII.A.2.
[82] Hitt Report, Section VII.A.
[83] Hitt Report, ¶¶ 98, 102.
[84] Hitt Report, ¶ 102.

CONFIDENTIAL

69.    Additionally, as previously discussed in the Hitt Report, Mr. Fanoe fails to perform any analysis of consumer behavior.[85]  By proposing a full refund methodology, his model incorrectly implies that the non-insurance travel assistance services have zero value.  Such an assumption implied by a full refund methodology is incorrect because consumers receive value whether or not an adverse event actually occurs.  Furthermore, protection from adverse outcomes often adds more value than simply the expected value of incurring such an event.[86]  This was further acknowledged by the Court, who agreed that "Plaintiffs have failed to show that assistance services (e.g., medical services, rebooking canceled flights) have no value for consumers" and that "Plaintiffs' primary model does not properly measure damages under its fraud claims because it is a full refund model."[87]  The same criticisms apply to Mr. Fanoe's partial refund methodology, which also does not capture consumer value.

### B.    Mr. Fanoe's Damages Methodology Would Award Damages to Putative Class Members Who Were Not Harmed

70.    As previously discussed in the Hitt Report, Mr. Fanoe's approaches involve a refund of all or most of the non-insurance travel assistance services fee to all consumers.[88]  This approach creates a windfall for consumers who place any value on these services at all (under a full refund model), or who value these services above Mr. Fanoe's calculated "actuarially reasonable price."[89]  In fact, given Mr. Fanoe's "actuarially reasonable price," the alternative method essentially offers a nearly full refund.[90]  The value of non-insurance travel assistance services is not zero to the extent that consumers received benefits of having non-insurance travel assistance services either in realized outcome (e.g., they used assistance services) or in expectation (e.g., they had a chance of being protected against an adverse event and received the "peace of mind" associated with that protection).[91]  Therefore, it is likely that Mr. Fanoe's proposed methods would generate a windfall for many consumers.[92]  Identifying which consumers valued the non-insurance travel assistance services or valued these services in excess of the "actuarially reasonable price" would require detailed economic analysis, which

---

[85] Hitt Report, ¶ 93.
[86] Hitt Report, ¶ 93.
[87] Class Certification Order, pp. 27–28.
[88] Hitt Report, ¶ 74.
[89] Hitt Report, ¶ 74.
[90] In the case of Ms. Chuanroong, instead of offering a 100% refund (under the primary method), the alternative method would offer a refund of $5.28, out of the $5.39 for non-insurance travel assistance services, which equates to a refund of 98%.
[91] Hitt Report, ¶ 74.
[92] Hitt Report, ¶ 74.

CONFIDENTIAL

Mr. Fanoe has not performed.  Therefore, Mr. Fanoe cannot reliably identify and exclude uninjured Class members.[93]

71.    Further, understanding which consumers were aware of the existence of non-insurance travel assistance services or the extent to which consumers understood the difference between insurance and non-insurance services, would directly impact what amount (if any) of economic injury may have been incurred.[94]  For example, it may be the case that consumers are unaware of what constitutes "insurance" versus "non-insurance" benefits when purchasing a travel insurance plan.[95]  Further, consumers who understood that Travel Guard's products included various non-insurance travel assistance services in its travel protection plan, and thus understood they were paying for a bundle of services, were likely unharmed as they would be unlikely to make a different product choice when provided additional information (such as in the form of an additional disclosure).[96]

72.    In fact, Mr. Fanoe himself agreed that "it's possible that some consumers know that assistance service fees are included when they buy Travel Guard protection plans."[97] Moreover, for consumers who were aware of the existence of non-insurance travel assistance services, the purchase of the product indicates that the total value of travel insurance and non-insurance travel assistance services exceeded the price that consumers paid for the bundled product.[98]

73.    Additionally, for consumers who may not have known about the fee for non-insurance travel assistance services in advance of their purchase, if those consumers did place any value on non-insurance travel assistance services (or misattributed them to the value placed on travel insurance), any damages paid to those consumers would represent at least a partial windfall to these consumers.[99]  The price paid for the bundle (and thus the basis for Mr. Fanoe's refund analysis) provides no information at all about the value to Class members of non-insurance travel assistance services and therefore cannot be used as a methodology to evaluate economic injury to Class members.[100]

---

[93] Hitt Repot, ¶ 75.
[94] Hitt Report, ¶ 78.
[95] Hitt Report, ¶ 79.
[96] Hitt Report, ¶ 79.
[97] Deposition of Gregory Fanoe, July 18, 2023, with Exhibits, ("Fanoe Deposition"), pp. 28:16–29:14, 67:7–12.  In fact, Mr. Fanoe testified that he was aware of the common practice that travel insurance providers bundle travel insurance with non-insurance travel assistance services.
[98] Hitt Report, ¶ 79.
[99] Hitt Report, ¶ 99.
[100] Hitt Report, ¶ 99.

CONFIDENTIAL

C.    **Mr. Fanoe's Adjustments to His Alternative Method Fail to Address The Conceptual Flaws Outlined in the Hitt Report and Further Rely on Arbitrary and Unfounded Assumptions**

74.    As noted above, Mr. Fanoe has made some slight modifications to his alternative method, which purports to "account for the value allegedly added to the insurance premium by the inclusion of Defendants' assistance services…"[101]  However, these modifications do not address the criticisms outlined in the Hitt Report,[102] and accordingly, none of the changes Mr. Fanoe has made remedy my prior criticisms.  Mr. Fanoe simply expands upon the way he calculates a purported "actuarially reasonable price" through further unfounded and unreasonable assumptions.  Therefore, Mr. Fanoe's damages calculations are unreliable and the opinions set forth in the Hitt Report remain unchanged.

75.    For example, in calculating the estimate of expenses to provide assistance services to the Class, Mr. Fanoe states that he will "allocate Travel Guard's annual global assistance expenses judgmentally, based on my experience and expertise, considering a review of several indications…"[103]  In doing so, he calculates the following three ratios:  (1) "the proportion of assistance cases with a California address in a given year to the total number of assistance cases handled by Travel Guard globally in that year," (2) the ratio of "costs for Travel Guard Group's assistance center to the total costs of Travel Guard's assistance centers globally," and (3) "the ratio of California revenues to nationwide revenues."[104]

76.    For the first ratio, the proportion of assistance cases with a California address, Mr. Fanoe calculates three different figures, summarized in the table shown in Fanoe Merits Report ¶ 29.  Setting aside the first order issue that conceptually expenses should not be allocated based on the number of California cases, Mr. Fanoe applies his "judgement" and decides the "selected allocation" should be ███.[105]  As discussed above, there are likely substantial fixed costs associated with providing a global assistance services network and adjusting this figure has substantial impact to Mr. Fanoe's calculations.

77.    Another example of Mr. Fanoe's unfounded and unreasonable assumptions, is his application of a profit margin of ███.[106]  Mr. Fanoe notes that in his review of rate filings, he finds that the filings "tend to contain profit provisions of either ███ or ███."[107]  This

---

[101] Fanoe Merits Report, ¶ 17.
[102] Hitt Report, Section VII.
[103] Fanoe Merits Report, ¶ 25.
[104] Fanoe Merits Report, ¶ 25.
[105] Fanoe Merits Report, ¶¶ 29, 33.
[106] Fanoe Merits Report, ¶ 49.
[107] Fanoe Merits Report, ¶ 49.

CONFIDENTIAL

assumption is based on profits associated with the insurance premium component of the travel insurance plan. However, the cost for non-insurance travel assistance services are not the same as the those for the insurance premium, despite Mr. Fanoe's unfounded assumption that non-insurance travel assistance services should be given an "actuarially reasonable price." Accordingly, it is inappropriate to assign, without any analysis or support, the insurance premium profit margin to the cost of non-insurance travel assistance services.

78.     Mr. Fanoe's approach is also flawed because he continues to exercise personal judgment, as opposed to relying on economic principles or evidence, and further presents calculations that are completely disconnected from the reality of both the actual world and what a realistic but-for world should be. As described above, none of the changes or updates Mr. Fanoe makes are based on economic or market analysis and continue to fail to offer any reliable way to measure Travel Guard's non-insurance travel services and what amounts should be owed to Class members as potential damages.

## VIII.   Mr. Fanoe Offers No Method to Reliably Calculate Individual Damages

79.     Even if one were to accept Mr. Fanoe's proposed damages methodology as a reliable calculation, this methodology fails to provide any reliable way of measuring any individual Class member's damages in this matter. Mr. Fanoe proposes either a primary method that would refund the "price" of the non-insurance assistance services, or under an alternative method, refund a percentage of the "price" of non-insurance assistance services based on his calculation of an "actuarially reasonable price." Doing so is unreliable for calculating individual damages because under neither of those methods does Mr. Fanoe attempt to define a realistic but-for world that addresses Plaintiffs' allegations or, further, connect any alleged wrongdoing to the calculation of individual damages.

### A.     Mr. Fanoe's Method Implies a But-For World That Cannot Exist

80.     First, as discussed in detail in the Hitt Report, neither Plaintiffs nor Plaintiffs' Experts have outlined a theory of harm that corresponds to the proposed damages methodology put forward by Mr. Fanoe.[108] If, as Plaintiffs allege, that they would have paid less for (or not purchased at all) policies with more prominently disclosed non-insurance assistance service fees, Mr. Fanoe fails to present a realistic counterfactual price (i.e., the price that would be

---

[108] Hitt Report, ¶103.

offered in the but-for world) because he does not account for consumer behavior at all.[109] Plaintiffs also seem to suggest that consumers should have had additional disclosures that revealed the component pricing and that such information would have resulted in consumers being less likely to purchase, if they purchased at all.[110] Under any permutation of assumptions or proposed methods, neither Plaintiffs nor Plaintiffs' Experts have offered any support for the claim that consumer behavior would change at all.[111]

81.    In fact, neither Plaintiffs nor Mr. Fanoe provide any analysis that causally connects the damages calculated by Mr. Fanoe to any individual's actual economic losses. Part of this is due to Mr. Fanoe's failure to specify a realistic and clearly defined but-for world. If, for example, Mr. Fanoe had defined a but-for world that presented a disclosure of the non-insurance assistance services fee as the remedy for any alleged wrongdoing (i.e., a but-for world with the same product at the same price but with additional information disclosed), such an outcome would result in an analysis and a damages calculation that would yield one set of results. This calculation would require (at a minimum) determining the impact of the disclosure on demand and resulting changes in price, if any – calculations that Mr. Fanoe has neither considered nor performed.

82.    However, if, as Mr. Fanoe's primary and alternative methods suggest, the remedy was that Travel Guard should have offered an a-la-carte product (or perhaps a different product entirely) at lower prices, the alleged refund owed to Class members would yield another set of results. Further, neither of these outcomes would be realistic reflections of actual damages or economic losses attributable to Class members due to the various and extensive reasons discussed in the Hitt Report.[112] This calculation would require (at a minimum) determining a but-for price for each component (and perhaps the bundle as a whole) and then modeling which products, at these new prices, consumers choose to buy – again, Mr. Fanoe has neither considered nor performed such calculations.

## B.    Empirical Evidence Suggests That a Disclosure of Price Components Would Have No Impact on Consumer Behavior

83.    As I showed in the Hitt Report (see Section VIII), if the alleged wrongdoing was related to a lack of disclosure, neither Plaintiffs nor Mr. Fanoe have provided any evidence of

---

[109] Hitt Report, ¶¶ 29, 84.
[110] Hitt Report, ¶ 104.
[111] Hitt Report, ¶ 104.
[112] Hitt Report, Sections VI, VII, VIII.

CONFIDENTIAL

consumer harm.  To the contrary, in the Hitt Report, I provide empirical evidence that suggests a disclosure of price components would likely have no impact on consumer behavior.[113]

84.    Specifically, Missouri is the only state in the United States that requires a separate disclosure of the non-insurance assistance services fee.  Based on regulation that occurred in 2018, Missouri implemented a disclosure requirement starting on December 10, 2020.[114]  To summarize the findings of the empirical analysis performed in the Hitt Report, I found that there was no evidence of a drop off in plans sold to Missouri residents after the implementation of the additional disclosures.[115]  As shown in Hitt Report Exhibits 3–7, attached again to this report as Exhibits 7–11, I compared Missouri to other comparable groups and found that Missouri showed similar trends in the demand for travel insurance plans both prior to the date of the disclosure policy change, as well as after the implementation of the disclosure policy change.

85.    The empirical evidence of this policy change in Missouri suggests that if non-insurance assistance services had been more prominently disclosed, and if such a disclosure had been implemented through other channels in other states, it is unlikely that it would have resulted in a reduction of travel insurance plans sold.[116]  Further, this evidence is based on real transaction data, where such a policy change was indeed implemented.[117]  Therefore, such a finding is inconsistent with Plaintiffs' allegations that, had they known about the component pricing, such information would have resulted in consumers being less likely to purchase, if they purchased at all.[118]

86.    If, alternatively, the counterfactual is instead an a-la-carte product, it is likely that the "price" for non-insurance travel assistance services would rise.  It is therefore possible that for consumers who had a low value for these services they could have a potential economic injury (i.e., the difference between the new, higher but-for price and the value placed on those services).  However, this theory would also apply to consumers who, instead, had a high value for non-insurance travel assistance services who end up paying a higher "price."  These consumers already received a "windfall" of paying a price that was much lower than the value they placed on the services in the actual world, and then, under Mr. Fanoe's proposed

---

[113] Hitt Report, Section VIII.
[114] Hitt Report, ¶ 127.
[115] Hitt Report, Section VIII.B.
[116] Hitt Report, ¶ 135.
[117] Hitt Report, ¶ 136.
[118] Hitt Report, ¶ 136.

CONFIDENTIAL

damages model, would receive even more of a windfall if they were provided with any damages award.

### C.    Mr. Fanoe's Analysis Fails to Identify Unharmed Class Members

87.     Given that Mr. Fanoe's analysis is entirely unrelated to consumer behavior, or any economic loss that may have occurred (at the individual level), there is no feasible way to reliably identify which consumers were harmed, and if so, by how much.  As discussed in the Hitt Report, consumers who purchase these products receive an expected value of being protected in the event of adverse events.[119]  In fact, travel insurance protection would be expected to add more value than simply the expected value (i.e., the probability of the adverse event multiplied by the expected loss of such an event).  This is because consumers are generally risk averse and would rather pay a certain cost up front (i.e., paying for travel insurance) than risk the chance of facing a potentially high cost, but low probability adverse event.[120]  In other words, risk averse consumers would be willing to pay more than the expected value of a travel insurance plan to avoid uncertain outcomes, and further, there may be other intangible benefits such as "peace of mind" that would further increase the value.[121]  The precise expected value of any policy, as perceived by consumers at the time of purchase, is difficult to determine, and likely varies considerably across consumers due to a variety of factors.[122]

88.     Given the fact that consumers likely have values that exceed the price they paid for their travel protection plans, it is further likely that many consumers were, in fact, uninjured.  At a minimum, it is very likely that any consumer who actually used assistance services would fall into the category of people who were unharmed in the actual world.  I understand that ███ California consumers actually utilized non-insurance travel assistance services during the class period, and Mr. Fanoe has made no attempt to exclude these individuals from receiving a windfall payment.[123]

89.     Further, it is also the case that repeat purchasers are likely to be more informed about travel protection plans and the benefits provided by both the insurance and non-insurance travel assistance services, and thus were likely unharmed under Plaintiffs' disclosure theory

---

[119] Hitt Report, ¶ 60.
[120] Hitt Report, ¶¶ 12, 60.
[121] Hitt Report, ¶ 64.
[122] Hitt Report, ¶ 63.
[123] MILLER-0061710.  Data are filtered to cases on or after December 17, 2017.

as those consumers would be unlikely to make a different product choice when provided additional information (such as in the form of an additional disclosure).[124]  Additionally, these consumers may also represent consumers who place a very high value on travel protection plans, but as noted in the Hitt Report, there is no feasible way to distinguish the breakdown of such high value across the insurance versus the non-insurance travel assistance services.[125]  Nonetheless, those consumers represent ███ of the class, and Mr. Fanoe has performed no analysis to account for these Class members or ensure that they do not receive a windfall under his damages model.[126]

90.     In summary, Mr. Fanoe's damages model – both his primary and alternative methods – fail to define a realistic but-for world that addresses Plaintiffs' allegations and, further, fail to connect any alleged wrongdoing to the calculation of individual damages.  Therefore, even if one were to assume the damages calculated by Mr. Fanoe were correct (which as described in detail throughout the Hitt Report and in this report are both incorrect and unreliable), Mr. Fanoe has failed to identify or offer a methodology to identify potentially unharmed Class members who will necessarily receive windfall payments for having experience zero economic loss.

Executed this 10th of October, 2023

_____

Lorin M. Hitt, Ph.D.

---

[124] Hitt Report, ¶ 79.
[125] Hitt Report, ¶ 95.
[126] Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Tamika Miller and Julianne Chuanroong, Plaintiffs, v. Travel Guard Group, Inc.; AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, Defendants.* Case No. 3:21-cv-09751-TLT, September 5, 2023. ("Opposition"), p. 20.

CONFIDENTIAL

**Appendix A**

**Curriculum Vitae**
**Lorin Moultrie Hitt**

Zhang Jindong Professor
Operations, Information and Decisions Department
University of Pennsylvania, Wharton School
571 Jon M. Huntsman Hall
Philadelphia, PA 19104
(215) 898-7730
E-mail:  lhitt@wharton.upenn.edu
www:  http://www.iecon.net/

## Educational History

| | |
|---|---|
| Massachusetts Institute of Technology | Ph.D. Management (1996)<br>Concentration in Information Technology and Economics<br>Dissertation Title: "Economic Analysis of Information Technology and Organization"<br>Committee:  Erik Brynjolfsson (MIT, chair), Zvi Griliches (Harvard), Thomas W. Malone (MIT) |
| Brown University | M.S. Electrical Engineering (1989) |
| Brown University | Sc.B. Electrical Engineering with Honors, Magna Cum Laude (1988) |

## Employment History

University of Pennsylvania, Wharton School, Philadelphia, PA. *Zhang Jindong Professor, Operations, Information and Decisions Department (formerly OPIM)* (2015-present).

University of Pennsylvania, Wharton School, Philadelphia, PA.  *Dean's Chair Professor, Department of Operations and Information Management* (2014-2015).

University of Pennsylvania, Wharton School, Philadelphia, PA.  *Professor of Operations and Information Management, Department of Operations and Information Management* (2013-2014).

University of Pennsylvania, Wharton School, Philadelphia, PA.  *Class of 1942 Professor (Term Chair), Department of Operations and Information Management* (2008-2013).

University of Pennsylvania, Wharton School, Philadelphia, PA. *Alberto Vitale Term Associate Professor of Operations and Information Management (2002-2008).*

University of Pennsylvania, Wharton School, Philadelphia, PA. *Alberto Vitale Term Assistant Professor of Operations and Information Management (2000-2002).*

University of Pennsylvania, Wharton School, Philadelphia, PA. *Assistant Professor of Operations and Information Management (1996-2000).*

Massachusetts Institute of Technology, Industrial Performance Center, Cambridge, MA. *Graduate Fellow (1995-1996).*

# Appendix A

Massachusetts Institute of Technology, Center for Coordination Science, Cambridge, MA. *Research Assistant (1992-1996)*.

Brown University, Department of Engineering, Providence, RI and IBM T.J. Watson Research Center, Yorktown Heights, NY. *Graduate Research Assistant (1988-89)*.

Brown University, Department of Engineering, Providence, RI. *Research Assistant (1987-88)*.

Oliver Wyman and Company, New York, NY. *Consultant (1989-1992)*.

Harry Diamond Laboratories, Adelphi, MD. *Engineering Technician (1984-87)*.

## Articles Published in Refereed Journals

1. Wu, Lynn, Lou, Bowen and Lorin M. Hitt (accepted). "Innovation Strategy after IPO:  How AI Analytics Spurs Innovation after IPO," *Management Science*.

2. Wong, Xiaoning, Wu, Lynn and Lorin M. Hitt (forthcoming).  "Social Media Alleviates Venture Capital Funding Inequality for Women and Less Connected Entrepreneurs," *Management Science*.

3. Chen, Pei-Yu, Hitt, Lorin M., Wong, Yili and Shin-Yi Wu (2021).  "Measuring Product Type and Purchase Uncertainty with Online Product Ratings: A Theoretical Model and Empirical Application," *Information Systems Research* 32(4):1470-1489 (a previous version appeared as Hong, Yili, Chen, Pei-Yu, and Lorin M. Hitt (2012).  "Measuring Product Type with Dynamics of Online Review Variance:  Implications for Research and Practice," *Proceedings of the 31st Annual International Conference on Information Systems* [runner-up best paper award]).

4. Wu, Lynn, Hitt, Lorin M. and Bowen Lou (2020).  "Data Analytics Skills, Innovation and Firm Productivity," *Management Science* 66(5): 1783-2290.

5. Wu, Lynn, Hitt, Lorin M. and Bowen Lou (2019).  "Data Analytics Supports Decentralized Innovation Communities," *Management Science* 65(10):  4451-4949.

6. Bavafa, Hessam, Hitt, Lorin M. and Christian Terwiesch (2018), "The Impact of E-Visits on Visit Frequencies and Patient Health: Evidence from Primary Care," *Management Science* 64(12): 5461-5959.

7. Avgar, Ariel, Tambe, Prasanna and Lorin M. Hitt (2018).  "Built to Learn: How Work Practices Affect Employee Learning During Healthcare Information Technology Implementation," *MIS Quarterly* 42(2):  645-659 (a previous version appeared as  "The Effects of Organizational Factors on Healthcare IT Adoption Costs:  Evidence from New York Nursing Homes," *Proceedings of the 2009 Hawaii International Conference on Systems Sciences:  HICSS-43*.).

8. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2018).  "Are All Spillovers Created Equal?  A Network Perspective on IT Labor Movement," *Management Science* 64(7):  2973-3468. (A previous version appeared as:  Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2014).  "Are All Spillovers Created Equal? A Network Perspective on IT Labor Movements," *Proceedings of the 33rd Annual International Conference on Information Systems*.).

**Appendix A**

9. Tan, Fangyun, Netessine, Sergei and Lorin M. Hitt (2017). "Is Tom Cruise Threatened? An Empirical Study of the Impact of Product Variety on Demand Concentration," *Information Systems Research* 28(3): 643-660.

10. Hitt, Lorin M. and Prasanna Tambe (2016). "Health Care Information Technology, Work Organization and Nursing Home Performance," *ILR Review* (69): 834-859.

11. Tambe, Prasanna and Lorin M. Hitt (2014). "Measuring Information Technology Spillovers," *Information Systems Research* 25(1):53-71. (A previous version appeared as: Hitt, Lorin M. and Sonny Tambe (2006). "Measuring Spillovers from Information Technology Investments," *Proceedings of the 25th Annual International Conference on Information Systems*)

12. Tambe, Prasanna and Lorin M. Hitt (2014). "Job Hopping, Information Technology Spillovers and Productivity Growth," *Management Science* 60(2): 338-355. (A previous version appeared as: Tambe, Sonny and Lorin M. Hitt (2010). "Job Hopping, Knowledge Spillovers, and Regional Returns to Information Technology Investments," *Proceedings of the 29th Annual International Conference on Information Systems.*) (Finalist, Management Science Best Paper Award IS Area, 2015; Winner Management Science Best Paper Award IS Area, 2016).

13. Wu, D.J., Ding, Ming, and Lorin M. Hitt (2013). "IT Implementation Contract Design: Analytical and Experimental Investigation of IT Value, Learning and Contract Structure," *Information Systems Research* 24(3). 787-801 (A previous version appeared as: Wu, D.J., Ding, Min and Lorin M. Hitt (2003). "Learning in ERP Contracting: A Principal-Agent Analysis," *Proceedings of the 37th Annual Hawaii International Conference on System Sciences,* Honolulu, HI.)

14. Gao, Gordon and Lorin M. Hitt (2012) "IT and Trademarks: Implications for Product Variety" *Management Science* 58(6): 1211-1226. [A previous version appeared as: Gao, Gordon and Lorin M. Hitt (2004). "IT and Product Variety: Evidence from Panel Data," *Proceedings of the 25th Annual International Conference on Information Systems*, Washington, D.C. (Runner-up – Best Paper Award)]

15. Tambe, Prasanna and Lorin M. Hitt (2012). "Information Technology and Productivity 1987-2006: Evidence from New Firm-Level Data," *Information Systems Research 23(9):599-617*. (Winner of the ISR 2013 Best Paper Award).

16. Field, Joy, Xue, Mei and Lorin M. Hitt (2012) "Learning by customers as co-producers in financial services: An empirical study of the effects of learning channels and customer characteristics," *Operations Management Research* 4(1-2), June: 43-56.

17. Tambe, Prasanna and Lorin M. Hitt (2012). "Now IT's Personal: Offshoring and the Shifting Skill Composition of the US Information Technology Workforce," *Management Science 58(4): 678-695*. [A previous version appeared as: Tambe, Sonny and Lorin M. Hitt (2010). "Now IT's Personal: Offshoring and the Shifting Skill Composition of the US Information Technology Workforce," *Proceedings of the 29th Annual International Conference on Information Systems*] (Finalist, Management Science Best Paper Award IS Area, 2014).

18. Tambe, Prasanna, Hitt, Lorin M. and Erik Brynjolfsson (2012). "The Extroverted Firm: How External Information Practices Affect Productivity," *Management Science 58(5): 843-859*. [A prior version appeared as: Tambe, Sonny, Hitt, Lorin M. and Erik Brynjolfsson (2008). "The Extroverted Firm," *Proceedings of the 27th Annual International Conference on Information Systems*] (Runner-Up, INFORMS Times Best Paper Award, 2017)

**Appendix A**

19. Li, Xinxin, Hitt, Lorin M. and Z. John Zhang (2011). "Product Reviews and Competition in Markets for Repeat Purchase Products," *Journal of Management Information Systems* 27(4): 9-42.

20. Hitt, Lorin M, Xue, Mei, and Pei-Yu Chen (2011). "The Determinants and Outcomes of Internet Banking Adoption," *Management Science* 57(2): 291-307.

21. Li, Xinxin and Lorin M. Hitt (2010). "Price Effects in Online Product Reviews: An Analytical Model and Empirical Analysis," *MIS Quarterly* 34(4): 809-831.

22. Tambe, Prasanna and Lorin M. Hitt (2010). "How Does Offshoring Affect IT Workers?" *Communications of the ACM* 53(10): 72-82.

23. Li, Xinxin and Lorin M. Hitt (2008). "Self Selection and the Information Role of Product Reviews," *Information Systems Research* 19(4): 456-474.

24. Wu, Shin-Yi, Hitt, Lorin, Chen, Pei-Yu, and G. Anandalingam (2008) "Customized Bundle Pricing for Information Goods: A Nonlinear Mixed Integer Programming Approach," *Management Science* 54(3): 608-622.

25. Hitt, Lorin M. and Sonny Tambe (2007) "Broadband Adoption and Content Consumption," *Information Economics and Policy* 19(3-4): 362-378.

26. Xue, Mei, Hitt, Lorin M. and Patrick T. Harker (2007). "Customer Efficiency, Channel Usage and Firm Performance in Retail Banking," *Manufacturing and Service Operations Management* (9): 535-558.

27. Eric K. Clemons, Gao, Gordon and Lorin M. Hitt (2006). "When Online Reviews Meet Hyperdifferentiation: A Study of the Craft Beer Industry," *Journal of Management Information Systems* 23(2): 149-171 (a previous version appeared in the *Proceedings of the 37th Annual Hawaii International Conference on System Sciences*, Honolulu, HI).

28. Jacobides, Michael G. and Lorin M. Hitt (2005). "Vertical Scope, Revisited: Transaction Costs vs. Capabilities and Profit Opportunities in Mortgage Banking," *Strategic Management Journal* 26(13): 1209-1227.

29. Hitt, Lorin M. and Pei-Yu Chen (2005). "Bundling with Customer Self-Selection: A Simple Approach to Bundling Low Marginal Cost Goods," M*anagement Science* 51(10): 1481-1493.

30. Clemons, Eric K. and Lorin M. Hitt (2004). "Poaching and the Misappropriation of Information: Transaction Risks of Information Exchange," *Journal of Management Information Systems* 21(2): 87-108. [An earlier version appeared as: Clemons, Eric K. and Lorin M. Hitt (2003). "Poaching and the Misappropriation of Information: Transaction Risks of Information Exchange," *Proceedings of the 37th Annual Hawaii International Conference on System Sciences*, Honolulu, HI.]

31. Snir, Eli and Lorin M. Hitt (2004). "Vendor Screening in Information Technology Contracting with a Pilot Project," *Journal of Organizational Computing and Electronic Commerce* 14(1): 61-88. [An earlier version of this paper appeared as Snir, Eli and Lorin M. Hitt (1999), "Vendor Screening in IT Contracting with a Pilot Project (extended abstract)," *Proceedings of the 20th Annual International Conference on Information Systems*, Charlotte, N.C.: 324-327. (Runner-up for Best Paper Award).]

32. Snir, Eli and Lorin M. Hitt (2003). "Costly Bidding in Online Markets for IT Services," *Management Science* 49(11): 1504-1520.

33. Brynjolfsson, Erik and Lorin M. Hitt (2003) "Computing Productivity: Firm-Level Evidence," *Review of Economics and Statistics* 85(4): 793-808.

**Appendix A**

34. Brynjolfsson, Erik, Hitt, Lorin M. and Shinkyu Yang (2002) "Intangible Assets: Computers and Organizational Capital, " *Brookings Papers on Economic Activity* (1): 137-199. [An earlier version of this paper appeared as Brynjolfsson, Erik, Hitt, Lorin M. and Shinkyu Yang (1998) "Intangible Assets: How the Interaction of Computers and Organizational Structure Affects Stock Market Valuations", *Proceedings of the 19th Annual International Conference on Information Systems,* Helsinki, Finland: 8-29.].

35. Chen, Pei-Yu and Lorin M. Hitt (2002) "Measuring Switching Costs and Their Determinants in Internet Enabled Businesses: A Study of the Online Brokerage Industry," *Information Systems Research* 13(3): 255-276. [An earlier version of this paper appeared as Chen, Pei-Yu and Lorin M. Hitt (2000) "Switching Cost and Brand Loyalty in Electronic Markets: Evidence from On-Line Retail Brokers," *21st Annual International Conference on Information Systems*, Brisbane, Australia: 134-144.]

36. Hitt, Lorin M., Wu, D.J. and Xiaoge Zhou (2002). "Investment in Enterprise Resource Planning: Business Impact and Productivity Measures," *Journal of Management Information Systems* (Special Issue on ERP) 19(1): 71-98.

37. Hitt, Lorin M. and Frances X. Frei (2002). "Do Better Customers Utilize Electronic Distribution Channels? The Case of PC Banking," *Management Science* 48(6, June): 732-749.

38. Clemons, Eric K., Hann, Il-Horn, and Lorin M. Hitt (2002). "Price Dispersion and Differentiation in Online Travel: An Empirical Investigation," *Management Science* 48(4, April): 534-550.

39. Bresnahan, Timothy, Brynjolfsson, Erik and Lorin M. Hitt (2002). "Information Technology, Workplace Organization and the Demand for Skilled Labor: Firm-level Evidence," *Quarterly Journal of Economics,* 117(1): 339-376. [Reprinted as "Technolġia de la Informatión, Organizatión del Lugar de Trabajo y Demanda de Trabajadores Calificados: Evidencia a Partir de Datos de Empresa," Chapter 8 in Reformas Y Equidad Social En America Latina Y El Caribe (Carlos Eduardo Velez and Pax Castillo-Ruiz, eds.) Banco Interamericano de Desarrollo: 135-168 (2004). An earlier version of this paper appeared as Bresnahan, Timothy, Brynjolfsson, Erik and Lorin M. Hitt (2000) "Technology, Organization and the Demand for Skilled Labor,*"* Chapter 5 in *The New Relationship: Human Capital in the American Corporation* (Margaret M. Blair and Thomas A. Kochan, eds.), Brookings Institution Press: 145-193.]

40. Clemons, Eric K., Hitt, Lorin M., Gu, Bin, Thatcher, Matt E. and Bruce W. Weber (2002). "Impacts of eCommerce and Enhanced Information Endowments on Financial Services: A Quantitative Analysis of Transparency, Differential Pricing and Disintermediation," *Journal of Financial Services Research* 22(1,2): 73-90.

41. Brynjolfsson, Erik and Lorin M. Hitt (2000). "Beyond Computation: Information Technology, Organizational Transformation and Business Performance." *Journal of Economic Perspectives,* 14(4): 23-48. [Reprinted as Brynjolfsson, Erik and Lorin M. Hitt (2004). "Information Technology, Organizational Transformation and Business Performance," Chapter 2 in *Productivity, Inequality and the Digital Economy* (Nathalie Greenan, Yannick L'Horty and Jacques Mairesse, eds.) , MIT Press: 55-91. Also reprinted as Chapter 4 in Inventing Organizations of the 21st Century (Thomas Malone, Robert Laubacher and Michael S. Scott Morton, eds): 70-99.]

42. Hitt, Lorin M. (1999). "Information Technology and Firm Boundaries: Evidence from Panel Data," *Information Systems Research,* 10(2, June): 134-149.

**Appendix A**

43. Brynjolfsson, Erik and Lorin M. Hitt (1998). "Beyond the Productivity Paradox," *Communications of the ACM*, 41(8): 49-55.

44. Hitt, Lorin M. and Erik Brynjolfsson (1997). "Information Technology and Internal Firm Organization: An Exploratory Analysis," *Journal of Management Information Systems* 14 (2): 81-101.

45. Brynjolfsson, Erik and Lorin M. Hitt (1996). "Paradox Lost? Firm-Level Evidence on the Returns to Information Systems," *Management Science* 42 (4): 541-558. [reprinted as Section 1 Chapter 1 in *Beyond the IT Productivity Paradox*, (Leslie Willcocks and Stephanie Lester, eds.), John Wiley and Sons: 39-68 (1999) and Section 2 Chapter 1 in *Exploring Information Systems Research Approaches*, (Robert D. Galliers, M. Lynne Markus and Sue Newell, eds.), Routledge: 109-127 (2007). An earlier version of this paper appeared as Brynjolfsson, Erik and Lorin M. Hitt (1993) "Is Information Systems Spending Productive? New Evidence and New Results," *Proceedings of the 14th Annual International Conference on Information Systems*, Orlando, FL. December: 47-64.]. Winner of the Best Paper Award in Information Systems Economics in last seven years (1999 Workshop on Information Systems and Economics).

46. Hitt, Lorin M. and Erik Brynjolfsson (1996). "Productivity, Business Profitability, and Consumer Surplus: Three Different Measures of Information Technology Value," *MIS Quarterly* 20(2): 121-142. Winner of 1996 Best Paper award. [An earlier version of this paper appeared as Hitt, Lorin M. and Erik Brynjolfsson (1994) "The Three Faces of IT Value: Theory and Evidence," *Proceedings of the 15th Annual International Conference on Information Systems*, Vancouver, B.C., December. (Winner of Best Paper and Best Paper Addressing Conference Theme Awards): 263-277.]

47. Brynjolfsson, Erik and Lorin M. Hitt (1995) "Information Technology as a Factor of Production: The Role of Differences Among Firms", *Economics of Innovation and New Technology* 3-4: 183-199.

48. Martin, Suzanne, Hitt, Lorin M., and James Rosenberg (1989) "p-Channel Germanium MOSFETs with High Channel Mobility," *IEEE Electron Device Letters* 10(7, July): 325-326.


**Refereed Conference Proceedings (Not otherwise published in Journals)**

49. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2015). "How Do Data Skills Affect Firm Productivity: Evidence from Process-driven vs. Innovation-driven Practices," *Proceedings of the 34th Annual International Conference on Information Systems*.

50. Wu, Lynn, Jin, Fujie and Lorin M. Hitt (2015). "Data Skills and the Value of Social Media: Evidence from Large-Sample Firm Value Analysis," *Proceedings of the 34th Annual International Conference on Information Systems*. (Updated version: SSRN 2826115)

51. Tambe, Sonny, Hitt, Lorin M. and Erik Brynjolfsson (2011) "The Price and Quantity of IT-Related Intangible Capital," *Proceedings of the 30th Annual International Conference on Information Systems*.

52. Gao, Gordon and Lorin M. Hitt (2003). "The Economics of Telecommuting: Theory and Evidence," *Proceedings of the 24th Annual International Conference on Information Systems*, Seattle, WA.

**Appendix A**

53. Chen, Pei-Yu and Lorin M. Hitt (2001) "Brand Awareness and Price Dispersion in Electronic Markets," *22nd Annual International Conference on Information Systems*, New Orleans, LA.

54. Gu, Bin and Lorin M. Hitt (2001) "Transactions Costs and Market Efficiency," *22nd Annual International Conference on Information Systems*, New Orleans, LA.


## Other Publications

### *Chapters in Books*

55. Altuglu, Vildan, Hitt, Lorin M., Hussain, Samid and Matteo Li Bergolis (2023). "Valuation of Personal Data" in *The Cambridge Handbook of Marketing and the Law* (Jacob E. Gersen and Joel H. Steckle, eds.), Cambridge University Press, p. 78-102.

56. Chen, Pei-Yu and Lorin M. Hitt (2007). "Information Technology and Switching Costs," in T. Hendershott, ed., *Handbook of Information Systems Economics*.

57. Brynjolfsson, Erik and Lorin M. Hitt (2005) "Intangible but not Unmeasurable: Some Thoughts on the Measure and Magnitude of Intangible Assets," in Carol Corrado and Daniel Sichel, eds., *Measuring Capital in the New Economy*, University of Chicago Press (for NBER).

58. Brynjolfsson, Erik and Lorin M. Hitt (2005) "Intangible Assets and the Economic Impact of Computers," in William Dutton, Brian Kahin, Ramon O'Callaghan, and Andrew Wyckoff, eds., *Transforming Enterprise*, MIT Press.

59. Clemons, Eric K., Hitt, Lorin M. and David C. Croson (2001) "The Future of Retail Financial Services: Transparency, Bypass and Differential Pricing," Chapter 4 in *Tracking a Transformation: E-commerce and the Terms of Competition in Industries* (J. Zysman, ed.), Brookings Institution Press: 92-111.

60. Clemons, Eric K. and Lorin M. Hitt (2001) "Financial Services: Transparency, Differential Pricing and Disintermediation," Chapter 4 in *The Economic Payoff from the Internet Revolution* (R. Litan and A. Rivlin, eds.), Brookings Institution Press: 87-128.

61. Hitt, Lorin M., Frei, Frances X. and Patrick T. Harker. (1999) "How Financial Firms Decide on Technology," Chapter 3 in *Brookings/Wharton Papers on Financial Services:1999,* Litan, Robert E. and Anthony M. Santomero, Eds. Washington, DC: Brookings Institution Press: 93-136.

62. Hitt, Lorin M. (1999). "The Impact of IT Management Practices on the Performance of Life Insurance Companies," Chapter 7 in *Changes in the Life Insurance Industry: Efficiency, Technology and Risk Management* (J. David Cummins and Anthony M. Santomero, eds.), Norwell, MA: Kluwer Academic Publishers: 211-243.

### *Trade Journal Publications*

63. Brynjolfsson, Erik and Lorin M. Hitt (1997) "Breaking Boundaries", *InformationWeek 500* September 22: 54-61.

64. Brynjolfsson, Erik and Lorin M. Hitt (1996) "The Customer Counts," *InformationWeek,* September 8: 38-43.

65. Brynjolfsson, Erik and Lorin M. Hitt (1995) "The Productive Keep Producing," *InformationWeek,* September 18: 38-43.

### *Books*

**Appendix A**

66. Ferguson, Matthew, Hitt, Lorin and Prasanna Tambe. *The Talent Equation*. McGraw Hill, 2013.

### *Reports*

67. Ahluwalia, Simran, Caulfied, Matthew, Davidson, Leah, Diehl, Mary Margaret, Ipsas, Aline, Windle, Michael and Lorin M. Hitt (2017). *The Business of Voting*. Wharton Public Policy Issue Industry Report. (https://publicpolicy.wharton.upenn.edu/business-of-voting/)

68. Hitt, Lorin M. and Prasanna Tambe (2011). Technical Report: The Business Case for Healthcare Information Technology in Nursing Homes. White Paper (SSRN 1964841)

69. Beard, Nick, Elo, Kinga Z., Hitt, Lorin M. and Michael G. Housman (2007). The Economics of IT and Hospital Performance. Pricewaterhouse Coopers White Paper (http://www.pwc.com/us/en/technology-innovation-center/assets/healthindex_web-x.pdf)

70. Hitt, Lorin, Wu, Lynn, Campbell, Karen, Jeafarqomi, Karim, Ashtiani, Hamid and Leslie Levesque. "Corporate Data Literacy: Scoring Firms and Firm Performance," IHS Markit White Paper, September 2018.

### *Working Papers*

71. Yapar, Ozge, Lobel, Ruben and Lorin M. Hitt (2017). "Technology Sharing in Two Sided Markets." Working Paper.

72. Jin, Fujie, Wu, Andy and Lorin Hitt (2017). "Social is the New Financial: How Startup Social Media Activity Influences Funding Outcomes," Mack Center Working Paper, Wharton School (https://mackinstitute.wharton.upenn.edu/wp-content/uploads/2017/03/FP0331_WP_Feb2017.pdf)

73. Brynjolfsson, Erik, Hitt, Lorin M. and Heekyung Hellen Kim (2011). "Strength in Numbers: how Does Data-Driven Decisionmaking Affect Firm Performance?" Working Paper (SSRN 1919486)

74. Brynjolfsson, Erik, Hitt, Lorin M., Rock, Daniel and Prasanna Tambe (2021). "IT, AI and the Growth of Intangible Capital," Working Paper (SSRN 3416290) (in review).

75. Erol, Etiye Cansu, Hitt, Lorin M. and Prasanna Tambe (2021). "Does EMR Adoption by Nursing Homes Decrease Hospitalization Costs?" Working Paper (in revision) (SSRN 3725715).

76. Hitt, Lorin M., Jin, Fujie and Lynn Wu (2016). "Data Analytics Skills and the Corporate Value of Social Media," Working Paper (SSRN 2826115) (in revision).

77. Hitt, Lorin M., Jin, Fujie and Bowen Lou (2022). "You Say, Firm says: An Empirical Study on Online Employer Brand and Firm Performance," Working Paper (in revision).

### **Academic Honors**

INFORMS Information Systems Society (ISS) Distinguished Fellow (2021)
INFORMS Information Systems Society (ISS) Practical Impacts Award (2021)
Management Science, Information Systems Best Paper Award Finalist (2014, 2015, winner 2016)
Information Systems Research: Best Paper Award (2013)
Wharton Excellence in Teaching Award, Undergraduate Division (1998, 1999, 2000, 2001, 2003, 2007, 2008, 2012, 2013, 2018, 2019, 2020, 2022)
Best Paper in Information Systems and Economics (last 7 years), Workshop on Information Systems and Economics (1999)
Runner-up for Best Paper, International Conference on Information Systems (1999, 2004, 2012)
David Hauck Award for Distinguished Teaching, Wharton School (1999)

**Appendix A**

Christian R. and Mary F. Lindback Award for Distinguished Teaching, University of
      Pennsylvania (1998)
National Science Foundation CAREER Program Grant Recipient (1998)
Best Paper Award, Management Information Systems Quarterly (1996)
International Conference on Information Systems Doctoral Consortium (1995)
MIT Industrial Performance Center Doctoral Dissertation Fellowship (1995)
"Best Paper" and "Best Paper Addressing the Conference Theme" Awards at the International
      Conference on Information Systems (1994)
DuWayne J. Petersen Fellowship (1992-1996)
Honorable Mention, National Science Foundation Fellowship (1989)
Elected to Tau Beta Pi Engineering Society (1988)
Elected to Sigma Xi Scientific Research Society (1988)
Finalist, National Merit Scholarship Program (1985)
National Society of Professional Engineers' Scholarship (1985)
Honorable Mention, Westinghouse Science Talent Search (1985)

**Grants**

Analytics at Wharton.  AI's Effect on Innovation and Productivity. ($50K) (12/20 – 12/22).

Commonwealth Fund.  The Business Case for Healthcare IT in Nursing Homes.  (~$150K) (1/08
– 12/13).

Co-Principal Investigator (with Mei Xue and Patrick Harker), National Science Foundation.
Collaborative Research:  Customer Efficience and the Management of Multi-Channel Service
Delivery Systems.  Award:  ~$250K (8/05 – 8/07)

Wharton eBusiness Initiative/Mack Center, University of Pennsylvania, Wharton School.  Product
Reviews, Pricing and Market Strategy.  Award:  $10K (5/05-11/05)

Fishman Davidson Center, University of Pennsylvania, Wharton School.  Information
Technology, Product Variety and Operations (6/2004-6/2005).  Award:  ~$18K.

University Research Foundation.  Information Technology and Product Variety;  Data
Development and Analysis.  Award:  $18.5K (9/2004-5/2005)

Co-Principal Investigator (with Paul Kleindorfer and D.J. Wu), SAP America.  Valuation of ERP
in the Oil and Gas Industry.  Award:  $40K (10/02-6/03)

Principal Investigator, NSF Grant IRI-9733877 (Computing and Social Systems Program): The
Economics of Information Technology, Organization and Productivity:  Theory Development and
Empirical Investigation.  Award:  $309K (6/98-10/04)

Principal Investigator.  Customer Behavior in On-Line Markets.  Wharton Electronic Commerce
Forum.  Award:  $25K (6/00 – 6/01).

Principal Investigator.  Switching Cost and Pricing in Electronic Markets.  Wharton eBusiness
Initiative.  Award $25K (6/01-6/02)

**Journal/Conference Reviews**

**Appendix A**

Editorial Board
Information Systems Research (Guest Senior Editor, 2009-2011;  Senior Editor, 2007-2008; Associate Editor  2000-2002, 2004 Guest Associate Editor)
Journal of Management Information Systems (2002-present)
Management Science (2002-2008;  Departmental Co-Editor – Information Systems, 2008-2015)
SSRN Information Systems and Economics (2004-2008)

Program Committee
Workshop on Information Systems and Economics (2009 Conference Co-Chair;  2004, Conference Co-Chair)
International Conference on Information Systems (2000, 2003 Associate Editor)
ACM Conference on Electronic Commerce (2007)
International Conference on Information Systems Doctoral Consortium (2007)
NYU CeDER Summer Doctoral Workshop (2007)

Ad-hoc Reviewer
American Economic Review, Canadian Journal of Economics, Canada Social Science Research and Humanties Council, City University of Hong Kong - Grant Review Committee, Communications of the ACM, Economic Inquiry, European Economic Review, European Journal of Operations Research, Hawaii International Conference on System Sciences Industrial Relations, Industrial and Labor Relations Review, Information Economics and Policy, Information Systems Frontiers, Information Systems Research, Information Technology and Management, Journal of Banking and Finance, Journal of Industrial Economics, Journal of Law, Economics and Organization, Journal of Management Information Systems, Journal of Organizational Computing, Journal of Productivity Analysis, Management Science, Managerial and Decision Economics, Manufacturing & Service Operations Management, Marketing Science, McGraw-Hill Textbook Division, MIS Quarterly (occasional Guest Associate Editor), National Science Foundation, Review of Economics and Statistics, Regional Science, Sloan Management Review, Quarterly Journal of Economics

**Teaching Experience**

Massachusetts Institute of Technology, Sloan School of Management.  Course:  15.567 - Introduction to eBusiness, Fall, 2001 (2 sections, co-taught with Erik Brynjolfsson)

University of Pennsylvania, The Wharton School.  Course:  OPIM101 - Introduction to Operations and Information Management.  Fall, 2007; Fall, 2008; Fall, 2009;  Fall, 2010; Fall, 2011 (Co-instructor);  Fall, 2012;  Fall, 2013 (x2); Fall, 2014 (x2) ;  Fall, 2015 (x2) (Instructor).

University of Pennsylvania, The Wharton School.  Course: OPIM105 - Data Analysis in VBA and SQL.  Spring, 2011 (Co-instructor);  Spring, 2012; Spring, 2013;  Fall, 2013; Fall 2015;  Fall 2016 (x2); Fall 2017 (x2);  Fall 2018 (x2), Fall 2019 (x2);  Spring 2020;  Spring, 2022;  Spring, 2023.

University of Pennsylvania, The Wharton School.  Course:  OIDD315 – Databases for Analytics. Spring, 2022 (x2) Spring, 2023 (x2).

University of Pennsylvania, The Wharton School.  Course:  OPIM 469 - Advanced Topics in Information Strategy and Economics.  Spring, 2000 (x2);  Spring, 2001 (x2);  Spring, 2002 (x3) (Instructor);  Spring, 2003 (Co-instructor, 2 sections); Spring, 2004;  Spring, 2005; Spring, 2006;

**Appendix A**

Spring, 2007;  Fall, 2008;  Spring, 2010; Spring, 2011; Spring, 2012; Spring, 2013, Fall 2014 (Instructor)

University of Pennsylvania, The Wharton School.  Course:  OIDD613 – Online Business Models 2022 (x2); 2023 (x2) (co-instructor).

University of Pennsylvania, The Wharton School.  Course:  OIDD663 – Databases for Analytics. Spring, 2022

University of Pennsylvania, The Wharton School. OPIM669 - Advanced Topics in Information Strategy/Financial Information Systems.  Spring, 1998;  Spring, 1999; Spring, 2000;  Spring, 2001;  Spring, 2002 (Guest Lecturer);  Spring, 2003 (Co-instructor); Spring, 2004; Spring, 2005; Spring, 2006; Spring, 2007 (Instructor).

University of Pennsylvania, The Wharton School.  Tiger Team Field Application Project.  Spring, 1999;  Spring, 2000; Spring, 2001 (Faculty Advisor for Electronic Commerce/IT projects)

University of Pennsylvania, The Wharton School.  Course: EMTM900 – Electronic Commerce Marketing.  Spring, 2000 (Guest Lecturer)

University of Pennsylvania, The Wharton School.  Course:  D-SEM on Electronic Commerce. Fall, 2000

University of Pennsylvania, The Wharton School.  Course:  OPIM 319 - Advanced Topics in Information Strategy/Advanced Decision Support Systems (now OPIM469).  Spring, 1998; Spring, 1999  (Instructor)

University of Pennsylvania, The Wharton School.  Course:  OPIM 210 - Management Information Systems. Fall, 1996; Spring, 1997; Fall, 1997; Spring, 1998;  Spring 1999 (x2);  Fall, 2002 (x2);  Spring, 2004;  Spring, 2006; Fall, 2006; Spring, 2007;  Fall, 2007 (Instructor).

University of Pennsylvania, The Wharton School.  MBA Pre-Term Exercise on Contract Negotiations for Information Technology Outsourcing.  Fall, 1998;  Fall, 1999 (with D. Croson and R. Croson)

University of Pennsylvania, The Wharton School.  Course:  OPIM 950/955/960/961 - Doctoral Seminar in Information Technology:  Economics and Organization.  Fall, 1997; Fall, 2000 w/ R. Aron as OPIM899;  Fall, 2001 (Guest Lecturer);  Fall, 2003 (Guest Lecturer); Spring, 2003;  Fall, 2004 (Guest Lecturer); Spring, 2005;  Spring, 2008; Spring, 2010;  Spring, 2012; Spring 2013 (co-Instructor); Spring, 2015; Spring 2016;  Spring 2017; Spring 2018; Spring 2019.

University of Pennsylvania, The Wharton School.  Course: WH101 – Business and You.  Spring, 2017, Fall 2017, Fall 2018, Fall 2019. (cotaught OIDD Session).

University of Pennsylvania, The Wharton School.  Course:  OPIM 666 - Information:  Industry Structure and Competitive Strategy.  Winter Quarter, 1997;  Spring Quarter, 1997 (Instructor); Guest Lecturer (Fall Quarter, 1999; Fall Quarter, 2000).

Massachusetts Institute of Technology, Sloan School of Management.  Course:  15.566 - Information Technology as an Integrating Force in Manufacturing. Spring, 1995 (Teaching Assistant)

**Appendix A**

Brown University, Department of Engineering.  Course:  EN 162- Analog Circuit Design. Spring, 1987 (Teaching Assistant)

**Professional Affiliations**

Sigma Xi, Tau Beta Pi, Association for Computing Machinery, American Economic Association, INFORMS, Association for Information Systems

**Students Supervised**

*Dissertation Supervisor*
 Eli Snir (2001):  Lecturer, Washington University
 Pei-Yu (Sharon) Chen (2002):  Professor, Arizona State University
 Guodong (Gordon) Gao (2005):  Associate Professor, University of Maryland
 Xinxin (Mandy) Li (2005):  Associate Professor, University of Connecticut
 Prasanna (Sonny) Tambe (2008):  Associate Professor, Wharton School
 Fujie Jin (2016):  Assistant Professor, Indiana University

*Thesis Reader*
 Bin Gu (2002):  Professor, Arizona State University
 Il-Horn Hann (2000): Professor, University of Maryland
 Michael Jacobides (2000):  Professor, London Business School
 Jeff McCullough (2005):  Assistant Professor, University of Minnesota
 Ying Liu (2006):  Assistant Professor, University of Hawaii
 Ben Powell (2003):  Unknown
 Michael Row (2001):  Private Industry
 Baba Prasad (2003):  Unknown
 Mei Xue (2001):  Associate Professor, Boston College
 Matt Thatcher (1999):  Assistant Professor, University of Nevada (Las Vegas)
 Shinyi Wu (2003): Assistant Professor, Arizona State University
 Moti Levi (2001):  Private Industry
 Antonio (Toni) Moreno-Garcia (2012):  Assistant Professor, Northwestern University
 Sergeui Roumanitsev (2006):  Private Industry
 Marcelo Olivares (2007):  Associate Professor, Columbia University
 Ben Shiller (2011):  Assistant Professor, Brandeis University
 Adam Saunders (2011):  Assistant Professor, University of British Columbia
 Fangyun (Tom) Tan (2011):  Assistant Professor, Southern Methodist University
 Vihbahshu Abhishek (2011):  Assistant Professor, Carnegie Mellon University
 Hessam Bavafa (2013):  Associate Professor, University of Wisconsin
 Yili (Kevin) Hong (2013):  Professor, University of Houston
 Dokyun Lee (2014):  Assistant Professor, Carnegie Mellon University
 Jing Peng (2015): Assistant Professor, University of Connecticut
 Bowen Lou (2019):  Assistant Professor, University of Connecticut
 Siriu Wang (2022):  Private Industry
 Xiaoning (Gavin) Wang (2022):  Assistant Professor, University of Texas at Dallas

*Other Doctoral Advising*
 Amanda Jensen (2010):  Summer Paper Advisor
 Felipe Csaszar (2005):  Academic Advisor
 Ozge Yapar (2015-6):  Independent study supervisor

**Appendix A**

Kayoung Choi (2015): Summer Paper Advisor
Atiye Cansu Erol (2019-present):  Summer Paper Advisor, Primary Academic Advisor

*Masters Students*

  Xiaoge Zhou, OPIM Department, Wharton School (1999-2001):  Thesis Supervisor
  Jihae Wee, School of Engineering and Applied Science (2003):  Project Supervisor
  Zhu Lu, College of Arts and Sciences (2014):  Thesis Supervisor

*MBA Students*

  Anna Blacyzyck, Wharton School (2004):  Independent Study Project Supervisor
  Luca Coltro, Wharton School (1997-1998):  Advanced Study Project Supervisor
  Andrew Trader, Wharton School (1999):  Advanced Study Project Supervisor

*Undergraduate Students*

  Steven Altman, Wharton School (1997):  Independent Study Project Supervisor
  Maury Apple, Wharton School (1997):  Independent Study Project Supervisor
  Tara Bhandari, Wharton School (2002):  Society Project Supervisor
  Thomas Burrell, Engineering School (2001):  Senior Project Supervisor
  Todd Bishop, Wharton School (1999):  Independent Study Project Supervisor
  Rachel Boim, Wharton School (1999).  Independent Study Project Supervisor
  Hope Bromley, Wharton School (2000):  Independent Study Project Supervisor
  John Chiang, Wharton School (2001):  Society Project Supervisor
  Charlene Chen, Wharton School (2005):  Senior Design Project Supervisor
  Robert Dolan, Wharton School (2003-4):  Wharton Research Scholars Supervisor
  Ronak Ghandhi, School of Engineering (2013):  Senior Design Project Supervisor
  Gabriel Gottleib, School of Engineering (2002):  Senior Design Project Supervisor
  Phuong Ho, Department of Economics (1998):  Honors Advisor
  Richard Hooper, Systems Engineering (1999):  Independent Study Project Advisor
  Hunter Horsley, Wharton School (2015):  Independent Study Project Advisor
  Melinda Hu, Wharton School (2018-2019):  Wharton Researh Scholars Advisor
  Pawel Hytry, Wharton School (2011-2012):  Independent Study Project Advisor
  Ulhas Jagdale, School of Engineering (2013):  Senior Design Project Supervisor
  Johnny Kong, Wharton School (2005):  Senior Design Project Supervisor
  Amin Laksmani, Computer Science and Enginering (2010): Senior Design Supervisor
  Henrique Laurino, Wharton School (2018):  Senior Thesis Supervisor
  Jacob Lefkowitz, Wharton School (1998):  Society Project Supervisor
  Steven Levick, Wharton School (2012):  Independent Study Supervisor
  Brandon Newberg, Wharton School (2012):  Independent Study Supervisor
  David Perez y Perez, Wharton School (1999):  Independent Study Supervisor
  Nickhil Ramchandi, Wharton School (1999):  Independent Study Supervisor
  Reuben Randolf, School of Engineering (1998):  Project Supervisor
  Kevin Reeves, School of Engineering (2001):  Independent Study Project Supervisor
  Allison Rosen, Wharton School (1997): Independent Study Project Supervisor
  Jennifer Seo, School of Engineering (2000):  Senior Design Project Supervisor
  Kyle Smith, Wharton School (2001):  Independent Study Project Supervisor
  David Thornton, Wharton School (2005):  Senior Design Project Supervisor
  Jon Turow, Wharton School (2005-6):  Independent Study Supervisor
  Udack Victor,  School of Engineering (2000):  Senior Design Project Supervisor
  Jason Wang, Wharton School (1998):  Society Project Supervisor
  Melinda Wang, Wharton School (2018):  Senior Project Supervisor
  Christine Wong, Wharton School (1997):  Society Project Supervisor

**Appendix A**

**Other Service**

University of Pennsylvania
      Academic Dishonesty Disciplinary Committee Panel (2012)
      Trustees Committee on Academic Policy (2009-2010)
      Lindback Teaching Award Committee (1999)
Wharton School
      Undergraduate Curriculum Evaluation Committee (chair, 2021-2022)
      Curriculum Innovation and Review Committee (CIRC) (chair, 2016-20, 2022-present)
      Undergraduate Curriculum Evaluation Committee (2014-2016)
      Management Department Q-Review Committee, Chair (2013-2014)
      Wharton Personnel Committee (2009-2011)
      Dean's Advisory Group (2008)
      Panel Moderator, Wharton Asia Business Forum (2006)
      Undergraduate Curriculum Design Committee (2003)
      Ph.D Program Review Committee (2000)
      Dean's Council on Education (2001)
      WebI Curriculum Development Committee (2000)
Wharton School, Undergraduate Division
      Moderator, Wharton Information Technology Career Panel (1997-99)
      Graduation Speaker (1999)
      Parents Weekend Speaker (1999)
      Hauck Teaching Award Committee (2000-01)
      Electronic Commerce Concentration Advisor (2000-present)
      Wharton/Monitor Corporation Undergraduate Case Competition Judge (2001)
      Deans Award for Excellence Committee (2010, 2006)
Wharton School, Department of Operations and Information Management/OIDD
      Recruiting Committee (2005, 2006, 2011, 2014, 2016, 2021)
      Doctoral Admissions Committee (2004, 2005, 2011, 2012-13, 2015-7)
      Department Q-Review Committee (1999-00)
      Undergraduate Coordinator (1998-01, 2002-2008)
      Undergraduate Curriculum Committee (1998-01, 2002-2008)
      Department Computing Coordinator (1997)
      Department Representative to Wharton Computing (1997)
      Department Seminar Coordinator (1996, 2010. 2022)
      Departmental Tenure Committees (2006, 2013, 2014, 2019)
Wharton School, Public Policy Initiative
      Wharton/OSET Foundation Project on the Voting Technology Industry (2016)
Morgan State University
      Advising on Curriculum Design (2019)
MIT Center for Coordination Science
      Seminar Coordinator (1994)
National Science Foundation
      Panelist (1998, 2001, 2003, 2005, 2006, 2015)
      Participant in the NSF CISE/SBE Cyberinfrastructure Workshop (2005)
International Confererence on Information Systems
      Doctoral Consortium Faculty (2006)
Other
      MIT Inclusive Innovation Competition Judge (2016)
      NYU/CeDER Summer Doctoral Consortium Faculty (2006)

Appendix B

# Prior Testimony at Trial, Arbitration
# or Deposition in the Last Four Years

*International Business Machines, Corp., Claimant v. Kyndryl, Inc., Respondent and Counterclaimant,* American Arbitration Association Case No. 01-22-0002-6955, September, 2023.

*Erica Frasco, et. al. v. Flo Health, Inc. et. al.,* United States District Court Northern District of California, Case No. 3:21-cv-00757-JD. August, 2023.

*In Re: Blackbaud, Inc. Customer Data Security Breach Litigation,* United States District Court for the District of South Carolina Columbia Division, Case No. 3:20-mn-02972-JFA, MDL No. 2972. August, 2023.

*Tamika Miller and Julianne Chuanroong, et. al. v. Travel Guard Group, Inc. et. al.,* United States District Court for the Northern District of California, C.A. No. 3:21-cv-09751-TLT. August, 2023.

*In Re Apple iPhone Antitrust Litigation* and *Donald Cameron, et al. v. Apple, Inc.,* United States District Court for the Northern District of California Oakland Division, Case Nos: 4:11-cv-06714-YGR and 4:19-cv-03074-YGR. October, 2021 and April, 2023.

*Holly Rydman et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.,* United States District Court, Western District of Washington, Seattle Division, Case No. 2:18-CV-01578-RSM. September, 2022.

*In re: Oracle Corporation Derivative Litigation,* Court of Chancery, State of Delaware, Case No. 2017-0337-SG. December, 2021 and August, 2022.

*Dr. Joseph Ciccio et al., v. SmileDirectClub, Inc., et al.,* United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:19-cv-00845. August, 2022.

*Sarah Hogan et al. v. Ulta Salon, Cosmetics and Fragrance, Inc.,* Supreme Court of the State of New York, County of New York, Index No. 651986/2020. June, 2022.

*Mark Chapman, et al. v. General Motors, LLC.,* United States District Court, Eastern District of Michigan, Case No. 2:19-cv-12333-TGB-DRG. June, 2022.

*Facebook, Inc. & Subsidiaries v. Commissioner of Internal Revenue,* United States Tax Court, Docket 21959-16. March, 2022.

*Wesley Won et al. vs. General Motors, LLC.,* United States District Court for the Eastern District of Michigan, Southern Division, Case 2:19-cv-11044. December, 2021.

*In re: Takata Airbag Product Liability Litigation,* United States District Court for the Southern District of Florida, Miami Division, MDL No. 2599. December, 2021.

**Appendix B**

*Stephen Marcinkiewicz and Robin Surcess v. General Motors et al.*, Ontario Superior Court of Justice, Case No. CV-17-576146-00CP.  October, 2021.

*VLSI Technology, LLC v. Intel Corporation*, United States District Court for the District of Delaware, Case No. 1:18-cv-00966-CFC.  July, 2021.

*In Re: Capital One Consumer Data Security Breach Litigation*, United States District Court for the Eastern District of Virginia, Alexandria Division.  MDL No. 1:19md2915 (AJT/JFA).  May, 2021.

*Epic Games, Inc. v. Apple, Inc.*, United States District Court, Northern District of California, Oakland Division, Case No. 4:20-cv-05640-YGR-TSH.  March, 2021 and May, 2021.

*Rachel Colangelo et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Northern District of New York, Case No. 6:18-cv-01228 (LEK/DEP).  April, 2021.

*Ramy Shaker et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Eastern District of Michigan, Southern Division, Case No. 2:18-cv-13603-LJM-DRG.  April, 2021.

*Afshin Zarinbaf et al. v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:18-cv-06951.  April, 2021.

*Stuart Mackinnon v. Volkswagen Canada Group, Inc., et al.*, Ontario Superior Court of Justice File No. CV-17-582746-00CP.  February, 2021.

*Andrea M. Williams et al. v. Apple Inc.*, United States District Court for the Northern District of California, Case No. 5:19-cv-4700-LHK.  February, 2021.

*Damonie Earl et al. v. The Boeing Company, Southwest Co.*, United States District Court for the Eastern District of Texas, Sherman Division, Case No. 4:19-cv-00507-ALM.  January, 2021.

*Jennifer Song and Scott Werkin v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court, District of Minnesota, Case No. 18-cv-03205-PJS-KMM.  December, 2020.

*VLSI Technology, LLC v. Intel Corporation*, United States District Court for the Eastern District of Texas, Case No. 19-cv-00977-ADA.  September, 2020.

*Jason Counts et al. v. General Motors Corporation*, United States District Court, Eastern District of Michigan, Case No. 1:16-cv-12541-TLL-PTM.  July, 2020.

*Jennifer Nemet et al. v. Volkswagen Group of America et al.*, United States District Court for the Northern District of California, Case No.  3:17-cv-04372-CRB.  July 2020.

*In Re: Sonic Corp. Customer Data Breach Litigation*, United States District Court for the Northern District of Ohio (Eastern Division at Cleveland), Case No. 1:17-md-02807-JSG.  April, 2020.

**Appendix B**

*Kimberley Laura Smith-Brown et al. v. Ulta Beauty, Inc. and Ulta Salon, Cosmetics and Fragrances, Inc.*, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:18-cv-610.  February, 2020.

*The California Institute of Technology v. Broadcom Limited, Broadcom Corporation, Avago Technologies Limited, Apple, Inc. and Cypress Semiconductor Corporation*, United States District Court for the Central District of California, Case No. 2:16-cv-3714-GW (AGRx). January, 2020.

*Scott Weaver v. Champion Petfoods USA, Inc. and Champion Petfoods LP.*, United States District Court for the Central District of California, Western Division, Case No.  2:18-cv-01996-JPS.  September, 2019.

Appendix C

# Documents Considered List

**Pleadings**

- Class Action Complaint, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-VC, December 17, 2021.

- Declaration of Robert E. Gallagher in Support of Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc., and National Union Fire Insurance Company of Pittsburgh, PA's Motion to Dismiss, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.,* Case No.: 3:21-cv-09751-VC, February 10, 2022.

- Defendants Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc., and National Union Fire Insurance Company of Pittsburgh, PA's Notice of Motion and Motion to Dismiss Complaint; Memorandum of Points and Authorities, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.,* Case No.: 3:21-cv-09751-VC, February 10, 2022.

- Defendants' Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No. 3:21-cv-09751-VC, July 13, 2022.

- Plaintiff Julianne Chuanroong's Objections and Responses to Defendants' First Set of Requests for Production, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, May 10, 2023.

- Plaintiff Julianne Chuanroong's Objections and Responses to Defendants' First Set of Interrogatories, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union*

CONFIDENTIAL

## Appendix C

*Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, May 10, 2023.

- AIG Travel, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, June 14, 2023.

- Defendants' Responses and Objections to Plaintiffs' Third Set of Interrogatories, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No. 3:21-cv-09751-TLT, June 14, 2023.

- Travel Guard Group's Responses and Objections to Plaintiffs' Second Set of Interrogatories, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, June 14, 2023.

- Declaration of Julianne Chuanroong in Support of Plaintiffs' Motion for Class Certification, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, June 21, 2023.

- Declaration of Tamika Miller in Support of Plaintiffs' Motion for Class Certification, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, June 22, 2023.

- Plaintiffs' Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof, *Tamika Miller and Julianne Chuanroong, on behalf of themselves, the general public, and those similarly situated v. Travel Guard Group, Inc., AIG Travel, Inc., American International Group, Inc. (d/b/a/ AIG), and National Union Fire Insurance Company of Pittsburgh, PA.*, Case No.: 3:21-cv-09751-TLT, June 23, 2023.

CONFIDENTIAL

# Appendix C

**Expert Reports**

- Declaration and Expert Report of J. Michael Dennis, PH.D., June 21, 2023.

- Declaration of Gregory Fanoe in Support of Plaintiff's Motion for Class Certification, September 5, 2023.

**Depositions with Exhibits**

- Deposition of Peter Kitt, April 27, 2023, with Exhibits.

- Deposition of James Page, May 9, 2023, with Exhibits.

- Deposition of Joseph Tritz, May 12, 2023, with Exhibits.

- Deposition of Robert Gallagher, May 18, 2023, with Exhibits.

- Deposition of Julianne Chuanroong, June 6, 2023, with Exhibits.

- Deposition of J. Michael Dennis, Ph.D., July 14, 2023, with Exhibits.

- Deposition of Gregory Fanoe, July 18, 2023, with Exhibits.

**Academic Articles**

- Adams, William James, and Janet Yellen, "Commodity Bundling and the Burden of Monopoly," *The Quarterly Journal of Economics*, Vol. 90, No. 3 (1976), pp. 475–498.

- Carroll, KA, Anya Samek, and Lydia Zepeda, "Consumer Preference for Food Bundles under Cognitive Load: A Grocery Shopping Experiment," *Foods*, Vol. 11, No. 7 (2022), Article 973.

- Kahneman, Daniel, and Amos Tversky, "Prospect Theory: An Analysis of Decision under Risk," *Econometrica*, Vol. 47, No. 2 (1979), pp. 263–292.

- Kirstein, Roland, "Risk Neutrality and Strategic Insurance," *The Geneva Papers on Risk and Insurance*, Vol. 25, No. 2 (2000), pp. 251–261.

- Kobayashi, Bruce H., "Does Economics Provide a Reliable Guide to Regulating Commodity Bundling by Firms? A Survey of the Economic Literature," *Journal of Competition Law & Economics*, Vol. 1, No. 4 (2005), pp. 707–746.

- O'Donoghue, Ted and Jason Somerville, "Modeling Risk Aversion in Economics," *The Journal of Economic Perspectives*, Vol. 32, No. 2 (2018), pp. 91–114.

- Schwarcz, Daniel, "Insurance Demand Anomalies and Regulation," *The Journal of Consumer Affairs*, Vol. 44, No. 3 (2010), pp. 557–577.

CONFIDENTIAL

## Appendix C

- Stigler, George J., "United States v. Loew's Inc.: A Note on Block-Booking," *The Supreme Court Review*, Vol. 1963 (1963), pp. 152–157.

- Zhou, Jidong, "Competitive Bundling," *Econometrica*, Vol. 85, No. 1 (2017), pp. 145–172.

**Books and Book Chapters**

- Allen, Mark, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Third Edition, (Washington, DC: The National Academies Press, 2011), pp. 425–502.

- Angrist, Joshua D. and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton, NJ: Princeton University Press, 2008).

- Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, Fourth Edition (Boston, MA: Pearson, 2015).

- DiNardo, J., "Natural Experiments and Quasi-Natural Experiments," in *The New Palgrave Dictionary of Economics* (London, England: Palgrave Macmillan, 2018), pp. 9325–9336.

- Mankiw, Gregor N., *Principles of Economics*, Eighth Edition (Boston, MA: Cengage Learning, 2018).

- Varian, Hal R., *Intermediate Microeconomics: A Modern Approach*, Seventh Edition (New York, NY: W. W. Norton & Company, 2005).

- Varian, Hal R., *Microeconomic Analysis*, Third Edition (New York, NY: W. W. Norton & Company, 1992).

- Werner, Geoff, Claudine Modlin, and Willis T. Watson, *Basic Ratemaking*, Fifth Edition (Casualty Actuarial Society, 2016), available at https://www.casact.org/sites/default/files/old/studynotes_werner_modlin_ratemaking.pdf.

**SEC Filings**

- AIG, Inc., Form 10-K for the Fiscal Year Ended December 31, 2022, Filed on February 17, 2023.

**Rules and Regulations**

- "Travel Insurance Model Act," National Association of Insurance Commissioners, 2018.

CONFIDENTIAL

# Appendix C

- Casualty Model Rating Law, Section 5, National Association of Insurance Commissioners.

- Regulatory Settlement Agreement between National Union Fire Insurance Company of Pittsburgh PA (NUFIC) and the Signatory Lead States of Missouri, Minnesota, Ohio, Oklahoma, Pennsylvania and Utah, January 24, 2018.

## Publicly Available Sources

- "Basic Package," *American Express US*, available at https://aeti.americanexpress.com/travel-insurance/compDetail.do?aetiSource=AETI, accessed July 24, 2023.

- "Bundling," *National Association of Insurance Commissioners*, May 11, 2022, available at https://content.naic.org/cipr-topics/bundling, accessed July 20, 2023.

- "CDC Museum COVID-19 Timeline," *Centers for Disease Control and Prevention*, available at https://www.cdc.gov/museum/timeline/covid19.html, accessed July 19, 2023.

- "Census Regions and Divisions of the United States," *U.S. Census Bureau*, available at https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf, accessed July 19, 2023.

- "Compare Travel Insurance Plans," *Travelex Insurance,* available at https://www.travelexinsurance.com/travel-insurance/plans, accessed July 18, 2023.

- "Compound Annual Growth Rate (CAGR) Formula and Calculation," *Investopedia*, May 24, 2023, available at https://www.investopedia.com/terms/c/cagr.asp, July 19, 2023.

- "Corporate Travel About Us," *Travel Guard*, available at https://www.travelguard.com/corporate-travel/about-us, accessed July 19, 2023.

- "Get Away USA Trip Protection," *Seven Corners*, available at https://www.sevencorners.com/plans/trip-protection/get-away-usa, accessed July 18, 2023.

- "Global Health, Travel & Security Risk Management Solutions," *Healix*, available at https://healix.com/, accessed July 18, 2023.

- "Gold Plan," *AXA Assistance*, available at https://www.axatravelinsurance.com/get-a-quote-now/pago, accessed July 24, 2023.

- "Great Travel Insurance at the Right Price," *Travelex Insurance*, available at https://www.travelexinsurance.com/, accessed July 18, 2023.

- "Insurance 101," *Insurance Information Institute*, available at https://www.iii.org/article/insurance-101, accessed July 20, 2023.

CONFIDENTIAL

## Appendix C

- "Insurance Plans," *Berkshire Hathaway Travel Protection*, available at https://www.bhtp.com/travel-insurance/, accessed July 24, 2023.

- "International SOS," *International SOS Services,* available at https://buymembership.internationalsos.com/, accessed July 18, 2023.

- "Personal Travel," *International SOS Services*, available at https://www.internationalsos.com/services/personal-travel, accessed July 18, 2023.

- "Products Page – Available products for you," *UHC SafeTrip*, available at https://www.uhcsafetrip.com/quote/, accessed July 18, 2023.

- "Rewards to Inspire Your Next Adventure," *Chase Sapphire Reserve*, available at https://account.chase.com/sapphire/reserve/benefits, accessed July 20, 2023.

- "SafeTrip International Travel Insurance," *UHC SafeTrip*, available at https://www.uhcsafetrip.com, accessed July 18, 2023.

- "Schengen Insurance," *Europ Assistance*, available at https://schengen.europ-assistance.com/en/schengen-insurance, accessed July 18, 2023

- "Should Travel Insurance Cost More?" *ITIJ*, available at https://www.itij.com/latest/long-read/should-travel-insurance-cost-more, accessed July 21, 2023.

- "Travel Insurance - Affordable Plans Starting at $27," *Allianz Global Assistance,* available at https://www.allianztravelinsurance.com, accessed July 24, 2023.

- "Travel Insurance | Affordable Travel Plans," *AXA Assistance,* available at https://axatravelinsurance.com/, accessed July 24, 2023.

- "Travel Insurance | Best Custom Insurance Plans," *Seven Corners*, available at https://www.sevencorners.com, accessed July 18, 2023.

- "Travel Insurance | Best Custom Insurance Plans," *Seven Corners*, available at https://www.sevencorners.com, accessed July 18, 2023.

- "Travel Insurance | Trip Insurance from Berkshire Hathaway Travel Protection," *Berkshire Hathaway Travel Protection*, available at https://www.bhtp.com/travel-insurance/, accessed July 18, 2023.

- "Travel Insurance | Trip Insurance from Berkshire Hathaway Travel Protection," *Berkshire Hathaway Travel Protection*, available at https://www.bhtp.com/travel-insurance/, accessed July 18, 2023.

- "Travel Insurance for Trip Cancellation, Study Abroad, Global Medical" *USI Affinity Travel Insurance Services,* available at https://www.travelinsure.com/, accessed July 18, 2023.

CONFIDENTIAL

## Appendix C

- "Travel Insurance Made Simple - Quote, Compare and Buy Online," *Generali Global Assistance*, available at https://www.generalitravelinsurance.com, accessed July 18, 2023.

- "Travel Insurance Quotes Online," *TravelSafe*, available at https://travelsafe.com/ts/, accessed July 18, 2023.

- "Travel Insurance Select Plan," *Travel Insurance Select,* available at https://select.travelinsure.com/?pcode=32701&_gl=1*15uhl45*_ga*MTc4MDc2NT QzNS4xNjg5NzE0NDk5*_ga_R6S46V4VGF*MTY4OTcxNDQ5OS4x%E2%80% A6, accessed July 18, 2023.

- "Travel Insurance," *American Express US,* available at https://aeti.americanexpress.com/travel-insurance/home.do, accessed July 18, 2023.

- "Travel Insurance," *C&F Travel Insured International,* available at https://www.travelinsured.com, accessed July 18, 2023.

- "Travel Insurance: An Actuarial Perspective," *American Academy of Actuaries Travel Insurance*, September 2018, available at https://www.actuary.org/sites/default/files/files/publications/TravelInsuranceMonogr aph_09052018.pdf, accessed July 20, 2023.

- "Travel Insurance: Get a Quote and Buy," *Travel Guard*, available at https://www.travelguard.com/, accessed July 20, 2023.

- "Travel Insurance: OneTrip Prime Plan," *Allianz Global Assistance,* available at https://www.allianztravelinsurance.com/find-a-plan/onetrip-prime.htm, accessed July 24, 2023.

- "TravelSafe Plans," *TravelSafe*, available at https://travelsafe.com/ts/products/trip-protection/, accessed July 18, 2023.

- "TripAssure – Book. Protect. Enjoy," *TripAssure,* available at https://www.tripassure.com/main/, accessed July 18, 2023.

- "What Are the Usual Profit Margins for Companies in the Insurance Sector?" *Investopedia*, August 24, 2021, available at https://www.investopedia.com/ask/answers/052515/what-usual-profit-margin-company-insurance-sector.asp, accessed July 21, 2023.

- "What We Do – Travel," *Europ Assistance*, available at https://www.europ-assistance.com/what-we-do-travel/, accessed July 18, 2023.

- "When to Consider a Standard Travel Insurance Plan," *Generali Global Assistance,* available at https://www.generalitravelinsurance.com/find-a-plan/standard.html, accessed July 18, 2023.

CONFIDENTIAL

# Appendix C

**Data**

- "Annual Estimates of the Resident Population by Sex, Age, Race, and Hispanic Origin for the United States: April 1, 2020 to July 1, 2022," *U.S. Census Bureau*, available at https://www.census.gov/data/datasets/time-series/demo/popest/2020s-national-detail.html.

- 2023-07-06 Policies Sold Through TG Website and Call Centers (rcv'd Peter).xlsx

- AIG Travel Legal Entities Operating Costs 2018-2022.xlsx.

**Miscellaneous**

- Conversation with Peter Kitt, July 26, 2023.

- Email dated 12/10/2020 from Lee Lukaszewicz with subject line RE: Missouri Pricing: Sprint Demo.

- Example Offers for Travel Guard Distribution Partners.

**Produced Documents**

- MILLER-0000001–1314

- MILLER-0001315–1443

- MILLER-0001444–1708

- MILLER-0001709–2160

- MILLER-0002161–2229

- MILLER-0002230–3254

- MILLER-0003255–3261

- MILLER-0003262–3276

- MILLER-0003277–3282

- MILLER-0003283–3305

- MILLER-0003306–3312

- MILLER-0003313–3331

- MILLER-0003332–3337

- MILLER-0003338–3362

- MILLER-0003363–3371

CONFIDENTIAL

# Appendix C

- MILLER-0003372–3400
- MILLER-0003401–3404
- MILLER-0003405–3429
- MILLER-0003430–3435
- MILLER-0003436–3457
- MILLER-0003458–3466
- MILLER-0003467–3484
- MILLER-0003485–3489
- MILLER-0003490–3511
- MILLER-0003512–3528
- MILLER-0003624–3669
- MILLER-0003670–3713
- MILLER-0003853.xlsx
- MILLER-0004349.xlsx
- MILLER-0004350.xlsx
- MILLER-0004351.xlsx
- MILLER-0004480.xlsx
- MILLER-0004517.xlsx
- MILLER-0004518–4534
- MILLER-0004563–4587
- MILLER-0004588
- MILLER-0004784–4801
- MILLER-0004890–4934
- MILLER-0005154–5157
- MILLER-0005501–5509
- MILLER-0005732–5813
- MILLER-0006196–6217
- MILLER-0006455–6456

CONFIDENTIAL

# Appendix C

- MILLER-0006457–6463
- MILLER-0008988–8998
- MILLER-0009459–9531
- MILLER-0009532–9552
- MILLER-0009611–9613
- MILLER-0009614
- MILLER-0009638–9748
- MILLER-0009773.xlsx
- MILLER-0011034–1053
- MILLER-0011093–1097
- MILLER-0011135–1154
- MILLER-0013669–3728
- MILLER-0014647–4681
- MILLER-0014960–5193
- MILLER-0015745–5765
- MILLER-0018932–8951
- MILLER-0019279–9300
- MILLER-0019821–9828
- MILLER-0020038–0069
- MILLER-0020347–0598
- MILLER-0021971.xlsx
- MILLER-0021972.xlsx
- MILLER-0026092.xlsx
- MILLER-0026696–6708
- MILLER-0027064–7070
- MILLER-0027202–7274
- MILLER-0028286–8288
- MILLER-0028289–8292

CONFIDENTIAL

## Appendix C

- MILLER-0028293.xlsx
- MILLER-0028368–8387
- MILLER-0028858.xlsx
- MILLER-0029795–9821
- MILLER-0031001–1002
- MILLER-0031237
- MILLER-0031238.xlsx
- MILLER-0032141.xlsx
- MILLER-0034723–4761
- MILLER-0037453–7495
- MILLER-0037865–7888
- MILLER-0038157
- MILLER-0038158.xlsx
- MILLER-0038183–8190
- MILLER-0038241–8245
- MILLER-0039456–9457
- MILLER-0039466.xlsm
- MILLER-0039773
- MILLER-0039780
- MILLER-0039784
- MILLER-0039788
- MILLER-0039790
- MILLER-0039792
- MILLER-0039795
- MILLER-0039799
- MILLER-0039802
- MILLER-0040034–0059
- MILLER-0040075–0100

CONFIDENTIAL

## Appendix C

- MILLER-0040365–0403
- MILLER-0040510–0574
- MILLER-0040760–0761
- MILLER-0040762–0804
- MILLER-0042088–2093
- MILLER-0042094
- MILLER-0042095
- MILLER-0042096–2144
- MILLER-0042145–2179
- MILLER-0042180–2253
- MILLER-0042254–2286
- MILLER-0042287–2337
- MILLER-0042338–2362
- MILLER-0045707
- MILLER-0045708.xlsx
- MILLER-0046480–6499
- MILLER-0046682–6725
- MILLER-0047914–7915
- MILLER-0047916–7926
- MILLER-0047927
- MILLER-0047928–7937
- MILLER-0047938
- MILLER-0047939
- MILLER-0047940
- MILLER-0047941–7951
- MILLER-0047952–7960
- MILLER-0048108–8109
- MILLER-0048110.xlsm

CONFIDENTIAL

## Appendix C

- MILLER-0048111.xlsx
- MILLER-0048112.xlsm
- MILLER-0048113
- MILLER-0048115
- MILLER-0048153–8154
- MILLER-0048155.xlsx
- MILLER-0048156.xlsm
- MILLER-0048157.xlsm
- MILLER-0048158.xlsx
- MILLER-0048183
- MILLER-0048184–8303
- MILLER-0048304.xlsm
- MILLER-0048305–8312
- MILLER-0048313–8324
- MILLER-0048325.xlsm
- MILLER-0048326
- MILLER-0048336
- MILLER-0048337.xlsm
- MILLER-0048338–8457
- MILLER-0048458–8465
- MILLER-0048466
- MILLER-0048467.xlsm
- MILLER-0048468.xlsx
- MILLER-0048469–8471
- MILLER-0051272–1299
- MILLER-0051909–1913
- MILLER-0053928–3942
- MILLER-0054127–4132

CONFIDENTIAL

# Appendix C

- MILLER-0054178–4187
- MILLER-0058140
- MILLER-0058486.xlsx
- MILLER-0058709.xlsx
- MILLER-0058744–8760
- MILLER-0060680.xlsx
- MILLER-0060681.xlsx
- MILLER-0060682.xlsx
- MILLER-0060700.xlsx
- MILLER-0060771.xlsx
- MILLER-0060897.xlsx
- MILLER-0060905.xlsx
- MILLER-0060906–0908
- MILLER-0060909–0913
- MILLER-0060914–0917
- MILLER-0060918–0923
- MILLER-0060924–0927
- MILLER-0060928–0931
- MILLER-0060932–0934
- MILLER-0060935–0937
- MILLER-0060938–0941
- MILLER-0060942–0945
- MILLER-0060946–0947
- MILLER-0060948
- MILLER-0060949–0950
- MILLER-0060951
- MILLER-0060952–0955
- MILLER-0060956–0961

CONFIDENTIAL

# Appendix C

- MILLER-0060962–0965
- MILLER-0060966–0969
- MILLER-0060970–0973
- MILLER-0060974–0977
- MILLER-0060978
- MILLER-0060979
- MILLER-0060980
- MILLER-0060981
- MILLER-0060982
- MILLER-0060983
- MILLER-0060984
- MILLER-0061004.xlsx
- MILLER-0061005–1016
- MILLER-0061017–1029
- MILLER-0061030–1041
- MILLER-0061042–1046
- MILLER-0061047–1050
- MILLER-0061051–1054
- MILLER-0061055–1058
- MILLER-0061059
- MILLER-0061060.xlsx
- MILLER-0061061.xlsx
- MILLER-0061062.xlsx
- MILLER-0061063.xlsx
- MILLER-0061064.xlsx
- MILLER-0061065.xlsx
- MILLER-0061066.xlsx
- MILLER-0061067.xlsx

CONFIDENTIAL

## Appendix C

- MILLER-0061068.xlsx
- MILLER-0061069.xlsx
- MILLER-0061070.xls
- MILLER-0061071.xls
- MILLER-0061072.xls
- MILLER-0061073.xls
- MILLER-0061074.xls
- MILLER-0061075.xls
- MILLER-0061076.xlsx
- MILLER-0061077.xlsx
- TRJ.E0.00975889.1.1.xlsx
- TRJ.E0.00980030.1.xlsx

**Marketing Materials & Sample Offer Content**

- GAR.E0.01154588.0 "A Complete Suite of Assistance Services," *Travel Guard*, April 2, 2020.
- GAR.E0.01154588.1 "Why Choose Travel Guard? Valuable Coverage from a Trusted Partner," *Travel Guard*, August 10, 2021.
- GAR.E0.01154588.2 "More Choices with AIG Travel," *Travel Guard*, March 29, 2021.
- KIP.E0.00122834 "Travel Guard US DTC Marketing: Messaging Q3 2020 During COVID19," *Travel Guard*, May 27, 2020.
- KIP.E0.01686064.0
- N1.LF.03236047 "Travel Guard Assistance Capabilities," *Travel Guard*, 2021.
- N1.LF.03236049
- N1.LF.03236050
- N1.LF.03236051
- N1.LF.03236052
- N1.LF.03236053
- N1.LF.03236054

CONFIDENTIAL

# Appendix C

- N1.LF.03236055
- N1.LF.03236056
- N1.LF.03236057
- N1.LF.03236058
- N1.LF.03236059
- N1.LF.03236060
- N1.LF.03236061
- N1.LF.03236062
- N1.LF.03236063
- N1.LF.03236064
- N1.LF.03236065
- N1.LF.03236066
- N1.LF.03236067
- N1.LF.03236068
- N1.LF.03236069
- N1.LF.03236070
- N1.LF.03236071
- N1.LF.03236072
- N1.LF.03236073
- N1.LF.03236074
- N1.LF.03236075
- N1.LF.03236076
- N1.LF.03236077
- N1.LF.03236078
- N1.LF.03236079
- N1.LF.03236080
- N1.LF.03236081
- N1.LF.03236082

CONFIDENTIAL

# Appendix C

- N1.LF.03236083

- N1.LF.03236084

- N1.LF.03236085

- N1.LF.03236086

- N1.LF.03236087

- N1.LF.03236088

- N1.LF.03236089

- N1.LF.03236090

- N1.LF.03236091

- N1.LF.03236092

- N1.LF.03236093

## Rebuttal Report – Additional Documents Considered

- "Assistance Services," *Travel Guard*, available at https://www.travelguard.com/info/assistance-services, accessed October 4, 2023.

- "Help Center," *Travel Guard*, available at https://pwww.travelguard.com/info/assistance-services, accessed October 4, 2023.

- Bragg, John M., "Prices and Commissions Based on the Theory of Games", *The Journal of Risk and Insurance* 33, no. 22, (1966), pp. 169–193.

- Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Tamika Miller and Julianne Chuanroong, Plaintiffs, v. Travel Guard Group, Inc.; AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, Defendants.* Case No. 3:21-cv-09751-TLT, September 5, 2023.

- Expert Report of Gregory Fanoe, September 18, 2023.

- Expert Report of Lorin M. Hitt, Ph.D., July 26, 2023.

- MILLER-0061229

- MILLER-0061710

- MILLER-0061966

- Order on Motion for Class Certification and Related Daubert Motions, *Tamika Miller, et al., Plaintiffs, v. Travel Guard Group, Inc., et al., Defendants.*, Case No. 3:21-cv-09751-TLT, September 15, 2023.

CONFIDENTIAL

# Appendix C

**Note: In addition to the documents on this list, I considered all documents cited in my report, my appendices, and my exhibits to form my opinions.**

CONFIDENTIAL

### Exhibit 1
## Impact to Mr. Fanoe's Total Estimated Refund Adjusting for Multiple Alternative Assumptions [1]
### Chuanroong Transaction



| | | Fanoe | | Alternative [2] |
|---|---|---|---|---|
| | | Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" | Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" | |
| 2018 Global Non-Insurance Travel Assistance Services Expenses | a | ■ | ■ | ■ |
| Percent of Global Non-Insurance Travel Assistance Services Expense Allocable to California [3] | b | ■ | ■ | ■ |
| Initial Non-Insurance Travel Assistance Services Expense Allocable to California | c = a * b | ■ | ■ | ■ |
| Total Percent of "Insurance Expense" Exclusion Cases | d | ■ | 0.0% | 0.0% |
| Non-Insurance Travel Assistance Services Expense Allocable to California | e = c * (1 - d) | ■ | ■ | ■ |
| Profit Margin [4] | f | ■ | ■ | ■ |
| Profit Weighted Non-Insurance Travel Assistance Services Expense Allocable to California | g = e / (1 - f) | ■ | ■ | ■ |
| Ms. Chuanroong Proportion of Non-Insurance Travel Assistance Services Expense Allocable to California [5] | h | ■ | ■ | ■ |
| Ms. Chuanroong "Actuarially Reasonable" Non-Insurance Travel Assistance Services Price Pre Commissions | i = g * h | $0.04 | $0.17 | $1.44 |
| | | | | |
| Ms. Chuanroong Real World Non-Insurance Travel Assistance Services Price | j | $5.39 | $5.39 | $5.39 |
| | [6] | ■ | ■ | ■ |
| Total Estimated Refund | m = l - i | $5.28 | $4.99 | $0.81 |

Source: Fanoe Merits Report; MILLER-006177; MILLER-0060905; Tritz Deposition, Exhibit 44

Note:
[1] Calculations performed using values presented in the exhibit may differ from actual values due to rounding.
[2] The Alternative Amount excluding cases Mr. Fanoe deemed to be "Insurance Expenses" is provided strictly as an illustrative example. It is my position that those cases Mr. Fanoe deemed to be "Insurance Expenses" are non-insurance travel assistance service cases.
[3] The Alternative Amount Percent of Global Non-Insurance Travel Assistance Services Expense Allocable to California is the product of (1) the percent of total claims from service centers that serviced at least one California customer between December 2017 and July 2022 and (2) the ratio of total California non-insurance travel assistance services revenue to total nationwide non-insurance travel assistance services revenue.
[4] Though I have not changed the profit margin Mr. Fanoe uses in his model, my objections and concerns expressed in Section VII.C still apply.
[5] The Alternative Proportion of non-insurance travel assistance services expense allocable to California allocable to Ms. Chuanroong is calculated as Ms. Chuanroong's non-insurance travel assistance services price divided by the total non-insurance travel assistance services revenue from California in 2018.
[6] ■

CONFIDENTIAL

## Exhibit 2
## Impact to Commission Payments Implied By Fanoe's Damages Methodology [1]
### Chuanroong Transaction

| | | Excluding Cases Fanoe Deemed to be "Insurance Expenses" | | Without Excluding Cases Fanoe Deemed to be "Insurance Expenses" | |
| --- | --- | --- | --- | --- | --- |
| | | Non-Insurance Travel Assistance Services Portion[2] | Total [3] | Non-Insurance Travel Assistance Services Portion[2] | Total [3] |
| Ms. Chuanroong's Real World Price | a | $5.39 | $13.46 | $5.39 | $13.46 |
| United Airlines Commission Rate | b | ■ | ■ | ■ | ■ |
| Actual Commission Payment [4] | c = a * b | ■ | ■ | ■ | ■ |
| Commission Payment Implied by Mr. Fanoe's Damages Methodology [5] | d | ■ | ■ | ■ | ■ |
| Reduction in Commission Payment | e = c - d | ■ | ■ | ■ | ■ |
| Percent Reduction in Commission Paid | f = e / c | ■ | ■ | ■ | ■ |

Source: Fanoe Merits Report

Note:
[1] Calculations performed using values presented in the exhibit may differ from actual values due to rounding.
[2] Values presented show impacts to Ms. Chuanroong's non-insurance travel assistance services payment, and exclude payments and costs associated with the insurance premium.
[3] Values presented show the impact to Ms. Chuanroong's total payment, including payments and costs associated with the insurance premium.
[4] Actual Commission Payment is calculated by multiplying Ms. Chuanroong's actual payment of $13.46 by the average United Airlines commission rate of ■, which equals ■. The non-insurance travel assistance services portion of the Actual Commission Payment is calculated as ■ multiplied by ■, to represent the non-insurance travel assistance services portion of the commission.
[5] Implied Commission Payment is calculated by subtracting Mr. Fanoe's calculated total proportional assistance cost of ■ from Mr. Fanoe's calculated total actuarially reasonable price of ■ for non-insurance travel assistance services, which equals ■. Then, the implied commission from the insurance premium is added. This is calculated by multiplying Ms. Chuanroong's actual payment for Insurance Services of $8.07 by the average United Airlines Commission Rate of ■, which equals ■. Together, these two numbers equal ■.

# Exhibit 3
# Impact to Fanoe's Total Estimated Refund Adjusting for Actual Non-Insurance Assistance Services Commission [1]
## Chuanroong Transaction

| | | Fanoe | | Alternative | |
|---|---|---|---|---|---|
| | | **Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** | **Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** | **Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** | **Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** |
| Mr. Fanoe's Estimated Actuarially Reasonable Non-Insurance Travel Assistance Services Price Pre Commissions | a | ███ | ███ | ███ | ███ |
| Mr. Fanoe's Estimated Actuarially Reasonable Non-Insurance Travel Assistance Services Price Plus Commissions [2] | b | $0.11 | $0.40 | ███ | ███ |
| Ms. Chuanroong's Real World Non-Insurance Travel Assistance Services Price | c | $5.39 | $5.39 | $5.39 | $5.39 |
| Commissions on Ms. Chuanroong Non-Insurance Travel Assistance Services Price | d = b - a | ███ | ███ | ███ | ███ |
| Ms. Chuanroong Post Commissions Price | e = c - d | ███ | ███ | ███ | ███ |
| **Total Estimated Refund** | f = e - a | $5.28 | $4.99 | ███ | ███ |

Source: Fanoe Merits Report

Note:
[1] Calculations performed using values presented in the exhibit may differ from actual values due to rounding.
[2] The Alternative Commission Payment is calculated by multiplying Ms. Chuanroong's actual total payment of $13.46 by the average United Airlines commission rate of ███ , which equals ███ . The non-insurance travel assistance services portion of the total Commission Payment is calculated as ███ ) multiplied by ███ , to represent the non-insurance travel assistance services portion of the commission. This amount is added to Mr. Fanoe's Estimated Actuarially Reasonable Non-Insurance Travel Assistance Services Price.

# Exhibit 4
## Service Center Claims and California Expenses [1]



| Service Center Location [2] | CA Claims | Total Number of Claims | Percent of Total Claims [3] |
|---|---|---|---|
| ■ | ■ | ■ | ■ |
| | | | |
| | | | |
| | | | |

**Percent of Total Claims From Service Centers that Serviced California Customers**  ■

**Ratio of Total California Non-Insurance Travel Assistance Services Revenue to**
**Total Nationwide Non-Insurance Travel Assistance Services Revenue [4]**  ■

**Allocation of Expenses to Service Centers Servicing Califonia Customers [5]**  ■

Source: Fanoe Merits Report; MILLER-0061077; MILLER-0060905

[1] Calculations performed using values presented in the exhibit may differ from actual values due to rounding. Includes all service centers that serviced at least one California case between December 2017 and July 2022.

[2] ■■■■■■■■■■■■■■■■■■■■■■■■. Service centers included are all service centers that handled at least one case from a California customer between December 2017 and July 2022.

[3] Calculated as the number of cases at each service center divided by the total cases across all service centers between December 2017 and July 2022.

[4] Mr. Fanoe calculates the ratio of total California non-insurance travel assistance services revenue to total nationwide non-insurance travel assistance services revenue to be ■.

[5] Allocation of Expenses to service centers servicing California customers is the product of (1) the percent of total claims from service centers that serviced at least one California customer and (2) the ratio of total non-insurance travel assistance services revenue to total nationwide non-insurance travel assistance services revenue.

# Exhibit 5
# Impact to Fanoe's Total Estimated Refund Adjusting for Alternative California Cost Assumption[1]

## Chuanroong Transaction

| | | Fanoe | | Alternative |
|---|---|---|---|---|
| | | **Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** | **Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses"** | |
| Actual Payment for Non-Insurance Travel Assistance Services | a | $5.39 | $5.39 | $5.39 |
| Mr. Fanoe's Estimated Actuarially Reasonable Price for Non-Insurance Travel Assistance Services Plus Commissions | b | $0.11 | $0.40 | ■ |
| **Mr. Fanoe's Total Estimated Refund** | c = a - b | $5.28 | $4.99 | ■ |

Source:  Fanoe Merits Report; MILLER-0061077

Note:
[1]  Calculations performed using values presented in the exhibit may differ from actual values due to rounding.  Mr. Fanoe estimates California non-insurance travel assistance services expenses make up ■ of to al global non-insurance travel assistance services expenses.  All calculations except for the California non-insurance travel assistance services expenses as a percent of total non-insurance travel assistance services expenses are held constant for this analysis.

## Exhibit 6
## Impact to Mr. Fanoe's Total Estimated Refund Adjusting for Alternative Expense Allocation Method [1]
### Chuanroong Transaction

| | | Fanoe | | Alternative | |
| --- | --- | --- | --- | --- | --- |
| | | Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" | Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" | Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" | Without Excluding Cases Mr. Fanoe Deemed to be "Insurance Expenses" |
| Actual Payment for Non-Insurance Travel Assistance Services | a | $5.39 | $5.39 | $5.39 | $5.39 |
| Mr. Fanoe's Estimated Actuarially Reasonable Price for Non-Insurance Travel Assistance Services Plus Commissions | b | $0.11 | $0.40 | ▮▮▮ | ▮▮▮ |
| Mr. Fanoe's Total Estimated Refund | c = a - b | $5.28 | $4.99 | ▮▮▮ | ▮▮▮ |

Source:  Fanoe Merits Report; Tritz Deposition, Exhibit 44

Note:
[1]  Calculations performed using values presented in the exhibit may differ from actual values due to rounding.  Mr. Fanoe es imates his model by allocating non-insurance travel assistance services expenses based off Ms. Chuanroong's insurance premium relative to total California insurance premiums collected (▮▮▮).  All calculations except for the expense allocation me hod ▮▮▮ are held constant for this analysis.

CONFIDENTIAL

## Exhibit 7
## Monthly Total Plans Sold in MO



## Exhibit 8
## Monthly Total Plans Sold in All Other States



Plans Sold

Change in MO

Source:

Notes: This chart displays monthly plans sold in the U.S..

CONFIDENTIAL

## Exhibit 9
## Monthly Total Plans Sold in the Census Midwest Region



Source:

Notes: This chart displays monthly plans sold in the Midwest Region.

## Exhibit 10
## Monthly Total Plans Sold in States Bordering MO



Source:

Notes: This chart displays monthly plans sold in states bordering MO

CONFIDENTIAL

## Exhibit 11
## Monthly Total Plans Sold in MO, All Other, Midwest Region, and Bordering States Pegged to Month Ending One Day Before the Change in MO Disclosure



Source:

Notes: This chart displays monthly plans sold pegged to the month ending one day prior to the change in MO disclosure requirement.

CONFIDENTIAL